## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| **RAUL ARCHULETA, ISAAC MARTINEZ, TRINA SUAZO-MARTINEZ, DANIEL FRANK, MICHELLE CORIZ, ADRIANNA MARTINEZ, VALLERIE LAMBERT,** and **SAM SPROW,** | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21-CV-1030 |
| v. | ) ) | |
| **TRIAD NATIONAL SECURITY, LLC**, d/b/a **LOS ALAMOS NATIONAL LABORATORY,** and **THOMAS MASON**, Director of Los Alamos National Laboratory, in his official capacity, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### SUMMARY OF THE CASE

Defendants Triad National Security, LLC, d/b/a Los Alamos National Laboratory, and Dr. Thomas Mason, President of Triad and Director of the Los Alamos National Laboratory ("LANL"), recently ordered that all LANL employees must receive a COVID-19 vaccine by October 15, 2021, or face termination. Plaintiffs are LANL employees with religious and medical objections to receiving that vaccine. Each Plaintiff requested and was granted a religious exemption. Unfortunately, without any attempt to engage in individualized, interactive dialog with any of the Plaintiffs, even though some of them have been working from home for over a year, LANL's only offer of an accommodation was a one-size-fits-all response of indefinite leave without pay ("LWOP"). LANL's "accommodation" not only strips Plaintiffs and other employees who have been granted a religious exemption of their income, but also cuts off all benefits and opportunities for promotion, merit pay raises, and bonuses. LANL has also told employees with

religious exemptions that after thirty (30) days on LWOP, they may no longer have a job. After ninety (90) days, Plaintiffs and others on LWOP will lose their security clearances.

Because Defendants are government actors, their actions violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments and the Religious Freedom Restoration Act ("RFRA"). By imposing their severe "accommodation," Defendants have also violated their obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") which requires them to provide reasonable accommodations and prohibits retaliation against Plaintiffs and others for asserting their federally protected civil rights. Finally, Defendants' denial of some of the Plaintiffs' medical exemption requests violates the Americans with Disabilities Act ("ADA") by failing to grant medical exemptions to those who have recovered from COVID-19 and have natural immunity.

Plaintiffs do not challenge the vaccine mandate itself, but when Defendants themselves have recognized that Plaintiffs, and others, have sincerely held religious convictions that prohibit them from taking the vaccine, they should not be permitted to coerce such persons to violate or ignore their convictions.  Such efforts are a *de facto* violation of Plaintiffs' constitutional rights. Likewise, Defendants have not even tried to provide *reasonable* accommodations to Plaintiffs and other employees with religious exemptions, as required by Title VII and the ADA.

Unless this Court acts, Plaintiffs and many others will suffer irreparable harm. Not only will many be coerced into taking a vaccine in violation of their deeply held religious convictions, but those who do not crumble in the face of LANL's pressure will suffer the loss of their security clearances, inability to pay for medical coverage, disruption of their dependents' college educations, and possibly even homelessness. Plaintiffs urge this Court to exercise its equity jurisdiction to restrain and enjoin Defendants' harsh "accommodation" policy to preserve the

2

status quo ante and the Court's ability to later order meaningful relief. *See, e.g., Bilyeu v. UT-Batelle, LLC*, No. 3:21-cv-352, 2021 WL 4859932 (E.D. Tenn. Oct. 15, 2021) (granting TRO in part against government contractor operating Oak Ridge National Laboratory and enjoining lab from placing employees granted religious accommodation on indefinite leave); *Sambrano v. United Airlines, Inc.*, No. 4:21-cv-01074 (N.D. Tex. Oct. 12, 2021) (granting TRO against employer and enjoining it from placing employees on indefinite paid leave as religious accommodation); *F.T.C. v. Dean Foods Co*., 384 U.S. 597, 604 (1966) (Supreme Court decisions "'have recognized a limited judicial power to . . . maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels'") (quoting *Arrow Transp. Co. v. Southern R. Co*., 372 U.S. 658, 671, n.22 (1963)); *Sheehan v. Purolator Courier Corp*., 676 F.2d 877, 884 (2d Cir. 1981) ("In general, if the court eventually will have jurisdiction of the substantive claim and an administrative tribunal has preliminary jurisdiction, the court has incidental equity jurisdiction to grant temporary relief to preserve the status quo pending the ripening of the claim for judicial action on its merits."); *Fed. Cap. Habeas Project v. Rosen*, No. CV 20-3742 (RC), 2021 WL 125917, at *1 (D.D.C. 2021) (same).

## FACTUAL BACKGROUND

Triad National Security, LLC is a Delaware limited liability company. On or about June 8, 2018, it was awarded the management and operating contract for LANL by the U.S. Department of Energy's National Nuclear Security Administration, made effective on or about November 1, 2018. Triad consists of three principals, Battelle Memorial Institute (which partners with the University of Tennessee to manage and operate the Oak Ridge National Laboratory), the Regents of the University of California, and the Texas A&M University System, each of whom owns an equal share of the LLC. Defendant Triad is a governmental actor subject to the restrictions of

federal and state constitutional law. In addition to being 2/3 owned by governmental entities, Triad was formed for the sole purpose of managing LANL and advancing the lab's missions, including enhancement of the U.S. nuclear weapons stockpile and protection of the nation from weapons of mass destruction. Triad manages LANL according to highly specific and complex requirements prescribed by the government under Triad's contracts with the National Nuclear Security Administration ("NNSA") and other laws. Compliance with these requirements is closely monitored and reviewed by the federal government. Triad relies entirely (or almost entirely) on governmental funding to conduct its operations; indeed, funding from the federal government to Triad has exceeded $10 billion dollars since it was created in 2018. Triad employees, like Plaintiffs in this case, are required to pass security background checks and hold specific security clearances.

When the COVID-19 pandemic first arose in early 2020, LANL instituted measures such as the wearing of masks, social distancing, and regular testing. LANL also instituted a teleworking project whereby significant numbers of employees began working remotely. In fact, according to an article published in January 2021, *eighty-five percent* (85%) of the LANL workforce had "made the transition to telework." *See* "NM's National Lab managers rated 'very good,'" Albuquerque Journal, Jan. 30, 2021, *available at* https://www.abqjournal.com/2354311/nms-national-labs-managers-rated-very-good-ex-triad-gets-10-million-boost-in-fee-for-managing-lanl.html.   While the pandemic was one reason for the move to working remotely, Defendants had another reason as well. According to LANL's "Site Sustainability Plan" for 2021, "management has emphasized the importance of teleworking to support the plutonium pit mission." *See* Los Alamos Study Group, Feb. 24, 2021, *available at* https://lasg.org/press/2021/press_release_24Feb2021.html (quoting LANL Site Sustainability Plan)).

Several Plaintiffs, and many others not before the Court, successfully made the transition to working from home. For example, Plaintiff Raul Archuleta has worked from home since March 2020 and anticipates that his group will continue to work remotely for the foreseeable future. *See* Exhibit 1: Declaration of Raul Archuleta, at 5, ¶ 20. Other Plaintiffs have faithfully abided by LANL protocols and maintained productivity throughout the worst of the pandemic. For instance, Plaintiff Adrianna Martinez works as a Research Tec 2 in the High Explosive and Science Technology group. She contracted COVID-19 shortly after beginning work at LANL a year ago, but even while dutifully quarantining for fourteen (14) days, she continued to work from home. *See* Pls.' Verified Compl., ¶ 24. Even as the pandemic was raging, Plaintiffs and the LANL workforce persevered. As a result of the dedicated efforts of Plaintiffs and others, Defendants were rewarded by the NNSA with a ten million dollar ($10,000.00) increase in management fees for a "very good" overall rating on its performance through 2020. *See* "NM's National Lab managers," *supra*.

But rather than receive a reward of their own, Plaintiffs and other faithful employees who survived the worst of the pandemic and have seen the COVID-19 numbers come down were instead given a mandate that all employees must be vaccinated by October 15. Defendants' mandate was first announced on August 23, 2021 – the same day President Biden announced full FDA approval of the Pfizer Comirnaty vaccine[1] and called on business leaders to impose vaccine mandates. Defendant Mason said the mandate was necessary because of the "rising COVID-19

---

[1] The Comirnaty vaccine is not available in this country; the only Pfizer vaccine available in the U.S. continues to be the Pfizer-BioNTech vaccine, which has only been granted Emergency Use Authorization. *See, e.g.*, "Pfizer's COVID-19 Vaccine with Comirnaty Label Still not Available in US – Same Formulation," C-VINE Network, Oct. 13, 2021, *available at* https://c-vine.com/blog/pfizers-covid-19-vaccine-with-comirnaty-label-still-not-available-in-us/.

case rates in northern New Mexico and beyond" and because three (3) unvaccinated employees of LANL's 10,000 plus workforce had been hospitalized during the recent surge. While three unvaccinated hospitalizations apparently constituted a crisis, the termination of 185 employees on October 15 and exiling another 153 placed on indefinite leave without pay as a result of the religious "accommodation" was cause for celebration. *See* Marie O'Neill, "185 Employees Separate From Triad At Los Alamos National Lab Due To COVID-19 Vaccine Mandate," Los Alamos Reporter, Oct. 21, 2021, *available at* https://losalamosreporter.com/2021/10/21/185-employees-separate-from-triad-at-los-alamos-national-lab-due-to-covid-19-vaccine-mandate/ (stating these numbers were "manageable" and "not a significant deviation from historical attrition;" quoting Director Mason: "The Laboratory is well positioned to meet our mission objectives now.").

The mandate applies to all employees, including those working remotely, although guest scientists, contractors, subcontractors, and students who work off-site are excluded. Pls.' Verified Compl., ¶ 2. The mandate created a stir among the employees, and there was significant confusion concerning how and when it would be implemented and whether and how exemptions would be granted. Accordingly, on September 13, 2021, in response to over 300 comments and questions about the vaccine mandate and in lockstep with the White House, which had issued an Executive Order on September 9, 2021, mandating that all federal employees be vaccinated, Director Mason issued a new directive on medical and religious exemptions. The directive stated: "If a *medical* exemption is granted, the Laboratory will put in place mitigations that will protect the health and safety of the entire workforce consistent with our obligations under the Americans with Disabilities Act." *Religious* exemptions, however, would be handled differently:

> If a religious exemption is granted, the Laboratory will determine if the exemption can be reasonably accommodated while still protecting the health and safety of the rest of the workforce. However, if the Laboratory has not found an acceptable accommodation by October 15, **unvaccinated employees with religious exemptions may be placed on unpaid leave or may use vacation leave until an accommodation that will not unduly burden the Laboratory or other employees has been identified**.

Exhibit 9: Email from Thom Mason dated 9/13/2021, at 1 (emphasis added).

One week later, on September 20, 2021, Director Mason issued an updated directive. He stated that "about 1,000" employees and contractors had received the vaccine since he first announced the mandate, and that "a small number of medical exemptions" had been granted, for which the Lab was "working to put in place appropriate accommodations" as required under the Americans with Disabilities Act. The Lab had also received "a larger number of religious exemption requests," but rather than attempt to accommodate them individually, as required under Title VII, Director Mason stated: "I have made the decision that **the only accommodation the Laboratory can provide at this time for those granted religious exemptions is to take vacation or Leave without Pay (LWOP) effective October 15**." Pls.' Verified Compl., ¶ 5 (emphasis added).

Despite promises from Defendants that medical and religious exemptions would be considered on a case-by-case basis, those afforded a religious exemption were given only a one-size-fits-all "accommodation" of indefinite leave without pay and no benefits. *Id*. Employees provided a medical exemption were genuinely accommodated and allowed to continue work; those given a religious exemption, like Plaintiffs, were not. *Id.* As if to underscore this differential treatment, on September 27, 2021, Defendant Mason issued a document entitled "New FAQ: updates on exemptions, accommodations, leave without pay." It stated in part:

Q: Can the same "appropriate accommodations" that will be put in place for an employee with a medical exemption be put in place for an employee with a religious exemption?

**A: No**, **medical exemptions fall under different rules and laws than religious exemptions**.

Pls.' Verified Compl., ¶ 9 (emphasis added).

To add insult to injury, the same document intimated that those granted a religious exemption faced imminent termination if they persisted in refusing to take the vaccine:

**Q: Will employees that are granted a religious exemption and go on LWOP be subject to the current LWOP policy that does not guarantee their job after 30 days?**

**A: Yes**, **employees granted a religious exemption** who are placed on a personal leave of absence **are not guaranteed a position at the end of a personal leave and there is no requirement for management to hold the job open**.

*Id.*, ¶ 10 (emphasis added).

The directive further revealed that there were no clear guidelines for when the LWOP might be revoked: "**There isn't currently an estimate on how long this will last**. The Laboratory leadership team will base their decision regarding safe return to the workplace on the future state of the pandemic." *Id.*, ¶ 11 (emphasis added).

Even though COVID numbers have dropped steadily for the past several weeks Defendants refuse to say when or whether Plaintiffs and others might return to work. Defendants' approach is designed to maximize the uncertainty and anxiety of those employees ready and willing to return to their jobs in an effort to force compliance with their mandate despite recognizing that Plaintiffs and others have a bona fide religious objection to taking the vaccines.

Since the mandate became effective on October 15, 2021, Plaintiffs and other employees granted a religious exemption have been using their accrued vacation days to continue receiving

their salaries. Once their vacation time runs out, however, they will lose their income and their benefits.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008) (collecting authorities); *see also Free the Nipple-Fort Collins v. City of Fort Collins, Colo*., 916 F.3d 792, 797 (10th Cir. 2019). The third and fourth factors merge when the opposing party is a government actor. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs satisfy each of these elements.

## I.    Plaintiffs are likely to succeed on the merits.

### A.    Plaintiffs are likely to succeed on their Free Exercise claim.

#### 1.    *Defendants are government actors*.

Triad purports to be an LLC operating as a mere private contractor of the federal government. A review of the details concerning its creation, composition, funding, governance, operations, and mission, however, show it to be a government actor and therefore subject to constitutional limitations on its conduct under the state action doctrine. "A public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities," *Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013), or if the government "'has so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity[.]'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 151 (10th Cir. 1995) (quoting *Burton v.*

*Wilmington Parking Auth.*, 365 U.S. 715 (1961)). "That Government-created and -controlled corporations are (for many purposes at least) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself. It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) (holding Amtrak to be a state actor, despite federal statute declaring that it is not part of the federal government); *see U.S. Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 53-56 (2015).

As stated by the U.S. Supreme Court, a nominally private actor becomes a governmental actor when there exists "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974)). Determining whether the state action doctrine applies to the conduct of a nominally private party is driven by analysis of the facts concerning the character of the entity, not by any "expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Id.* at 296. "Some of the factors to consider . . . are: (1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008) (discussing *Brentwood Acad.*, 419 U.S. at 495-99).

The Tenth Circuit has traditionally utilized "various analyses and referred to them as the 'nexus test,' the 'public function test,' the 'joint action test,' and the 'symbiotic relationship test'" to determine whether state action is present. *Wittner*, 720 F.3d at 775 (citations omitted). Triad's

status as a state actor is most evident under the "symbiotic relationship" (or "entwinement") test.[2] This "analysis starts by asking whether and to what extent the state's relationship with the private actor goes beyond the 'mere private [purchase] of contract services.'" *Wittner*, 720 F.3d at 778 (quoting *Brentwood*, 531 U.S. at 299).

Triad is an LLC consisting of three principals: Battelle Memorial Institute, the Regents of the University of California, and the Texas A&M University System, each of whom owns an equal share of the LLC. *See* Triad Nat'l Sec., LLC, "Members," *available at* https://triadns.org/ (last visited Oct. 22, 2021); *see also* Los Alamos Nat'l Lab., Press Release, "Triad National Security takes the helm at Los Alamos National Laboratory,'" Nov. 1, 2018, *available at* https://www.lanl.gov/discover/news-release-archive/2018/November/1101-triad-takes-the-helm.php (describing equal ownership of Triad) (last visited Oct. 22, 2021) [hereinafter, "LANL Press Release"]. Thus, Triad is 2/3 owned by state governments (*i.e.*, the state governments of California, *see* Calif. Const. art. IX, § 9, and Texas, *see* Tex. Const. art. VII, § 13). Moreover, Triad was formed to operate and manage LANL on behalf of the National Nuclear Security Administration (an agency within the U.S. Department of Energy, *see* 50 U.S.C. § 2401). *See* Triad Nat'l Sec., LLC, *supra*, "About Us."

 As manager of the lab, Triad has responsibility for all aspects of managing and advancing LANL's missions, which include "enhancing national security by ensuring the safety and reliability of the U.S. nuclear stockpile" and "developing technologies to reduce threats from weapons of mass destruction." LANL Press Release, *supra*. Triad runs the laboratory according to

---

[2] Plaintiffs believe that Triad qualifies as a state actor under the other recognized tests as well but review under the symbiotic relationship test more than adequately establishes how Triad is subject to the state action doctrine. Plaintiffs here limit their arguments to the symbiotic relationship test, but expressly reserve the right to make arguments for application of the other tests later in the litigation, particularly after the benefit of discovery.

highly specific and complex requirements prescribed by the government, including its contracts with the NNSA. *See, e.g.,* NNSA, "Contract No. 89233218CNA000001 Conformed through Modification P00074," *available at* https://www.energy.gov/sites/default/files/2021-07/Triad%20Conformed%20to%20P00074%20Complete%20Contract%20Document.pdf (last visited Oct. 22, 2021); *see also* 50 U.S.C § 2410(b) (describing control of contractors (like Triad) by NNSA and the U.S. Secretary of Energy). Compliance is closely monitored and reviewed by the federal government. *See, e.g.,* NNSA, FY 2022 Performance Review, *available at* https://www.energy.gov/sites/default/files/2021-10/FY22%20Triad%20PEMP%20Final.pdf (last visited Oct. 22, 2021). Triad relies entirely (or almost entirely) on governmental funding to conduct its operations, and its employees – like Plaintiffs in this case – are required to pass national security background checks and hold specific national security clearances. *See* Exhibits 1-8: Pls.' Decls. (describing security clearances).

"In *Brentwood [Academy v. Tennessee Secondary School Athletc Association]*, the U.S. Supreme Court held that the Tennessee Secondary Schools Athletic Association (TSSAA) was not a mere private contractor because, *inter alia*, the state Board of Education supervised the TSSAA, resulting in state involvement with the private actor from the 'top down,' and the state public schools constituted the majority membership of the TSSAA, resulting in state involvement with the private actor from the 'bottom up.'" *Wittner*, 750 720 F.3d at 778. So, too, here Triad is, from the "bottom up," 2/3 governmental actors, while from the "top down" it operates under close governmental scrutiny, observation, and review to perform tasks on behalf of the federal government that are vital to the country's national security needs, including tasks related to the security of the nation's nuclear weapons and protection of the country from WMDs. Moreover,

Triad does all this through reliance on massive governmental, not private, funding[3] and by employing workers who must be approved (via obtaining proper national security clearances) by the federal government.

The fact that the federal and two state governments have joined together to accomplish important national security objectives using governmental funding, resources, and powers is not overcome by the nominally private business entity by which they elected to do it. *See Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946) ("That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely governmental purposes.") (discussing the Reconstruction Finance Corporation). Indeed, it would be difficult to find any purely private entity that would be allowed unfettered access to nuclear weapons, WMDs, or related technologies. This is a function that is only entrusted to the federal government. Under the symbiotic relationship (or entwinement) test, therefore, Triad easily qualifies as a governmental actor that may not unconstitutionally infringe on Plaintiffs' rights to the Free Exercise of their religions and to equal treatment under the law.

2.     *Defendants' vaccine mandate violates the Free Exercise Clause.*

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof*...." (Emphasis added). It has been incorporated and applied against the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Defendants' vaccine mandate plainly burdens

---

[3] According to the U.S. government's website USAspending.gov, Triad received approximately $4 *billion* dollars in federal money in FY 2021 alone. *See* "Triad National Security, LLC," usaspending.gov, *available at* https://www.usaspending.gov/recipient/d7cb14cb-cb4c-e4cf-49be-b358766c0aee-P/latest (last visited Oct. 22, 2021).

Plaintiffs' free exercise of religion. Because the mandate is not neutral and not generally applicable, it cannot satisfy strict scrutiny. Defendants' mandate is not neutral because it treats religious exemptions differently than medical exemptions, and it is not generally applicable because it authorizes (at least theoretically) both religious and medical exemptions that, on the mandate's own premise, make LANL employees more vulnerable to contracting the COVID-19 Delta variant. These exemptions (and the examples of other states, which have no such mandates) show that LANL has no compelling interest in denying a genuine religious exemption to these Plaintiffs and others not before the Court. Defendants' mandate is not the least restrictive means of furthering LANL's stated interest.

A regulation is not a neutral burden on religion if it discriminates against a religious practice on its face, or if in its real operation it targets a religious practice. *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health and Mental Hygiene*, 763 F.3d 183, 193, 194-95 (2d Cir. 2014). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868, 1877 (2021). Here, Defendants' mandate is not neutral because it permits secular conduct by those afforded a medical exemption (i.e., being on-site without being vaccinated or working from home) while prohibiting religious conduct that undermines Defendants' asserted interests in protecting against COVID-19. "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," including activities that "could . . . present[] similar risks" of "spread[ing] COVID-19." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) (emphasis added) (internal quotations omitted).

The discrepancy between LANL's treatment of those claiming a medical exemption, who have been afforded individualized interactive dialog and genuinely accommodated such that they could continue to work at LANL without getting the vaccine, and those like Plaintiffs claiming a religious exemption, who were denied any individualized, interactive dialog and instead were exiled to an indefinite LWOP, is stark. Against all reason and science, religion was singled out for differential and discriminatory treatment. And "a law which visits gratuitous restrictions on religious conduct . . . seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538 (1993) (internal quotation marks and citation omitted).

Since Defendants' vaccine mandate is neither neutral nor generally applicable, it is subject to strict scrutiny, which it cannot survive. To survive strict scrutiny, Defendants carry the burden of showing that the vaccine mandate, first, "advances interests of the highest order and [is] narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (internal quotations omitted). Further, "[i]t is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 2234. The asserted compelling interest cannot be stated at an unduly "high level of generality," but rather must be a compelling interest "in denying an exception" to "particular religious claimants." *Fulton*, 141 S. Ct. at 1882 (emphasis added). Finally, narrow tailoring for purposes of strict scrutiny requires "showing that [the challenged rule] is the least restrictive means" of achieving a compelling interest. *Thomas v. Review Bd. of Indiana Emp. Security Div.*, 450 U.S. 707, 718 (1981) (emphasis added). The vaccine mandate fails both prongs here.

First, there is no compelling interest in denying at least an opportunity to engage in an individualized interactive dialog to explore genuine religious accommodation for Plaintiffs and others similarly situated, when Defendants have in fact engaged in just such individualized interactive dialogs with those granted medical exemptions, notwithstanding the government's claimed interest in stopping the spread of the Delta variant. Defendants can offer "no compelling reason why [they] ha[ve] a particular interest in denying an exception [to Plaintiffs] while making them available to others." *Fulton*, 141 S. Ct. at 1882; *see also id.* (holding that City of Philadelphia's authorization of secular exemptions from a non-discrimination rule "undermines the City's contention that its non-discrimination policies can brook no departures"). As the Supreme Court has said with respect to the government's "interest in reducing the spread of COVID," "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is *more dangerous* than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297 (emphasis added). Defendants cannot make that showing here because both on-site work and remote work, while unvaccinated, is permitted for medical reasons but not for religious reasons.

Moreover, all the Plaintiffs diligently completed their work throughout the pandemic without need for vaccination. Yet now, Defendants implausibly claim a dire threat to ***vaccinated*** employees if Plaintiffs are not vaccinated now. What good, then, is the vaccination of the vaccinated? Any asserted "compelling interest" here is merely rhetorical, not actual.

Additionally, Defendants cannot satisfy the narrow-tailoring test that "the government must show that it seriously undertook to address the problem with less intrusive tools readily available to it," and that the government "must *demonstrate* that alternative measures imposing lesser burdens on religious liberty would fail to achieve [its] interests." *Agudath Israel v. Cuomo*,

16

983 F.3d 620, 633 (2d Cir. 2020) (emphasis added). Defendants have already shown, however, that alternative measures imposing lesser burdens *are* feasible by virtue of their preferential treatment of medically exempt employees. Defendants fail to satisfy their burden under the strict scrutiny test and thereby violate the Free Exercise Clause.

**B.      Defendants' vaccine mandate violates the Equal Protection Clause.**

"[I]f a classification 'impinge[s] upon the exercise of a fundamental right,' the Equal Protection Clause requires 'the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014) (quoting *Plyler v. Doe*, 457 U.S. 202, 216–17 (1993)). Defendants' classification of Plaintiffs and others similarly situated, plainly impinges upon their fundamental Free Exercise rights. As such the classification is subject to strict scrutiny.

For the reasons shown above, Defendants are unable to satisfy their burden under strict scrutiny, thereby violating the Equal Protection Clause. Additionally, government classifications must have at least a rational basis in furtherance of a legitimate interest. *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995). Defendants' classifications here fail even to satisfy rational basis. Plaintiffs are similarly situated to the class of medically exempt employees who are allowed to continue working despite the vaccine mandate for medical reasons, yet Plaintiffs are treated differently without any rational basis. That is, those with medical reasons for not taking the vaccines are accommodated, but those with religious reasons are not. Plaintiffs are, however, no more unsuited to being reasonably accommodated. There is no rational, legitimate, or compelling interest in Defendants' application of different standards to the similarly situated groups. *See Romer v. Evans*, 517 U.S. 620, 633 (1996) ("A law declaring that in general it shall be more

difficult for one group of citizens than for all others to seek [protection] from the government is itself a denial of equal protection of the laws in the most literal sense.").

    **C.**    **Plaintiffs are likely to succeed on their Title VII claims.**

        *1.*    *EEOC review is no obstacle here to preliminary injunctive relief.*

Each Plaintiff has initiated a charge with the EEOC complaining of Defendants' discriminatory and retaliatory actions. *See* Exhibits 1-8: Pls.' Declarations. While individuals asserting claims under Title VII or the ADA must complete the EEOC's administrative process before seeking "final relief" through a civil action, preliminary injunctive relief is available on those claims where irreparable injury is shown and a likelihood of ultimate success has been established. *See*, *e.g.*, *Bilyeu v. UT-Batelle, LLC*, No. 3:21-cv-352, 2021 WL 4859932 (E.D. Tenn. Oct. 15, 2021) (granting TRO in part against government contractor operating Oak Ridge National Laboratory and enjoining lab from placing employees granted religious accommodation on indefinite leave); *Sambrano v. United Airlines, Inc.*, No. 4:21-cv-01074 (N.D. Tex. Oct. 12, 2021) (granting TRO against employer and enjoining it from placing employees on indefinite paid leave as religious accommodation); *see also Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 185 (2019) ("Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts.").

*Bilyeu* and *Sambrano* present almost identical fact patterns to the instant case and compel a similar result. In fact, *Bilyeu* involves a claim by employees at Oak Ridge National Laboratory (ORNL), operated by UT-Batelle, LLC, manager and operator of ORNL for the U.S. Department of Energy, just as Triad manager and operator of LANL for the same federal agency. Indeed, Batelle is one of the three principals in Triad. In *Bilyeu*, ORNL announced a vaccine mandate on August 26, 2021 – three days after LANL announced its mandate here. All ORNL employees were

required to take the vaccine by October 15, 2021 – the same deadline imposed by LANL here. Like the LANL mandate, the ORNL mandate is absolute; there is no option to undergo regular testing, wear masks, and practice social distancing. *See Bilyeu v. UT-Batelle, LLC*, E.D. Tenn. Case No. 3:21-cv-00352, Dkt #8: Pls.' Mem. in Support of Mot. for Temporary Restraining Order and Preliminary Inj., at *4 (E.D. Tenn. 2021).[4] The *Bilyeu* plaintiffs were ostensibly granted a religious accommodation, but instead of individualized accommodations, plaintiffs there – exactly like Plaintiffs here – were given only a uniform policy of indefinite leave without pay. *Id.* at *5.[5]

The U.S. District Court in the Eastern District of Tennessee, after conducting a hearing on the plaintiffs' motion for a temporary restraining order, found "that issuing a TRO is necessary to avoid immediate and irreparable injury, loss, or damage to Plaintiffs pursuant to Fed. R. Civ. P. 65(b)(A)." *Bilyeu*, 2021 WL 4859932, at *2. It found that the plaintiffs were likely to succeed on the merits, and that the plaintiffs had "adequately expressed they will suffer irreparable harm if Defendant moves forward with its unpaid leave policy," including in the form of the possible loss "of employment benefits, loss of security clearances associated with their employment, and inability to pay for housing and education costs." *Id.* at *2-3. The court further determined that entry of the injunction would cause "minimal harm" to ORNL because it was "operating with Plaintiffs and others receiving accommodations" up to the time of the hearing and preventing ORNL from placing the plaintiffs on leave for a short time "simply will not harm Defendant." The same is true here. Plaintiffs here are likely to prevail on the merits, they will suffer irreparable

---

[4] These remarkable similarities strongly suggest a coordinated effort by the Department of Energy to achieve the goal of near-total vaccination at the two labs.
[5] The only difference between the ORNL accommodation and the LANL accommodation is that ORNL will continue to pay benefits for employees on leave up to 60 days; LANL has cut off all benefits as of October 15.

harm absent injunctive relief, Defendants will not be prejudiced by entry of an injunction, and the public interest favors an injunction.

Just as preliminary injunctive relief was urgently needed in *Bilyeu*, so it is imperative to maintain the status quo ante here. Without such relief, Plaintiffs will be impaled on the horns of a terrible dilemma – one for which the EEOC and this Court will have no remedy. Plaintiffs must decide, before their vacation pay runs out, whether to violate their religious beliefs and receive the COVID-19 vaccine or face termination – literally or functionally. If they decide to take the vaccine against their conscience, such decision cannot be undone by either the EEOC or this Court. If, on the other hand, Plaintiffs decide to accept Defendants' accommodation-by-termination they stand to lose their security clearances, life and health insurance coverage (which for some will mean disruption of ongoing medical treatments), the loss of farm animals, the loss of not only their salaries but also merit pay raise and bonus opportunities, inability to pay for housing and education costs, and in one case at least the loss of a promotion that was virtually in hand but for Defendants' indefinite leave without pay policy.

Defendants will undoubtedly argue that Plaintiffs' requested injunction seeks to alter the status quo rather than maintain it, simply because the arbitrary deadline of October 15 has passed. But Defendants would be mistaken. First, the status quo ante is defined as the "'last peaceable uncontested status existing between the parties before the dispute developed.'" *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 984 (10th Cir. 2004) (en banc) (Murphy, J., joined in full by Ebell, Kelly, and O'Brien, JJ., and as to Part I by Hartz, McConnell, and Tymkovich, JJ., concurring in part and dissenting in part), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (quoting 11A Wright & Miller § 2948, at 136). The last peaceable uncontested status between the parties here was when

Plaintiffs received fully salary and benefits. Second, even as of the date of filing of this lawsuit, Plaintiffs continue to receive their salaries, because they are using vacation days. Thus, even if Defendants were correct that the passing of the October 15 deadline altered some aspect of the status quo, it has not changed the fact that Plaintiffs are still being compensated and will continue to receive their salaries until their vacation time is depleted.

2.      *Plaintiffs have established a prima facie case under Title VII.*

Title VII of the Civil Rights Act of 1964 renders unlawful any employment practice that discriminates against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. §2000e-2(a)(1). Similarly, subsection (a)(2) prohibits an employer from "limit[ing], segrat[ing], or classify[ing]" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." *Id.* Defendants have violated both these provisions.

The term "religion" is broadly defined to include "'all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate … an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.'" *Tabura v. Kellogg USA*, 880 F.3d 544, 549 (10th Cir. 2018) (quoting 42 U.S.C. § 2000e(j)). Title VII requires an employer to make "reasonable accommodations" to the religious needs of its employees unless such accommodations would create "undue hardship." *Tabura*, 880 F.3d at 549 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977)).

Once an employee establishes a prima facie case by showing that she has a bona fide religious belief that conflicts with an employment requirement and has informed her employer of

21

that conflict, "[t]he burden then shifts to the employer to (1) conclusively rebut one or more elements of the . . . prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156 (10th Cir. 2000) (footnote omitted). Defendants have conceded that Plaintiffs established a prima facie case because they granted the religious exemptions. It thus becomes Defendants' burden to show it has offered a *reasonable* accommodation (or that it could not do so without undue burden). Defendants' accommodation-by-termination wholly fails to satisfy its burden.

3.    *Defendants have failed to provide a reasonable accommodation*.

While an employer is not required to afford the precise accommodation requested by the employee, it must nonetheless provide a *reasonable* accommodation if it can do so without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986). An employer is free to choose among reasonable accommodations, but "an employer is not free to 'choose an unreasonable form of accommodation over a reasonable one.'" *EEOC v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1179 (D. Colo. 2018) (quoting *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73-74 (5th Cir. 1990)).

A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices" without penalizing the employee. *Id.* at 70-71. A short period of unpaid leave is not necessarily unreasonable, but "unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones." *Id.* at 71. Defendants have imposed even worse than that on Plaintiffs and others granted religious exemptions: they have allowed those granted *medical* exemptions to continue getting paid and not be placed on leave, but those granted *religious* exemptions are exiled to leave without pay indefinitely. "Such an arrangement would display a discrimination against religious practices that

is the antithesis of reasonableness." *Id.* Defendants policy here, imposing a punitive, one-size-fits-all, indefinite leave without pay with no guarantee of a job after thirty (30) days, is exactly that – the antithesis of reasonableness.

Indeed, Defendants' refusal to engage in an interactive dialog to examine each employee and his or her particular circumstances in order to ascertain a reasonable accommodation was itself improper. "Determining what is reasonable [in terms of an accommodation] is a fact-specific determination that must be made on a case-by-case basis." *Tabura*, 880 F.3d at 551. Defendants' blanket LWOP policy is the antithesis of a fact-specific, case-by-case determination. Moreover, Defendants warned in their September 27, 2021, FAQ that "**employees granted a religious exemption** who are placed on a personal leave of absence **are not guaranteed a position at the end of a personal leave and there is no requirement for management to hold the job open**." *See* Decl. Raul Archuleta, *supra*, attachment 2 at 2 (emphasis added).

This implied threat of termination is another nail in the coffin of Defendants' "accommodation" scheme.  The Tenth Circuit has emphatically stated, that it is not a reasonable accommodation if the employer "only provided Plaintiffs with an opportunity to delay their eventual termination." *Tabura*, 880 F.3d at 550 (citing *Ansonia*, 479 U.S. 60, 70-71, and *Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Cntys*., 735 F.2d 388, 390-91 (10th Cir. 1984)). As the *Tabura* court noted, in *Pinsker* the employer's leave policy was upheld as reasonable only because it "jeopardized neither [the employee's] job nor his observation of religious holidays." *Id.* Here, by contrast, Defendants have intentionally jeopardized Plaintiffs' jobs. In effect, Defendants have proffered an accommodation by termination. *See Love v. City of Dallas*, No. 3:96-CV-0532-R, 1997 WL 278126, at *6 (N.D. Tex. May 14, 1997) ("leave without pay differs very little from termination"). Such an "accommodation" is in fact no accommodation at all.

4.       *Defendants have refused to engage in an interactive dialog*.

In a case arising out of this district, the United States Supreme Court reaffirmed in an 8-0

decision "the feasibility of case-by-case consideration of religious exemptions to generally

applicable rules." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436

(2006) (citing *Cutter v. Wilkinson*, 544 U.S. 709 (2005)). *Gonzales* arose under the Religious

Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C.A. § 2000bb–1(b); *Cutter* involved a claim

under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.

§ 2000cc. But the point is that in all religious exemption cases, be they Free Exercise cases, RFRA

cases, RLUIPA cases, or Title VII cases, individualized consideration is required. And in the

employment context, "[t]he obligation to engage in an interactive process is inherent in the

statutory obligation to offer a reasonable accommodation" to an otherwise qualified employee.

*Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en

banc) (disability case).[6] In fact, "[a] party that obstructs or delays the interactive process is not

acting in good faith." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)

(quoted in *Smith*, 180 F.3d at 1172).

Defendants claim the vaccine mandate is necessary to protect the health of all employees.

Yet they have flatly refused reasonable accommodations even to those like Plaintiffs Raul

---

[6]  Defendants falsely stated in their FAQ of September 27, 2021, that "medical exemptions fall
under different rules and laws than religious exemptions" and therefore the same "appropriate
accommodations" afforded to those granted medical exemptions need not be put in place for those
granted religious exemptions. *See* Archuleta Decl., *supra*, attachment 2, at 1. In fact, Title VII's
rules governing religious exemptions are virtually interchangeable with the ADA's rules governing
medical exemptions. "[T]he requirement of employers to provide reasonable accommodations for
disabled employees under the ADA is analogous to Title VII's requirement that employers provide
reasonable religious accommodations; thus, jurisprudence under the ADA can provide guidance
as to when an employer's duty to provide a reasonable religious accommodation is triggered under
Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1141 (10th Cir. 2013), *rev'd
on other grounds and remanded*, 575 U.S. 768 (2015).

Archuleta, Trina Martinez, and Daniel Frank, who work from home and pose no threat to their coworkers. Likewise, Defendants have refused to grant medical exemptions to some Plaintiffs and others not before the Court who have recovered from COVID-19 and have natural immunity, which is at least as strong as vaccine-acquired immunity and likely much stronger. *See, e.g.,* Paul Elias Alexander, "91 Research Studies Affirm Naturally Acquired Immunity to Covid-19: Documented, Linked, and Quoted," Brownstone Institute, Oct. 17, 2021, *available at* https://brownstone.org/articles/79-research-studies-affirm-naturally-acquired-immunity-to-covid-19-documented-linked-and-quoted/.

LANL recently reported to have as many as eighty-five percent (85%) of its employees working remotely during the pandemic last year prior to the availability of COVID vaccines. *See* "NM's National Lab managers rated 'very good,'" Albuquerque Journal, January 30, 2021, *available at* https://www.abqjournal.com/2354311/nms-national-labs-managers-rated-very-good-ex-triad-gets-10-million-boost-in-fee-for-managing-lanl.html. When the on-site workforce is so significantly reduced, it makes it much easier to accommodate unvaccinated employees by increasing the possibility of social distancing and separating employees in different parts of the facility. Defendants' failure to engage in interactive dialog under these circumstances is even more unreasonable.

        5.     *Defendants have unlawfully classified Plaintiffs based on their religious beliefs.*

Defendants have also violated Title VII by classifying Plaintiffs and others not before the Court in a manner depriving them of employment opportunities and adversely affecting their status as employees because of their religion in violation of subsection (a)(2) of §2000e-2(a)(1). Defendants have done precisely what the Supreme Court in *Romer v. Evans*, 517 U.S. 620 (1996) said should not be done, namely "identif[y] persons by a single trait [religious beliefs] and then

den[y] them protections across the board." *Id*. at 633. By failing to undertake an individualized interactive dialog to identify specific ways to accommodate each Plaintiff, Defendants have effectively placed a mark of disrepute upon them, thereby "denying them protections across the board." They now face being denied their salaries, stripped of their benefits, exiled from the workplace, and destined for termination.

In general, to establish a disparate treatment claim, a plaintiff must show: "(i) that he is a member of a protected class; (ii) that he suffered adverse employment action; and (iii) disparate treatment among similarly situated employees." *Barber v. Lovelace Sandia Health Sys*., 409 F. Supp. 2d 1313, 1327 (D.N.M. 2005) (national origin discrimination claim). Here, Plaintiffs are members of a protected class based upon their religion; they have plainly suffered adverse employment action, having been placed on indefinite leave without pay; and they have experienced disparate treatment among similarly situated employees insofar as those employees granted medical exemptions are allowed to continue working by means of individualized accommodations.

6.      *Plaintiffs have suffered retaliation on account of their religious beliefs*.

Finally, Plaintiffs are also likely to succeed on their retaliation claim. "Title VII prohibits retaliation against employees for opposing any practice made unlawful by Title VII . . . ." *Barber*, 409 F. Supp. 2d at 1328. To establish a prima facie case of retaliation, a plaintiff must show "that: (i) the plaintiff engaged in protected opposition or participated in a Title VII proceeding; (ii) the employer took an adverse employment action against the plaintiff subsequent to the protected activity; and (iii) there is a causal connection between the plaintiff's participation in the protected activity and the adverse employment action taken by the employer." *Id.* (citations omitted).

It is undisputed that Plaintiffs engaged in protected conduct by seeking a religious exemption. Similarly, it cannot be questioned that they have suffered an adverse employment

action undertaken subsequent to the protected activity in the form of the harsh LWOP policy. And, there is a direct causal connection between Plaintiffs' seeking a religious exemption and Defendants' imposing the LWOP "accommodation." Thus, Plaintiffs easily establish a prima facie case of retaliation.

The burden then shifts to Defendants to offer "an explanation to rebut the prima facie case." *Barber*, 409 F. Supp. 2d at 1328. And while Defendants need not fully litigate the merits of their reasoning, they must nevertheless produce reasoning that is "reasonably specific and clear." *Id*. Having refused to engage in a dialog with Plaintiffs individually, Plaintiffs look forward to Defendants' explanation of their actions in this proceeding. Given the apparent ease with which Defendants could accommodate at least some of the Plaintiffs and their failure to do so, the specter of pretext hangs ominously over Defendants' attempt to rebut Plaintiffs' prima facie case.

Ironically, the Supreme Court has recently affirmed that "Title VII does not demand mere *neutrality* with regard to religious practices . . . . [r]ather, it gives them *favored treatment*." *Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 775 (2015) (emphasis added); *see also Dr A v. Hochul*, No. 1:21-CV-1009, 2021 WL 4734404, at *5 (N.D.N.Y. Oct. 12, 2021) (citing *Abercrombie* and granting preliminary injunction against vaccine mandate that purported to prohibit religious exemptions with reasonable accommodations). Defendants, however, have singled out those with sincere religious beliefs for *disfavored* treatment. Title VII does not countenance such disregard for religious freedom.

In short, Plaintiffs are likely to prevail on the merits of their Title VII claims.

**D.     Plaintiffs are likely to succeed on their ADA claims.**

The Americans with Disabilities Act, like Title VII, prohibits discrimination against a "qualified individual with a disability" because of her disability "in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Discrimination is defined under the ADA as "not making reasonable accommodations" unless the employer can demonstrate that it would cause an "undue hardship," again much like Title VII. 42 U.S.C. § 12112(b)(5)(A); *see also Smith*, 180 F.3d at 1161.

Plaintiffs Archuleta, Isaac Martinez, Trina Suazo-Martinez, and Adrianna Martinez, who have had COVID-19 and recovered from it and now have natural immunity, are qualified individuals with a disability.  *See* Pls.' Verified Compl. ¶¶ 20-22, 24. They face a risk of severe impairment if they take the vaccine but are fully capable of performing their job functions and in fact have demonstrated that capability for many months. They have informed Defendants of their disability and formally requested a medical exemption. Their requests were all denied. As shown above, these Plaintiffs have experienced discrimination in the form of Defendants' failure to make reasonable accommodations for them, just as Defendants have failed to reasonably accommodate all Plaintiffs under Title VII based on their religious exemptions.

For the same reasons as Plaintiffs are likely to succeed on their religious discrimination and retaliation claims under Title VII, these Plaintiffs are likely to succeed on their medical discrimination claims under the ADA. *See, e.g., Bilyeu*, 2021 WL 4859932 (granting TRO in part against government contractor operating Oak Ridge National Laboratory and enjoining lab from placing employees granted religious or medical exemptions on indefinite leave); *Sambrano*, No. 4:21-cv-01074 (granting TRO against employer and enjoining it from, *inter alia*, placing

employees on indefinite paid leave as medical accommodation). Defendants failed to consider these Plaintiffs' individual situations and circumstances, instead issuing in some cases a summary denial of their request for exemption and in others simply citing dated authority that has been proven by an overwhelming number of studies to have been incorrect. *See*, *e.g.*, Paul Elias Alexander, "91 Research Studies Affirm Naturally Acquired Immunity to Covid-19: Documented, Linked, and Quoted," Brownstone Institute, Oct. 17, 2021, available at https://brownstone.org/articles/79-research-studies-affirm-naturally-acquired-immunity-to-covid-19-documented-linked-and-quoted/.

Moreover, as this Court has recently recognized, the Delta variant of the virus "now accounts for virtually all new infections in the United States – including in New Mexico – and is believed to be twice as contagious as previous variants." *Valdez v. Grisham*, No. 21-CV-783 MV/JHR, 2021 WL 4145746, at *2 (D.N.M. Sept. 13, 2021) (citation omitted). But the most recent data shows that the vaccine's immunity does not last, and it is far less effective against the Delta variant. In fact, the vaccine may actually enhance the susceptibility to contracting the Delta variant. *See, e.g.,* Sharyl Attkisson, "Covid-19 natural immunity compared to vaccine-induced immunity: The definitive summary," October 13, 2021, *available at* https://sharylattkisson.com/2021/10/covid-19-natural-immunity-compared-to-vaccine-induced-immunity-the-definitive-summary/ (noting waning effectiveness of vaccine immunity and natural immunity persisting for long time). Under these circumstances, Defendants' punitive, indefinite LWOP policy not only fails to satisfy the reasonable accommodation standard, but is itself an unreasonable and illogical policy. Vaccinating the entire workforce is no solution at all. In fact, it may even make matters worse. Removing those with natural immunity while simultaneously requiring others to get the vaccine may well be a recipe for a disaster of epic proportions. For an

29

institution that prides itself on its science, LANL is doubling down on a very unscientific policy.

Plaintiffs are likely to prevail on their ADA claims.

## II.    Plaintiffs Satisfy the Remaining Factors for a TRO and a Preliminary Injunction.

### A.    Plaintiffs will suffer irreparable injury unless this Court acts.

Defendants have placed religious and disabled employees in a nearly impossible position, facing relentless coercive efforts aimed at inducing them to violate their consciences and health or be punished with indefinite leave without pay, no benefits, and probable termination. After ninety (90) days of leave, they will also lose their security clearances.

"'Irreparable harm' means that the injury must be both certain and great and that it must not be merely serious or substantial. ... [I]rreparable harm is often suffered when the injury can [not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits." *McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1258-59 (D.N.M. 2003) (cleaned up) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (citations omitted)). Irreparable harm occurs "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Id.* (citations omitted). Defendants' arbitrarily short deadline and harsh "accommodation" were calculated to coerce Plaintiffs and others not before the Court to take the vaccine.

While Plaintiffs steadfastly refused to bow to the pressure, hundreds of other LANL employees did. On September 20, 2021, Director Mason announced that in less than a month since he had first announced the edict "about 1,000" employees and contractors had gotten the vaccine. Hundreds more succumbed to the pressure since then, leaving only 185 that were terminated on the October 15 deadline and some 153 who, like Plaintiffs, have been placed on indefinite LWOP.

The U.S. District Court for the Northern District of Texas recently counseled, absent emergency injunctive relief, "nothing would prevent hundreds of workers from ostensibly either: (1) being compelled to take a vaccination in violation of their religious beliefs or medical restrictions, or (2) being placed on indefinite unpaid leave." *Sambranos*, No. 4:21-cv-1074-P. The urgent need for relief persists, even though the October 15 deadline has passed, because Plaintiffs and others similarly situated remain in a state of supreme uncertainty, not knowing whether LANL will ever deem it safe enough to allow them to return to work while every day their vacation days are running lower and lower and their future looking bleaker and bleaker. The continued coercive pressure and threat to take the vaccine is itself irreparable harm because once the vaccine is administered there is no way for the Court to undo it. Mere monetary damages are woefully inadequate.

With respect to Plaintiffs' claims under the First and Fourteenth Amendments, the Tenth Circuit observed in *Hobby Lobby Stores, Inc. v. Sebelius*, that '[i]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor.'" 723 F.3d 1114, 1145 (10th Cir. 2013) (quoting *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012)). The Tenth Circuit in *Hobby Lobby* then explained this statement by stating:

> "That is because:
>
> - 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionable constitutes irreparable injury' *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted);
>
> - 'when a law . . . is likely unconstitutional, the[] interests [of those the government represents, such as voters] do not outweigh [a plaintiff's interest] in having [its] constitutional rights protected,' *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012); and
>
> - 'it is always in the public interest to prevent the violation of a party's constituational rights,' *id.* at 1132."

*Hobby Lobby*, 723 F.3d at 1145.

By establishing that they are likely to prevail on the First and Fourteenth Amendment claims, Plaintiffs have satisfied the remaining elements necessary for injunctive relief.

With respect to Plaintiffs' claims under Title VII, the ADA, and RFRA, Plaintiffs have likewise established that they are suffering, and will continue to suffer, irreparable harm. Notwithstanding the coercive attempt to force Plaintiffs and others to violate their conscience and religious beliefs, Plaintiffs will suffer irreparable harm by losing their security clearances absent prompt relief from the Court. Plaintiffs have further met the irreparable harm prong in light of the fact that they face the risk of losing insurance coverage, ongoing medical procedures that will be negatively impacted, the prospect of losing professional reputations, an inability to pay for education costs, and the loss of homes. *See, e.g., Bilyeu, LLC*, 2021 WL 4859932 (granting TRO in part against government contractor operating Oak Ridge National Laboratory and enjoining lab from placing employees granted religious accommodation on indefinite leave); *Dr A v. Hochul*, 2021 WL 4734404, at *5 (preliminary injunction entered against statewide vaccine mandate on behalf of healthcare workers facing loss of employment, harm to professional reputation, and possible harm to professional licenses); *Sambrano*, No. 4:21-cv-01074 (granting TRO against employer and enjoining it from placing employees on indefinite paid leave as religious accommodation); *see also Tiwari v. Mattis*, No. C17-242 TSZ, 2018 WL 1737783, at *7 (W.D. Wash. 2018) (failure to receive interim security clearance constitutes irreparable harm).

**B.     The balance of harms tips decidedly in favor of Plaintiffs.**

The third prong of the preliminary injunction analysis examines whether the balance of equities favors the movant. *Winter*, 555 U.S. at 20. There is little question here that the weighty consequences Plaintiffs face because of Defendants' harsh indefinite LWOP policy – loss of all

benefits, possible loss of security clearances, severe emotional distress, the uncertainty of future employment, possible termination, and even the loss of their homes – far outweighs any harm Defendants might suffer from a temporary restoration of Plaintiffs and others pending a hearing on the merits. After all, Plaintiffs and the other employees were all on the payroll before Defendants' arbitrary deadline, and in fact Defendants continue to pay Plaintiffs via their vacation time; extending that status quo for a short while is hardly a significant harm to Defendants. Under these circumstances, the balance of the equities strongly favors Plaintiffs. *See Bilyeu*, 2021 WL 4859932 (granting TRO in part against government contractor operating Oak Ridge National Laboratory and enjoining lab from placing employees granted religious accommodation on indefinite leave); *Sambrano*, No. 4:21-cv-01074 (N.D. Tex. Oct. 12, 2021) (granting TRO against employer and enjoining it from placing employees on indefinite paid leave as religious accommodation); *Tiwari*, 2018 WL 1737783, at *7 (W.D. Wash. 2018) (failure to receive interim security clearance constitutes irreparable harm).

**C.    The public interest will be served by entry of a preliminary injunction.**

The fourth and final prong of the preliminary injunction inquiry asks whether entry of an injunction would further the public interest. *Winter*, 555 U.S. at 20. Entry of a preliminary injunction here would further the public interest, "First, the public interest lies with enforcing the guarantees enshrined in the Constitution and federal anti-discrimination law." *Dr A v. Hochul*, 2021 WL 4734404, at *23; *see also Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 245 (N.D.N.Y. 2019) ("The public interest generally supports granting a preliminary injunction where . . . a plaintiff has established a clear likelihood of success on the merits and made a showing of irreparable harm."). Second, although Defendants will likely claim that granting the injunction may hinder their efforts to control the spread of COVID-19, in truth several of the Plaintiffs (and

certainly many others not before the Court) have acquired natural immunity, which greatly reduces the risk of any spread of the virus. In addition, several of the Plaintiffs and many others not before the Court are *still* working remotely. To suggest that a slight delay in Defendants' indefinite leave will hardly cause any significant harm. Furthermore, it is now well established that the vaccinated may contract the disease and spread it. The mantra that this is a "pandemic of the unvaccinated" can no longer be invoked with a straight face. Third, Defendants have admittedly granted genuine accommodations to several employees granted a medical exemption. Defendants have not and cannot show that granting the same benefit to Plaintiffs and others not before the Court would impose any more harm, especially when Plaintiffs have been faithfully and safely working throughout the worst of the pandemic.

The public interest would be served by entry of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motions to temporarily restrain and preliminary enjoin Defendants from terminating or placing on indefinite leave without pay any employee who has received a religious exemption. Alternatively, if the requested injunctive relief is not granted, Plaintiffs respectfully request an injunction pending appeal or, failing that, an order denying same.

Respectfully submitted,

LAW OFFICE OF ANGELO J. ARTUSO

By:/s/Angelo J. Artuso
    Angelo J. Artuso
    P.O. Box 51763
    Albuquerque, New Mexico 87181-1763
    Telephone: (505) 306-5063
    angelo@nmliberty.com

       and

THOMAS MORE SOCIETY

By: /s/B. Tyler Brooks
    B. Tyler Brooks[†]
    N.M. Federal Bar No. 21-296
    309 W. Washington St., Suite 1250
    Chicago, Illinois 60606
    Telephone: (312) 782-1680
    btb@btylerbrookslawyer.com

    [†] *Admitted in NC, SC, TN & MI.*

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that the foregoing Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction was served on October 24, 2021, on David Sosinski, General Counsel for Los Alamos National Laboratory, by email to Dsosinski@lanl.gov.