# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**RAUL ARCHULETA, ISAAC
MARTINEZ, TRINA SUAZO-
MARTINEZ, DANIEL FRANK,
MICHELLE CORIZ, ADRIANNA
MARTINEZ, VALLERIE LAMBERT,
and SAM SPROW,**

      **Plaintiffs,**

**v.**

**TRIAD NATIONAL SECURITY, LLC,
d/b/a LOS ALAMOS NATIONAL
LABORATORY, and THOMAS MASON,
Director of Los Alamos National
Laboratory, in his official capacity,**

      **Defendants.**

**Case No. 1:21-CV-1030 KWR/SCY**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Defendant Triad National Security, LLC ("Triad") is a private company that operates Los Alamos National Laboratory ("LANL") under a Management and Operating contract with the U.S. Department of Energy's National Nuclear Security Administration ("DOE/NNSA").

To date, COVID-19 has taken approximately 700,000 American lives. At LANL, COVID-19 outbreaks have sickened or killed numerous Triad employees and have disrupted critical operations. To protect the health of its employees and avoid further disruptions to its operations, Triad instituted a COVID-19 vaccine requirement for all workers at LANL. Triad did so independently and without influence or direction from either the federal or any state government. Consistent with federal and state law, Triad allowed workers to submit requests for medical and religious exemptions, and Triad granted religious and medical accommodations to qualifying requests. Consistent with its policy, Triad separated employees who had not received a first vaccine shot by the close

of business on October 15 and has placed on a leave of absence those employees who received a religious accommodation, including Plaintiffs.

Plaintiffs ask this Court for extraordinary relief that would change their current employment status and prioritize their personal objections to receiving a COVID-19 vaccine over the health and safety of their coworkers as well as Triad's mission. Plaintiffs' arguments ignore the current state of the public health emergency and the law.  Indeed, employers like Triad may adopt COVID-19 vaccination requirements, and courts almost unanimously support their right to do so. Plaintiffs' request that the Court act as a "super-personnel department" and reverse Triad's leave of absence accommodation for them and grant them their preferred accommodation, allowing them to work while unvaccinated, is unfounded and endangers Triad's employees and mission at LANL. Plaintiffs' motion fails for many reasons.

First, on October 15, the Honorable Jason Lidyard of the First Judicial District Court of the State of New Mexico, County of Los Alamos already denied a motion for preliminary injunction brought by approximately 110 named and anonymous "Doe" Triad employees, including at least one or all of the Plaintiffs here, on behalf of all Triad employees, effectively seeking the same relief and based on the same grounds proffered by Plaintiffs here. Plaintiffs and their lawyers knew about this prior decision and are effectively asking this Court to act as a state appellate court and reverse Judge Lidyard's order, which is improper.

Second, Plaintiffs' requested relief—prohibiting Triad from terminating or placing on indefinite leave without pay any employee (not just the named Plaintiffs) who has received a religious exemption—is a disfavored mandatory injunction. Plaintiffs are already on a leave of absence; six of eight Plaintiffs are currently using up their vacation banks while the other two have none and are on unpaid leave. Plaintiffs effectively are asking the Court to order Triad to take

affirmative steps to reinstate them—and all other similarly-situated employees even though this is not a Rule 23 class action—which would effectively constitute a wide-scale mandatory injunction.

Third, Plaintiffs' claims must be arbitrated.  Under the parties' arbitration agreements, an arbitrator has the authority to grant all relief that this Court can order. Plaintiffs' request here would give them everything they want from an arbitration and render null their arbitration agreements.

Fourth, Plaintiffs cannot demonstrate a likelihood of success on the merits because (a) Defendants are private actors, not government actors, and therefore Plaintiffs' constitutional law claims all fail; (b) even if Triad were a government actor (it is not), Triad has articulated not just a rational basis, but a compelling basis for requiring all employees who want to remain actively employed to become vaccinated, except for those few with certain CDC-recognized medical conditions who would likely be physically harmed by the vaccine and, thus, Triad's policy passes constitutional muster; (c) Plaintiffs cannot demonstrate that Defendants violated either Title VII or the ADA; and (d) Plaintiffs' requested religious accommodation—being allowed to work at LANL without vaccination—is not reasonable, would create an undue hardship, create untenable safety risks, and impose more than *de minimis* costs on Triad.

Fifth, Plaintiffs cannot demonstrate irreparable harm. Triad is a private employer, not a government actor, and Plaintiffs' (theoretical) right to recover money damages would repair any alleged harm from losing their jobs or security clearances.

Sixth, the balance of hardships and the public interest weigh heavily against Plaintiffs' request. Any injunction that blocked or limited Triad's vaccine requirement and related exemptions policy would put Triad's mission at serious risk, to say nothing of the health and safety of other workers at LANL.

## FACTUAL OVERVIEW

### I.   TRIAD IS A PRIVATE EMPLOYER WHOSE WORK DIRECTLY SUPPORTS NATIONAL SECURITY.

Triad is a private limited liability company that manages and operates LANL pursuant to a contract with DOE/NNSA. LANL is not a legal entity; it is a physical space, owned by the U.S. Government. Triad works with DOE/NNSA on projects to further national security, science, energy, and environmental stewardship. Triad also works with other federal agencies to further nuclear security, intelligence, defense, emergency response, nonproliferation, counterterrorism, energy security, emerging national threats, and environmental stewardship. Triad's mission and ability to operate without delay or interference is connected to the United States' national security interests. Declaration of William Mairson ("Mairson Decl.") ¶¶ 3-5.

### II.   COVID-19 DISRUPTED WORK AT LANL.

The COVID-19 virus continues to spread across the United States. COVID-19 is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk.  The risk of transmission is heightened in indoor environments, where infectious droplets may linger for longer periods of time. As of October 27, 2021, approximately 739,716 Americans and over 5,000 New Mexicans have lost their lives to COVID-19. Declaration of Dr. Sara Pasqualoni ("Pasqualoni Decl.") ¶¶ 3-5.

Despite Triad's strict masking, social distancing, and testing requirements, over the last eighteen months, numerous Triad employees and contractors have been exposed to, infected with, or killed by COVID-19. As of September 29, 2021, before the vaccine requirement went into effect, 4,031 workers at LANL have been exposed to COVID-19 while at work, 1,072 workers have been diagnosed with COVID-19, and 8,861 total workers have been forced to isolate for days or weeks. During this same period, ten employees reported that they are no longer able to work

because of longer term health consequences arising from their COVID-19 infection or their prolonged intensive care treatment. At least five Triad employees have died due to COVID-19. Mairson Decl. ¶¶ 9-10. As of late August 2021, COVID-19 infections and exposures caused 21,450 employee isolation days (i.e., days when employees remained isolated at home and could not come to work) and 44,762 contractor isolation days, totaling approximately *216 years'* worth of lost productivity. Mairson Decl. ¶¶ 8-11.

## III.   VACCINATIONS SAVE LIVES AND REDUCE OPERATIONAL DISRUPTIONS.

Vaccinations against COVID-19 became available in New Mexico in early 2021, after having been approved by the FDA and recommended by the CDC. Triad's Medical Director, Dr. Sara Pasqualoni, analyzed the available CDC and FDA data regarding COVID-19 vaccines and concluded that they are safe and effective. Triad has offered free vaccines onsite to employees since January 4, 2021. Pasqualoni Decl. ¶¶ 9, 10. Even so, as of early August 2021, approximately 1,500 workers, or 15% of LANL's workforce, were not vaccinated. Mairson Decl. ¶ 13.

The Delta COVID-19 variant (variant B.1.617.2) made matters worse. This variant is more contagious than the initial strain, and studies suggest it is more dangerous as well. The Delta variant can evade certain natural antibodies, and as of July 2021, infections began to rise. The Delta variant now makes up "virtually 100%" of new cases in New Mexico, and unvaccinated individuals are more likely to be infected. Pasqualoni Decl. ¶¶ 11-17.

While masks and distancing provide some mitigation against COVID-19, infections remain possible, and vaccination is the best way to limit infections, hospitalizations, and deaths. Not only do vaccinations reduce the likelihood of serious illness, but vaccinated people are also less infectious. Studies indicate that while viral loads are initially comparable between vaccinated and unvaccinated people infected by the Delta variant, vaccination is associated with a faster decline in viral load, meaning that vaccinated people are infectious for a shorter period of time. In sum,

vaccinated people are much less likely to transmit a COVID-19 infection and are much less likely to die from COVID-19. Pasqualoni Decl. ¶¶ 15-18.

## IV.     TRIAD'S VACCINE REQUIREMENT AND ACCOMMODATION PROCESS.

Despite an 85% vaccination rate among the workforce at LANL in August 2021, COVID-19 threatened to impact Triad's ability to accomplish its mission. Mairson Decl. ¶ 15. Unvaccinated workers at LANL have experienced worse medical outcomes than vaccinated workers, and one healthy, unvaccinated employee in his thirties recently died due to COVID-19.  Pasqualoni Decl. ¶¶ 18-19.

Therefore, in August, Triad analyzed whether to institute a vaccine requirement for workers at LANL. Triad analyzed economic, productivity, and health impacts, as well as the moral costs and benefits of instituting such a requirement. Mairson Decl. ¶¶ 16-22. Triad concluded that a fully vaccinated population would substantially reduce risks to LANL's operations and workforce, so Triad decided to require vaccinations for all employees, contractors, and subcontractors. Mairson Decl. ¶ 23.  Triad made its decision to implement a vaccine requirement and developed its own vaccination strategy and outreach for vaccinating its employees independently and without any direction, input, or guidance from either the U.S. government or any state government.  Mairson Decl. ¶¶ 24-25.

At first, Triad required all workers who wish to continue their employment at LANL to obtain their second Moderna or Pfizer shot or first Johnson & Johnson shot by October 1, 2021 in order to be "fully vaccinated" by October 15, 2021. On September 27, 2021, Triad clarified that employees who were partially vaccinated by October 15 would be permitted to continue to work until fully vaccinated, and those who were partially vaccinated by October 15 would be permitted to use vacation starting Monday, October 18 until they were fully vaccinated. Mairson Decl. ¶ 31-32, 35, Exh. 7.  Triad allowed both medical and religious exemptions. Mairson Decl., ¶¶ 34, 37.

Consistent with the policy, those who were not vaccinated by October 15 and who had not submitted or received a medical or religious exemption to the vaccination requirement were terminated. *Id.*, ¶ 35.

*Medical exemptions*. Employees who sought a medical exemption were required to submit a form supported by information from a doctor. In some cases, Triad granted a temporary exemption to accommodate specific circumstances, and in other cases, Triad granted a permanent exemption to accommodate an ongoing health condition. If the medical exemption was denied, the unvaccinated employee would be expected to pursue vaccination if he or she chose to continue working for Triad. Pasqualoni Decl. ¶¶ 21-24, Ex. 2; Mairson Decl. ¶ 38.

Dr. Pasqualoni evaluated the appropriate criteria and made determinations for granting or denying medical exemption requests. She relied on CDC guidance to make those determinations, and in situations where the guidance may not have seemed entirely clear, Dr. Pasqualoni obtained second opinions from appropriate specialists. In many instances, Dr. Pasqualoni followed up with employees to ask questions and, in multiple cases, asked the employees to submit additional information from their physicians. Pasqualoni Decl. ¶¶ 23, 24.

Dr. Pasqualoni analyzed 95 formal requests for a medical exemption (including from Triad contractors). She did not approve 52 requests because they did not qualify as a contraindication to COVID-19 vaccination for a medical exemption under the CDC's guidance. Pasqualoni Decl. ¶¶ 25. Dr. Pasqualoni gave certain employees—like those on parental leave—extensions, so long as they are fully vaccinated before they return to work. *Id.*, ¶ 23. Dr. Pasqualoni also granted 18 extensions to provide additional information; six of those employees have been instructed by the specialist to whom Dr. Pasqualoni referred them to receive the vaccine. Dr. Pasqualoni granted 13 extensions to initiate the vaccine series on a later date due to COVID-19 recovery and/or treatment

with monoclonal antibodies or convalescent plasma. She granted three exemptions based on a medical condition that met the CDC's criteria. *Id.*, ¶ 24.

*Religious Exemptions.* Despite Plaintiffs' argument otherwise, Triad conducted an individualized assessment of all religious accommodation requests. Mairson Decl. ¶ 39. Because Triad received so many employee requests for religious exemptions, Triad hired contract employees to interview employees about their requests to determine on an individualized basis whether they met the standards for accommodation. Triad received approximately 293 requests for religious exemptions. Of those requests, Triad approved approximately 267 (including Plaintiffs'), denied 21 (one of which is being appealed), and is still evaluating one. *Id.*, ¶ 42.

Triad considered various accommodations for employees with sincerely held religious beliefs. Triad evaluated each request, including the job duties for each employee, and for each request submitted, Triad determined that a leave of absence was the only reasonable accommodation that Triad could provide that did not place an undue burden on Triad and its employees.[1]  Mairson Decl. ¶ 42.  The vast majority of jobs at LANL are ones that require employees to perform their usual duties onsite, and ***all*** active LANL workers must come onsite periodically to perform their required duties. *Id.*, ¶¶ 7, 26-30. Allowing unvaccinated employees to be present onsite at LANL during the COVID-19 pandemic would create an undue health hazard and burden to LANL operations and Triad's employees. *Id.*, ¶ 44.

Following the October 15 deadline, Triad placed approximately 152 employees who received a religious exemption on a leave of absence. Mairson Decl. ¶ 46.  A leave of absence is a reasonable accommodation because: (1) a leave of absence will not impose an undue burden on Triad or its onsite workers; (2) Triad allows employees to first exhaust vacation before going on a

---

[1]Merely because Triad reached the same conclusion does not mean that Triad did not conduct an individualized inquiry.

leave; (3) a leave is not the same as a job termination, particularly because employees will retain seniority rights and are likely to return to work when it is safe to do so; and (4) Triad is attempting to resolve the security clearance issue raised by some of the Plaintiffs through a pending request to the Department of Energy. Mairson Decl. ¶ 49.

## V.    A NEW MEXICO STATE COURT ALREADY REJECTED PLAINTIFFS' AR-GUMENTS.

On September 27, 2021, 34 identified employees and 81 anonymous "Doe" employees "on behalf of themselves and all others similarly situated" filed a lawsuit in the First Judicial District Court for the State of New Mexico, County of Los Alamos against Triad, Dr. Mason, and Triad's Medical Director asserting that Triad's COVID-19 vaccine requirement infringed on the constitutional rights of all Triad employees and/or violated the New Mexico Human Rights Act ("NMHRA"), which is virtually indistinguishable from Title VII and the ADA. *See Butters, et al. v. Mason, et al.*, Case No. D-132-CV-2021-00084.  It appears that *at least* one of the Plaintiffs here, Adrianna Martinez, was a Doe plaintiff in *Butters*, as a redacted affidavit was submitted in *Butters* containing facts virtually identical to those Martinez asserts in her affidavit in this case. *Compare* Declaration of Adrianna Martinez (Doc. No. 5, Exhibit 4) with Defs.' Mot. Compel Arbitration, Ex. C, Doc. No. 12-3.  On September 29, the *Butters* plaintiffs filed an Emergency Motion for an Ex Parte Temporary Restraining Order or for a Preliminary Injunction seeking to prohibit Triad from enforcing its vaccine requirement.  The Honorable Jason Lidyard denied the request for a TRO, and the parties thereafter submitted written evidence and argument related to the preliminary injunction motion.

In the meantime, on October 11, 2021, Plaintiffs' lawyers in this lawsuit sent Triad a letter demanding that Triad reverse its policy and decisions on religious and medical accommodation requests, but Plaintiffs' lawyers did not reveal the identities of their clients. Triad responded on

October 13 by informing the lawyers of the existence of the already pending *Butters* matter and invited the lawyers to identify their clients so that Triad might have a dialogue about their specific circumstances. Plaintiffs' lawyers did not immediately respond; they instead waited to see what would happen in the *Butters* case.  Declaration of David Sosinski ("Sosinski Decl.") Exs. 1, 2.

On October 14, Judge Lidyard held oral arguments for approximately three hours.  On Friday, October 15, Judge Lidyard issued a lengthy order from the bench denying the motion for preliminary injunction in its entirety.  Judge Lidyard assumed without deciding that Triad was a New Mexico state actor (it is not), and ultimately found that  (1) Triad's vaccine policy is a neutral rule of general applicability; (2) Triad's vaccine policy does not violate the Free Exercise Clause; (3) Triad's policy does not violate the 14th Amendment; (4) Triad's vaccine policy does not violate religious or disability rights under the NMHRA; (5) the *Butters* plaintiffs failed to demonstrate irreparable harm; and (6) the balance of equities and public interest favors Triad. *See* Request for Judicial Notice ("RJN") Ex. 1.

On Monday, October 18, after the *Butters* plaintiffs had been let go or placed on leave, they unilaterally dismissed their case.  Within hours of that dismissal, Plaintiffs' lawyers here followed up with another letter refusing to disclose their clients' identities, but also demanding that Triad reverse its vaccine requirement.  Sosinski Decl. Ex. 3.  Triad responded on October 21 noting that Judge Lidyard already denied the relief Plaintiffs are seeking and that Triad already separated employees who were not vaccinated or put those who received religious exemptions on a leave. *Id*., Ex. 4.  Triad again asked the lawyers to identify their clients so that the parties could have a dialogue about their situations. In the evening of that same day, Plaintiffs' lawyers sent another letter again refusing to identify their clients, but noting that they intended to commence this action.[2]

---

[2] Plaintiffs made no meaningful efforts to attempt to resolve this dispute prior to the date Triad's vaccine requirement went into effect. Plaintiffs' October 11, 18, 21 letters were not genuine attempts to avoid litigation because the

**LEGAL ARGUMENT**

I.   **PLAINTIFFS' CLAIMS SHOULD BE COMPELLED TO ARBITRATION.**

The Court should compel Plaintiffs' claims to arbitration because each of the Plaintiffs signed and agreed to be bound by an At-Will Employment, Invention Assignment, and Confidentiality Agreement ("Employment Agreement") containing a broad arbitration provision requiring arbitration of all disputes "arising out of or related to [their] employment."  The arbitration provision has no carve-out for injunctive relief and permits the arbitrator to issue all of the same remedies this Court could issue.  *See* Mairson Decl. ¶ 50, Ex. 8.  Thus, unlike in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726 (10th Cir. 1988), the arbitration agreement does not provide for the parties to seek injunctive relief in this Court.  *See Dawson v. Sw. Multiple Listing Serv., Inc.*, No. CIV-99-0794, 1999 WL 35808950, at *3 (D.N.M. Sept. 29, 1999) (ordering arbitration and staying proceedings prior to ruling on plaintiff's request for injunctive relief because, as found in *Dutton*, "in the Tenth Circuit, courts have refused to allow [an injunction proceeding] unless it is specifically agreed to in the arbitration clause").

While some courts have authorized the issuance of injunctive relief prior to compelling arbitration, they have done so only "to preserve the meaningfulness of the arbitration process" and ensure it is not a "hollow formality"—but Plaintiffs' request does the opposite.  *See e.g.*, *Cappriole v. Uber Tech., Inc.*, 7 F.4th 854, 867 (9th Cir. 2021) (affirming order compelling arbitration where plaintiffs' sought injunction reclassifying them from contractors to employees in advance of arbitration because "the magnitudinous attendant changes to their pay and benefits" would "upend, rather than preserve the status quo" and "would certainly fail to 'preserve the meaningfulness of

Plaintiffs' lawyers did not identify Plaintiffs. This precluded Triad from having any meaningful dialogue about Plaintiffs' specific circumstances, something Plaintiffs repeatedly argue that Triad was required but failed to do. Plaintiffs' decision to sit on their rights by hiding behind anonymity, despite contending that the only way Triad could respect their rights was to consider them individually, is unreasonable.

the arbitral process.'"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053–54 (4th Cir. 1985) ("a district court has the discretion to grant a preliminary injunction to preserve the status quo pending the arbitration of the parties" dispute if the enjoined conduct would render that process a 'hollow formality.'") (internal citations omitted).

Here, Plaintiffs ask the Court to effectively require Triad to reinstate Plaintiffs and hundreds of other employees to active employment pending resolution of Plaintiffs' disputes on the merits.  Granting this relief would not only provide Plaintiffs with more than the relief they could individually recover in arbitration, there also would be no way to make Triad whole for the damages such an injunction would cause if it ultimately prevailed on the merits—rendering arbitration meaningless and a hollow formality for Triad.  *See Bradley*, 756 F.2d at 1053–54 ("The arbitration process would be a hollow formality where the 'arbitral award rendered could not return the parties substantially to the *status quo ante*.").  Thus, the Court should compel arbitration without reaching Plaintiffs' request for injunctive relief.

## II.   PLAINTIFFS' CLAIMS ARE PRECLUDED BY THE STATE COURT RULING.

It is rare that plaintiffs who fail to obtain a preliminary injunction from a state court immediately run to federal court to try again. Yet when they do, "universal" principles of preclusion "support the proposition that a preliminary injunction ruling has preclusive effect with regard to subsequent motions for preliminary injunction." *Hayes v. Ridge,* 946 F. Supp. 354, 364 (E.D. Pa. 1996), *aff'd, Hayes v. Ridge,* 216 F.3d 1076 (3d Cir. 2000) ("In this case, nearly every indication favors a finding that the prior state court ruling denying plaintiffs' application for a preliminary injunction has a preclusive effect such that their identical motion in this court ought to be denied.")

As noted above, a New Mexico state court refused to enjoin Triad's vaccine requirement. Without pinpointing any changed circumstances, those 114 employees are therefore precluded from asking this Court to enjoin the same policy. At least one of the anonymous *Butters* plaintiffs

appears to be a Plaintiff here (Adrianna Martinez) whose affidavit in this case is virtually identical to a redacted affidavit submitted in *Butters*. Defendants suspect that *all* the plaintiffs in this action were either anonymous plaintiffs in *Butters* or at least in privity with the *Butters* plaintiffs.

In *Taylor v. Sturgell*, the Supreme Court identified six circumstances in which plaintiffs who were not formally parties in an action can nonetheless be precluded by that action. Two of those circumstances—when the subsequent plaintiff had "control" over the initial action or is litigating the second action as a "proxy" for the original plaintiffs—appear to be triggered here. *See Taylor v. Sturgell*, 553 U.S. 880, 895 (2008). That appearance arises from the timing and content of the communications Triad received from Plaintiffs' lawyers: they steadfastly refused to identify their clients and threatened to seek a TRO only after the state court refused to enjoin Triad's vaccine mandate. While it is possible that Plaintiffs (minus Ms. Martinez) had no control over the *Butters* action and are not pursuing this action on behalf of the *Butters* plaintiffs, the speed with which this motion has proceeded has prevented Defendants from obtaining under-oath discovery from Plaintiffs. Accordingly, even if Plaintiffs' preliminary-injunction motion had merit, the Court should not issue preliminary equitable relief without first allowing Defendants an opportunity to investigate Plaintiffs' connection to *Butters*.[3] Then, the Court should refuse a preliminary injunction for any Plaintiffs, like Ms. Martinez, engaged in "obvious forum shopping."  *Hayes*, 946 F. Supp. at 366.

## III.   PLAINTIFFS SEEK A DISFAVORED MANDATORY INJUNCTION.

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (internal citations

---

[3] That Plaintiffs here assert some claims that are different from the claims the *Butters* plaintiffs asserted is no barrier to preclusion, for preclusion attaches not only to issues that were litigated but also to issues that could have been litigated, *see Brooks Trucking Co. v. Bull Rogers, Inc.*, 128 P.3d 1076, 1079 (2006). Every claim asserted here could have been asserted in *Butters*.

and quotations omitted). To obtain a TRO or preliminary injunction, Plaintiffs must show: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)). Notably, "the movant 'must' satisfy his or her burden for each and every one of these prerequisites … the strength of one cannot compensate for the weakness of another." *Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1192 (D.N.M. 2020) (citing *Jewell*, 839 F. 3d at 1282).

Courts disfavor preliminary injunctions that "exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). If a motion exhibits one of these three characteristics, a plaintiff faces "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor." *Id*.

On its face, Plaintiffs' Motion seeks to enjoin Triad from "terminating or placing on indefinite leave without pay any employee, including Plaintiffs, who has received a religious exemption."[4]  Plaintiffs, however, concede that Triad ***already*** placed Plaintiffs on "an indefinite leave without pay" (Plaintiffs' Memorandum in Support of Motion for TRO or Preliminary Injunction ("Memo.") at 26) or what Plaintiffs call an "accommodation by termination." *Id*. at 23.  Stated differently, Plaintiffs are asking the Court to enjoin Triad from doing something it has already

---

[4]   Plaintiffs' request for relief on behalf of unnamed and unrepresented Triad employees is improper.  Plaintiffs have not filed a Rule 23 action and, even if they had, they each signed arbitration agreements precluding them from seeking class-wide relief.

done. This renders Plaintiffs' request moot. *See, generally, Sanders v. Biden*, 687 Fed. Appx. 745, 746 (10th Cir. 2017) ("Suffice it to say that the various events sought to be enjoined have already occurred, thereby rendering the case moot").

Reading between the lines, Plaintiffs are asking the Court to order Triad to **reinstate** or otherwise **return** them to active status; indeed, Plaintiffs ask this Court for a "restoration" to their positions.  Memo at 33. Plaintiffs in effect seek a disfavored mandatory injunction. *Schrier*, 427 F.3d 1261 ("We characterize an injunction as mandatory if the requested relief affirmatively requires the nonmovant to act in a particular way.").  Reinstating or returning Plaintiffs to active status would require Triad to take several affirmative steps, including reissuing them badges, computers, cellphones, cryptocards, and keys, as well as unraveling all of the efforts to reassign their duties and reorganizing the work that has already been redistributed to other employees. Mairson Dec. ¶ 47. Courts regularly find that an injunction that orders reinstatement is a disfavored mandatory injunction.  *Schrier*, 427 F.3d at 1261 (relief requesting that plaintiff be reinstalled as Chair of the Department of Medicine was a mandatory injunction); *Isler v. N.M. Activities Ass'n*, 2010 U.S. Dist. LEXIS 144454, at *23 (D.N.M. Feb. 19, 2010) ("This Court finds that the injunction being sought is a disfavored mandatory injunction, as it requires the reinstatement of Mr. Isler."); *Chrysler Motors Corp v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 909 F.2d 248, 249 (7th Cir. 1990) ("An ordering to reinstate an employee is a mandatory injunction."). Plaintiffs therefore bear a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors and must make a strong showing that these tilt in their favor.

## IV.   PLAINTIFFS CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### 1.   Defendants Are Not Government Actors, and Therefore, Plaintiffs' Constitutional Law Claims All Fail.

Plaintiffs appear to contend that Defendants are federal actors or, alternatively, state actors.

*See* Memo. 2-4, 9, 11-13. Defendants are neither and therefore "Plaintiffs' likelihood of success on the merits of their constitutional claims is virtually nonexistent, weighing heavily against granting injunctive relief." *See Beckerich v. St. Elizabeth Med. Center*, 2021 WL 4398027, at *3 (E.D. Ky. Sept. 24, 2021) (denying request for injunction to bar COVID-19 vaccine requirement and rejecting application of state actor doctrine).

### A.   Defendant Triad is not a federal actor.

Triad is a private limited liability company, not a federal actor.  When constitutional claims are asserted against a private party, to be classified as a government actor under color of law, the private party "must be jointly engaged with [government] officials in the conduct allegedly violating the [constitutional] right." *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021) (internal quotations omitted).[5] Courts apply various tests when examining alleged government action, including (1) the nexus test, (2) the public function test, (3) the joint action test, and (4) the symbiotic relationship test.  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). Ultimately, to constitute government action under any of these tests, the challenged conduct must be "fairly attributable" to the government.  *Id.* at 1447 (internal quotations omitted).

Plaintiffs failed to submit evidence establishing that Triad is a federal actor. Plaintiffs' allegations—that Triad was formed for the sole purpose of managing LANL, Triad manages LANL according to "highly specific and complex requirements prescribed by the government," the government monitors Triad's compliance with those requirements, Triad relies entirely or almost entirely on government funding, and Triad's employees must pass background checks and

---

[5]   The ***standards*** for determining whether an action is governmental are the same whether the purported nexus is to the state or to the federal government, though the ***relevant facts*** are different.  *See Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1432 n.3 (9th Cir. 1989); *see also Romero v. Peterson*, 930 F.2d 1502, 1507 (10th Cir. 1991) (applying § 1983 caselaw when determining if defendant was a "federal actor").

hold security clearances (Memo. at 11-12)—show only that Triad is a federal **contractor** and are insufficient for the Court to find that Triad is a federal **actor**. *See, e.g.*, *Gallagher*, 49 F.3d at 1451 (even "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action"); *United States v. N.M.*, 455 U.S. 720, 739-40 (1982) (concluding that DOE contractors like Triad were not instrumentalities of the federal government because the contractors were "privately owned corporations; Government officials do not run [their] day-to-day operations nor does the Government have any ownership interest" and the fact that "the federal property involved was being used for the Government's benefit—something that by definition will be true in virtually every management contract—was irrelevant, for the contractors remained distinct entities pursuing private ends, and their actions remained commercial activities carried on for profit" (internal quotations omitted)); *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) (the mere fact that a business is subject to government regulation does not convert its action to that of the state, nor does the fact that the regulation is extensive and detailed); *Mineo v. Transp. Mgt. of Tenn., Inc.*, 694 F. Supp. 417, 419, 424 (M.D. Tenn. 1988) (no symbiotic relationship even though private company's "sole function … was to manage and operate Nashville's transit system" and even though the government supplied company with "equipment, office space, furniture and supplies").[6]

    Indeed, Plaintiffs' argument that Triad is a federal actor also fails for the simple reason that

---

[6] Plaintiffs misleadingly suggest that *Bilyeu et al. v. UT-Battelle, LLC*, 2021 WL 4859932 (E.D. Tenn. Oct. 15, 2021) is analogous because it involves a DOE contractor at another national laboratory. *See* Memo. at 18-19. But the *Bilyeu* plaintiffs did not even assert any constitutional claims in that case or allege that the DOE contractor was a government actor. *See* Verified Appl. for TRO and for Prelim. Inj., *Bilyeu*, No. 3:21-cv-352 (E.D. Tenn. Oct. 13, 2021).

Triad acted independently in implementing its vaccine requirement and exemptions policy, without any instruction, input, or direction from the government. Mairson Decl. at ¶¶ 24-25, 31; *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982) ("Faithful adherence to the 'state action' requirement … requires careful attention to the gravamen of the plaintiff's complaint."); *Janny*, 8 F.4th at 919 (to be classified as a government actor, the private party "must be jointly engaged with [government] officials in the conduct allegedly violating the [constitutional] right").[7] In other words, the challenged employment requirement—Triad's vaccine mandate—is not federal action simply because Triad is a federal contractor. If Plaintiffs' logic were sound, every employment decision by a contractor like Triad would have constitutional ramifications.[8] There is no precedent to support such an expansion of the law.

### B.   Plaintiffs have no cause of action to assert constitutional claims.

Even if Triad were a federal actor (and it is not), Plaintiffs have no cause of action to assert constitutional claims against Triad. Plaintiffs purport to bring their constitutional claims against Defendants only through 42 U.S.C. § 1983. *See* Am. Compl. ¶ 13; Count IV (heading and ¶ 63); Count VI (heading and ¶ 85). But Plaintiffs cannot bring a § 1983 action against a ***federal*** actor because § 1983 actions apply only to defendants acting under color of ***state*** law. *See* 42 U.S.C. §

---

[7] That DOE requested Triad to modify its contract to add a COVID-19 vaccination requirement ***after*** Triad independently implemented its mandate is of no consequence and does not retroactively convert Triad into a federal actor. *See Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013) (government approval of or acquiescence to the challenged conduct is not enough to establish the nexus required for government action); *Pino v. Higgs*, 75 F.3d 1461 (10th Cir. 1996) (no government action where the government did not pressure or coerce the private party into making the decision in question); *Gallagher*, 49 F.3d at 1455 (the fact that the private entity and the government share a common goal is not enough to show government action; rather, the private entity and the government "must share the specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action"); *Carlin Commc'n v. S. Bell Tel. & Tell. Co.*, 802 F.2d 1352, 1361 (11th Cir. 1986) ("[T]he mere approval by the [government agency] of a business practice of a regulated utility does not transmute a practice initiated by the utility into state action.").

[8] Even if Triad were a government actor, it is acting as an employer and not a regulator, and therefore has greater leeway to manage its employees. *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.").

1983; *see also Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 398 n.1 (1971) (no recovery may be had from any of the federal defendants under § 1983); *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976) (Section 1983 has no application to federal officers acting pursuant to federal law); *Martinez v. The Geo Group, Inc.*, Case No. ED CV 18-1125-SP, 2020 WL 2496063, at *14 (C.D. Cal. Jan. 7, 2020) (Section 1983 provides no right of action against federal—rather than state—actors); Am. Compl. at ¶¶ 63, 78, 85 (alleging that Triad is acting "under color of ***federal*** law" (emphasis added)).

The federal analogue to § 1983 is an implied right of action under *Bivens*, which Plaintiffs have not asserted. And indeed, a *Bivens* action is not appropriate here. The Supreme Court has made clear that plaintiffs cannot bring a *Bivens* action against private defendants, even if those private defendants are acting under color of federal law. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (there is no implied private right of action under *Bivens* for damages against private entities that engage in alleged constitutional deprivations while acting under color of federal law); *Menteer v. Applebee*, 196 Fed App'x 624, 627 (10th Cir. 2006) (affirming trial court's dismissal of plaintiff's *Bivens* claim against private corporate defendant). What's more, the Supreme Court recently admonished against expanding *Bivens* actions into "new" contexts, *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859-60 (2017), and this is certainly a new context. Plaintiffs identify no precedent where employees were allowed to bring a *Bivens* action on Free Exercise grounds. *Cf. Bush v. Lucas*, 462 U.S. 367 (1983) (holding that *Bivens* could not be used for a First Amendment claim by a federal employee against his supervisor).

### C.   Defendant Triad is not a state actor.

Triad is not a state actor either. To argue otherwise, Plaintiffs rely on their allegations that Triad consists of three principals: a private company (Battelle Memorial Institute), the University of California, and the Texas A&M University System.  *See* Memo. at 3-4, 11. Being partially

owned by state universities is not enough to convert Triad into a state actor. *See Barber v. Regents of the Univ. of Cal.*, 2008 WL 11336753, at *2 (D.N.M. Feb. 4, 2008) (order clarified on other grounds) (Triad's predecessor, Los Alamos National Security, LLC, was 50% owned by the University of California, but was still a private sector corporation, not an instrumentality of the state); *Wittner*, 720 F.3d at 776 (allegation that defendant receives state funding does not create state action when there is no allegation that the state uses its funding to coerce the particular challenged conduct). Moreover, Plaintiffs do not allege ***anything*** connecting Triad's vaccine mandate and exemptions policy to any action by California or Texas, and there is no such connection. *See, e.g.*, *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (state action may be found if and only if the challenged conduct has a "close nexus" to the state such that the seemingly private behavior may be treated as that of the state itself); *Janny*, 8 F.4th at 919 ("When a constitutional claim is asserted against private parties, to be classified as state actors under color of law they must be jointly engaged with state officials in the conduct allegedly violating the federal right." (internal quotations omitted)); Mairson Decl. at ¶ 24.

### D.     Defendant Dr. Mason is neither a federal actor nor a state actor.

Plaintiffs suggest that Dr. Mason is a government actor, but besides generally alleging that he is the director of LANL (Memo. at 2, 9), Plaintiffs fail to explain how they are likely to show that Dr. Mason, an individual employed by a private company, is either a federal or state actor. Plaintiffs thus cannot show that they are likely to prevail on their constitutional claims against Dr. Mason. *See, e.g.*, *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018) (explaining that "[b]ecause the grant of a preliminary injunction is 'an extraordinary remedy,' the movant must make a 'clear showing' that he is entitled to the injunction" and rejecting the request for a preliminary injunction where plaintiffs presented insufficient evidence and no supportive caselaw (citation omitted)). Indeed, because Triad is neither a federal nor state actor as explained

above, Dr. Mason, an employee of Triad, cannot be a government actor either.  *See Holly v. Scott*, 434 F.3d 287, 293 (4th Cir. 2006) ("To be sure, [defendant], like a great many private corporations, does business under contract with the government. But this is not by itself enough to subject it to constitutional liability, *let alone to create such liability for its individual private employees*." (internal citations omitted) (emphasis added)).

Plaintiffs' constitutional claims also fail for the same reasons they fail against Triad. Specifically, Plaintiffs have no cause of action to assert constitutional claims against Dr. Mason: (1) Plaintiffs cannot assert a § 1983 action against Dr. Mason, even if he was acting under color of federal law (*see, e.g.*, *Bivens*, 403 U.S. at 398 n.1); and (2) Plaintiffs cannot assert a *Bivens* action against Dr. Mason as a private individual. *See Malesko*, 534 U.S. at 66 (*Bivens* does not provide a remedy for alleged wrongs committed by a private defendant alleged to have denied the plaintiff's constitutional rights under color of federal law); *see also Ziglar*, 137 S. Ct. at 1859-60 (narrowing *Bivens* to cases where *Bivens* suits have already been recognized); *Martinez*, 2020 WL 2496063, at *18 ("*Bivens* has never been applied to an individual who was not in the direct employ of the federal government." (citing *Holly*, 434 F.3d at 291)).

Because Plaintiffs cannot prove that Defendants are government actors, their constitutional claims all fail, and Plaintiffs are not likely to succeed on the merits of these claims. *See, e.g.*, *Beckerich*, 2021 WL 4398027, at *3 ("Put simply, without establishing that Defendants are state actors, Plaintiffs' constitutional claims cannot stand, and thus have zero likelihood of success on the merits."); *Duran v. New Mexico Monitored Treatment Program*, 128 N.M. 659, 996 P.2d 922 (N.M. Ct. App. 2000) (where a private entity's actions cannot be characterized as government action, private entity cannot be held liable for alleged violations of constitutional rights).

## 2.   Plaintiffs' Constitutional Claims Still Fail.

Even if Triad were a government actor (and it is not), Triad's vaccine requirement passes

Constitutional muster and Plaintiffs' First and Fourteenth Amendment claims would still fail.

### A.   Plaintiffs' free exercise claim will fail.

Triad's vaccine mandate is "religiously neutral and generally applicable" and so needs only to be "rationally related to a legitimate governmental interest." Triad's mandate is neutral because it does not single out religion or religious practices. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). And it is generally applicable because it does not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct. *See id.* at 543. Triad does not mandate that *only* religious employees get vaccinated; the requirement applies to *all* employees. *Does 1-6 v. Mills*, _ F.4th _, 2021 WL 4860328, at *1 (1st Cir. Oct. 19, 2021) (vaccine mandate generally applicable because "it applies across the board"). It is a blanket requirement—constitutionally, no different than an employment requirement that all employees pass criminal background checks or pass random drug tests.

Plaintiffs compare Triad's requirement to regulations challenged in *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193–94 (2d Cir. 2014) and *Lukumi*, 508 U.S. at 538, but both are easily distinguishable because the regulations in those cases *targeted* religious practices. In *Cent. Rabbinical.*, the regulation *targeted* Judaism's bris ceremony and thus "purposefully and exclusively target[ed] a religious practice" of citizens. 763 F.3d at 186. So too in *Lukumi*: the regulation *targeted* religion because it forbade citizens from killing animals for religious purposes, but not for secular purposes. 508 U.S. at 521-22.

Plaintiffs also argue that Triad's vaccine policy is not generally applicable because it treats medical and religious *exemptions* differently. Plaintiffs are mistaken. To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting *comparable* secularly motivated conduct. *See Lukumi*, 508 U.S. at 543. "Comparability is concerned with the risks various activities pose." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Here, medical

exemptions are not comparable to religious exemptions because those with medical exemptions could be physically harmed by the vaccine and, therefore, allowing them to be exempt from the mandate and remain in active status advances the purpose of Triad's vaccine requirement.  Medical exemptions, in other words, arise from medical necessity.  Employees may have any number of other reasons for personally opposing vaccinations—maybe they don't trust the FDA and CDC, maybe they fear needles. Religious objections to vaccination are comparable to those non-medical objections, and on that axis, Triad treats religious objections *better* than comparable objections. Triad's vaccine requirement is generally applicable because it does not permit "secular conduct that undermines [Triad's] asserted interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania,* 141 S. Ct. 1868, 1877 (2021).

Indeed, Triad's vaccine policy is aligned with the vaccine mandate upheld in *Does 1-6 v. Mills*, No.21-1826,  F.4th 2021 WL 4860328. In *Mills*, the First Circuit found that a vaccination mandate which allowed medical *but not religious exemptions* did not violate the Free Exercise clause.  This is because the differential treatment between religious objection (which received no exemption) and medical need (which did) furthered the ultimate purpose of the vaccine requirement itself: to protect health and safety. *Id*. at *6. The court explained:

> Exempting from vaccination only those whose health would be endangered by vaccination does not undermine Maine's asserted interests here: (1) ensuring that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system; (2) protecting the health of the those in the state most vulnerable to the virus -- including those who are vulnerable to it because they cannot be vaccinated for medical reasons; and (3) protecting the health and safety of all Mainers, patients and healthcare workers alike.

*Id.*  For those citizens for whom receiving a vaccine would cause them medical hardship, the entire purpose of vaccination would be defeated. *Id*.  But for those seeking a religious exemption, receiving the vaccine would still help improve the health and safety of the citizens. *Id*.

Here, Triad's vaccine requirement is more generous than the one in *Mills* because it includes religious exemptions. So even if Triad were a government actor—which it is not—it cannot violate the Constitution by gratuitously providing an exemption that the Constitution does not require. *United States v. Cooper*, 754 F. Supp. 617, 621 n.7 (N.D. Ill. 1990), *aff'd*, 19 F.3d 1154 (7th Cir. 1994) ("where [parties have] been afforded greater procedural rights than the Constitution commands, they can scarcely complain (at least in constitutional terms) that those rights were not extended even farther."); *Porro v. Barnes*, 624 F.3d 1322, 1329–30 (10th Cir. 2010) ("Simply put, the failure to enforce a prophylactic policy …. well in excess of what due process requires cannot be—and we hold is not—enough by itself to create a triable question over whether county officials were deliberately indifferent to the Constitution").[9]

Accordingly, Triad's policy is subject to a rational basis review.  Under that test, incidental varying treatment of different groups—such as medical and religious accommodations—is wholly permissible. *Maniscalco v. New York City Dep't of Educ.*, 2021 WL 4344267, at *5 (E.D.N.Y. Sept. 23, 2021), *aff'd*, 2021 WL 4814767 (2d Cir. Oct. 15, 2021) ("Under [rational basis review], a court will uphold the state action unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the actions were irrational." (internal citations omitted)). Granting narrower accommodations for a broader group (religious exemptions) supports Triad's ultimate goal of limiting infections and protecting employee health.  *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1049 (D.N.M. 2020), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 F. App'x 316 (10th Cir.

---

[9] Plaintiffs' Motion does not address their Religious Freedom Restoration Act ("RFRA") claim.  *See* Am. Compl. at 25. RFRA only applies to the federal government, and Title VII preempts and precludes Plaintiffs' RFRA claims regardless. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014); *Holly v. Jewell*, 196 F. Supp. 3d 1079, 1090–91 (N.D. Cal. 2016) ("[U]pon review of RFRA, its legislative history, and cases interpreting RFRA, the court finds that Title VII remains the exclusive remedy for religious discrimination in federal employment.").

2021) (recognizing appropriateness of treating different risk levels differently).

That said, even if strict scrutiny applied, Triad's vaccine requirement is narrowly tailored. The interest in preventing the spread of COVID-19 is "compelling." *Wise v. Inslee*, 2021 WL 4951571, at *3 (E.D. Wash. Oct. 25, 2021). And Triad's vaccine requirement is tightly tied to that interest, as the requirement applies to everyone who works at or near LANL and who would therefore have to appear onsite for—at a minimum—drug testing, badge issues, or other technology related concerns. Mairson Decl. ¶¶ 27-29.  Before enacting the vaccine requirement, Triad tried other ways to protect the health of its employees and operations, but those alternatives did not succeed.  LANL still had severe disruptions and deaths.  Nor would altering the religious exemption to match the medical exemption advance Triad's compelling interest.  As detailed below, the standard for granting a medical accommodation is high while the same standard for religious accommodations is low.  As such, the number of employees with religious accommodations is almost three hundred while the number with a permanent medical accommodation is just three.  Allowing hundreds of people onsite would exponentially increase the risk. The vaccine mandate and accommodation process, which only allows a handful of employees who would be harmed by the vaccine to continue to work unvaccinated, is narrowly tailored to meet Triad's purpose for its vaccine mandate.  *Wise*, 2021 WL 4951571, at *3.

### B.    Plaintiffs' equal protection claims will fail.

To establish an equal protection claim, Plaintiffs must demonstrate they are members of a protected class and the rule at issue intentionally discriminates against them or their fundamental rights. *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). A disparate impact does not violate the Constitution. *Curtis v. Oliver*, 2020 WL 4734980, at *63 (D.N.M. Aug. 14, 2020).

Here, Plaintiffs argue that Triad violated Plaintiffs' equal protection rights by (1) refusing to provide medical exemptions to those who have previously recovered from COVID-19, and (2)

not treating religious accommodations the same as medical accommodations. Both arguments fail. Those who have recovered from COVID-19 are not a protected class, and Triad's compliance with CDC guidance concerning medical accommodations is not evidence of discrimination. *Bauer v. Summey*, 2021 WL 4900922, at *12 (D.S.C. Oct. 21, 2021) (concluding that vaccine mandate that does not allow exception for those who have already contracted COVID-19 would likely survive rational basis review); Pasqualoni Decl. ¶ 16.  Though religion qualifies as a fundamental right, Plaintiffs' Equal Protection claims fail for the same reason their Free Exercise claim fails: Plaintiffs have provided no evidence that Triad's vaccination mandate actually or intentionally discriminates against religion. *Valdez v. Grisham*, 2021 WL 4145746, at *5 (D.N.M. Sept. 13, 2021) (collecting cases that find that vaccine requirements do not implicate a fundamental right and therefore rational basis review applies). Indeed, Triad has provided a religious accommodation— though Plaintiffs don't think it goes far enough, the very existence of the accommodation indicates that Triad is not intentionally discriminating against religion.

### C.   Plaintiffs' Title VII Claims Fail.

#### a.   Plaintiffs are Not Entitled to the Accommodation of their Choosing.

Plaintiffs admit that Triad provided them each a religious exemption from its vaccine requirement. *See* Am. Compl. ¶¶20-27. Yet Plaintiffs assert a meritless argument that Triad violated Title VII, failed to engage in an interactive dialogue, and/or retaliated against them because they did not receive their *preferred* accommodation. Memo. at 22-27.  Plaintiffs, however, are not entitled to their preferred accommodation. *Tabura v. Kellogg USA*, 880 F.3d 544, 551 (10th Cir. 2018) ("[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation."). Unpaid leave is a reasonable accommodation because it eliminates the conflict between Triad's vaccine requirement and Plaintiffs' religious practice. *Ansonia Bd.*

*of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986) ("The provision of unpaid leave eliminates the conflict between employment requirements and religious practices")).

Although Plaintiffs argue that they should be permitted to remain unvaccinated and continue to work, Triad is not obligated to provide an accommodation that presents "more than a de minimis cost." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) (addressing potential loss in production and finding that "[a]ny cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship" (internal citation omitted)). Nor is Triad obligated to consider numerous accommodations to ensure that the Plaintiffs are satisfied. *Graff v. Henderson*, 30 F. App'x 809, 810 (10th Cir. 2002) (the duty to accommodate "does not obligate the employer to consider and preclude an infinite number of possible accommodations" (internal citation omitted)).

Here, Triad requires—and Plaintiffs admit—that even if they were to work remotely, they must come onsite for various tasks, including to participate in random drug tests. Mairson Decl. ¶ 27, Frank Decl. ¶4. Allowing Plaintiffs to work during a COVID-19 surge would present more than a de minimis risk to the health and lives of Triad's drug testers, badge workers, or other employees who are required to interact, in person, with Triad's entire New Mexico workforce as well as a risk to LANL's operations. Mairson Decl. ¶¶ 27-29.

### b. Providing Different Accommodations for Religious and Medical Exemptions is Lawful.

Plaintiffs' argument that Triad violated Title VII by providing more limited accommodations to those with religious objections than those with medical need is meritless. Religious accommodations are governed by Title VII while disability/medical accommodations are governed by the Americans with Disabilities Act ("ADA"), and courts routinely recognize the different

requirements under these laws.  *See e.g. Farah v. A-1 Careers*, No. 12-2692-SAC, 2013 WL 6095118, at *8 (D. Kan. Nov. 20, 2013) ("Title VII's religious accommodation requirement is less demanding than the accommodation requirement in the ADA"); *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1049 (7th Cir. 1996)("The Senate and House Reports on the ADA clarified that Hardison's statement that only de minimis costs were required for reasonable accommodation does not apply under the ADA"); *Prise v. Alderwoods Grp*., Inc., 657 F. Supp. 2d 564, 599 (W.D. Pa. 2009) ("The phrases 'reasonably accommodate' and 'undue hardship,' when employed in the Title VII context, do not impose on employers the heightened standards applicable under the Americans with Disabilities Act of 1990").

Because the standard for undue hardship under Title VII is much lower, it is not unlawful for Triad to grant different accommodations to those with medical exemptions under the ADA than those with a religious objections.  *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 757 (E.D.N.Y. 1998), aff'd, 189 F.3d 461 (2d Cir. 1999)("Title VII's obligation to make a reasonable accommodation of religious practices should not be confused with the obligation imposed by the Americans With Disabilities Act ("ADA") to make reasonable accommodation of disabilities. . . . [T]he Supreme Court has interpreted narrowly Title VII's duty to make reasonable accommodations, holding that any accommodation imposing "more than a de minimis cost" amounts to an undue hardship. Thus, in stark contrast to the ADA's reasonable accommodation requirement, which has been interpreted broadly, the obligation under Title VII is very slight.").[10]

Indeed, Triad's different treatment of religious and medical accommodations here is reasonable. Triad received only three qualifying medical exemptions of the 87 requests; this low

---

[10] Plaintiffs' reliance on *Romer v. Evans*, 517 U.S. 620, 633 (1996) is also unavailing.  There, the state Constitutional amendment at issue singled out a specific minority group to exclude from protections.  Nothing of the kind is at issue here.  The vaccine requirement is applicable to everyone, and those with either a religious or medical exemption may seek accommodation.

number was expected given the very few medical conditions that qualify as a contraindication to the vaccine. Pasqualoni Decl. ¶ 24. In contrast, Triad granted 267 of the 293 religious accommodation requests. Mairson Decl. ¶ 41. This, too, was expected given the lower bar for receiving a religious accommodation. *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 200 F. Supp. 3d 553, 559 (E.D. Pa. 2016), aff'd, 877 F.3d 487 (3d Cir. 2017)("Beliefs are protected under Title VII when they are '(1) sincerely held, and (2) religious in nature, in the claimant's scheme of things.'"). Allowing hundreds of unvaccinated people onsite—even for limited activities like drug testing or to address badge issues—would put Triad's entire population at risk. Indeed, the EEOC has confirmed that, when analyzing appropriate religious accommodations, employers may consider "the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer)."[11] Exposing Triad's employees to hundreds of unvaccinated employees with religious exemptions, as compared to just a handful of medical exemptions, would exponentially increase the risks to Triad's employees as well as its operations.

Plaintiffs cite *EEOC v. JBS USA, LLC*, 339 F. Supp. 3d 1135 (D. Colo. 2018) to argue that Triad's accommodation is not "reasonable." Initially, the United States Supreme Court has found that any accommodation is "reasonable" if it "eliminates the conflict between employment requirements and religious practices," as Triad's accommodation does here. *Ansonia*, 479 U.S. at 70. Moreover, the *JBS USA* court specifically recognized "[t]he questions of whether a proposed accommodation is reasonable and whether a proposed accommodation creates an undue hardship are separate and distinct." *Id*. at 1174 (internal citation omitted). Here, the issue is not whether allowing the Plaintiffs to keep working is a reasonable accommodation. Both potential accommodations would exempt the Plaintiffs from vaccination, so both are reasonable. The question is

---

[11] *See* EEOC Guidance, "Vaccinations - Overview, ADA, Title VII, and GINA," https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L.3

whether allowing Plaintiffs to continue working, which necessarily requires them to interact with drug testers, badge workers, and others, presents an undue hardship.

Numerous cases have found that an accommodation that would increase a health or safety risk is more than "de minimis," presents and undue hardship, and does not have to be provided, and Triad is not obligated to provide a different accommodation here. *Robinson v. Children's Hosp. Boston*, 2016 WL 1337255, at *9 (D. Mass. Apr. 5, 2016) ("The Hospital contends that granting Robinson's request would have been an undue hardship [under Title VII] because it would have increased the risk of transmitting influenza to its already vulnerable patient population. [ ] On this record, the Court agrees."); *Horvath v. City of Leander, Texas*, 2018 WL 10771965, at *5 (W.D. Tex. Oct. 10, 2018), aff'd sub nom. 946 F.3d 787 (5th Cir. 2020), as revised (Jan. 13, 2020) ("With respect to the department's vaccine requirement, the question for the Court is not '[w]hether the employer's decision was the correct one, or the fair one, or the best one' but 'whether the employer's [action] was motivated by discrimination.' The Department here concluded, based on recommendations for health care workers by the CDC, State Health Department, and Williamson County officials, that required vaccination of EMS and first responders would protect public health and safety." (internal citation omitted)).

Plaintiffs' reliance on *Sambrano et al v. United Airlines, Inc.* and *Bilyeu et al v. UT-Battelle* is similarly misplaced. First, the courts in both of these cases issued TROs to preserve the status quo ***before*** the respective vaccine requirement came into effect and the defendants put the employees on a leave. In contrast, Triad's vaccine requirement is already in effect and Plaintiffs are already on leave, so the relative status quos are different. Second, *Sambrano* is less persuasive than an in-circuit decision from the District of Colorado addressing the exact same facts and

finding that leave without pay was the only accommodation that did not present an undue hardship. *Barrington v. United Airlines*, 2021 WL 4840855, *5 (D. Colo., Oct. 14, 2021) ("A review of the parties' briefing and all relevant case law suggests that the Plaintiff will likely not be able to establish that United failed to provide her with a reasonable accommodation under Title VII. While the accommodation offered by the Defendant may not be the Plaintiff's preferred accommodation, Defendant can likely show that it was reasonable given the burden that alternative actions would impose on United.").  Third, neither of these cases are as compelling as Judge Lidyard's October 15, 2021 opinion ***denying a request to enjoin this exact vaccine requirement***.[12]

### D.     Plaintiffs' ADA Claims Fail.

Plaintiffs allege that Triad engaged in discrimination by failing to grant medical accommodations for those who have recovered from COVID-19 and who allege that they now have natural immunity.  Initially, studies show that those who have recovered from COVID-19 are more likely to be reinfected—and spread disease to others—than those who have been vaccinated.  Pasqualoni Decl. ¶¶ 14, 16.  Even if they were not, Plaintiffs have submitted no evidence or case law indicating that having recovered from COVID-19 is a "disability" under the ADA, and Plaintiffs therefore cannot make out a *prima facie* disability discrimination claim.  *Hence, Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir. 1997) (Noting that "[plaintiff] must demonstrate (1) that he is "disabled" within the meaning of the ADA").

### E.     Plaintiffs failed to exhaust their administrative remedies.

Plaintiffs admit they failed to exhaust their administrative remedies as required by both

---

[12] Plaintiffs do not provide any justification for their contention that Triad's failure to provide Plaintiffs preferred accommodation amounts to retaliation. While Plaintiffs point to case law showing that they should be granted favorable treatment, that is exactly what Triad has done. Memo at 27.  Those with religious objections are on leave, maintain their seniority, and may use vacation. Those with non-religious objections have been fired.  Mairson Decl. ¶¶ 46, 49.

Title VII and the ADA and therefore, the Court can deny Plaintiffs' Motion on this basis alone.[13]

## V.   PLAINTIFFS CANNOT SHOW THAT THEY WILL SUFFER IRREPARABLE HARM.

To qualify for an injunction, Plaintiffs must show they will suffer an injury that is "both certain and great" and cannot be adequately compensated with money damages. *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th Cir. 2001). An injury that is speculative or compensable with money damages is insufficient to show irreparable harm. *Id.* Here, Plaintiffs attempt to identify two alleged irreparable harms: infringement of their constitutional rights and various consequential damages they allegedly will suffer if they are not reinstated. Neither are sufficient to warrant an injunction.

As explained, Plaintiffs' constitutional rights are not at issue here because Defendants are not government actors and, even if they were, Plaintiffs' constitutional law claims fail. Thus, Plaintiffs' constitutional law argument cannot establish irreparable harm. *See Beckerich*, 2021 WL 4398027, at *6, *9 (denying injunction against COVID-19 vaccine mandate and rejecting irreparable harm argument based on constitutional law claims because defendants were not state actors). To the extent that Plaintiffs claim they are being forced to forego their religious beliefs, that alleged harm is also insufficient. As they admit, Triad **granted** religious exemptions. No one is forcing anyone to be vaccinated against their will. Instead, Triad simply offered the only accommodation

---

[13] The Court should deny preliminary injunctive relief to Adrianna Martinez and any other Plaintiff who was a "Doe" in the *Butters* action for the additional reason that they were plaintiffs in the previous state court action. Courts have given preclusive effect to prior denials of preliminary injunctions when the same plaintiff attempts to seek the same form of relief for essentially the same claims, but in a new forum. *See Hayes v. Ridge*, 946 F. Supp. 354, 365 (E.D. Pa. 1996), *aff'd*, 216 F.3d 1076 (3d Cir. 2000) ("In this case, nearly every indication favors a finding that the prior state court ruling denying plaintiffs' application for a preliminary injunction has a preclusive effect such that their identical motion in this court ought to be denied."); *see also  Rosedale Manor Assocs., LLP v. Borough of Madison, New Jersey*, 2005 WL 8175463, at *4 (D.N.J. Aug. 16, 2005); *Lyon Ford, Inc. v. Ford Mktg. Corp.*, 337 F. Supp. 691, 695 (E.D.N.Y. 1971). In the state court action, Plaintiff Martinez sought preliminary injunctive relief against the same vaccine policy she and the other Plaintiffs attack here and with the identical claim that the policy violates the Free Exercise Clause. The court should reject Martinez's "obvious forum shopping."  *Hayes*, 946 F. Supp. at 366.

available which does not create an undue burden—offering Plaintiffs leave of absence until COVID-19 infection rates decline.

For this reason, this case is entirely distinguishable from *Dr. A v. Kathy Hochul*, 2021 WL 4189533, *1 (N.D.N.Y. Sept. 14, 2021), upon which Plaintiffs rely. There, the court enjoined a state mandate because a revision had **removed** the opportunity for religious exemptions. *Id.*, *Mills*, 2021 WL 4860328, at *9 ("In light of that change [to remove religious accommodations], Dr. A. found that state officials had singled out religious believers through a 'religious gerrymander.'"). Here, to the contrary, Triad is a private employer—not a government actor—and Triad's requirement has always provided for religious exemptions.  Mairson Aff. ¶¶ 25, 40-45.  Even if Triad's vaccine requirement **never** provided a religious exemption, an injunction would still not lie.  Mills, 2021 4860328, at *9 As discussed above, the *Sambrano* and *Bilyeu* decisions are also distinguishable because both orders were issued before the vaccine requirement at issue went into effect, and both are out-of-circuit decisions regardless.  When a court in this circuit analyzed this exact issue, the District of Colorado found that the plaintiff had not shown that being put on an indefinite leave would cause irreparable harm. Barrington, 2021 WL 4840855, *8 ("Plaintiff cannot establish that she will suffer irreparable harm if her [injunction] request is not granted").

Plaintiffs' other bases for irreparable harm amount to typical consequential damages that a plaintiff might claim in any wrongful termination lawsuit from no longer receiving a salary, such as losing insurance coverage, assets, and homes.  This is not irreparable harm, but harms that can be remedied by damages following a trial.  *Schrier*, 427 F.3d at 1267 ("simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages"); *McDonough v. New Mexico Highlands Univ.*, 1999 WL 35809011, at *3 (D.N.M. Aug. 5, 1999) ("Courts have been reluctant to grant injunctive relief in situations where

an employee is going to be terminated because of lack of irreparable harm and the availability of adequate legal remedies."). "In fact, wrongful termination claims exist for that very reason—whether brought under the ADA, Title VII, or some other state or federal law, a wrongfully terminated plaintiff can receive monetary damages to compensate their loss of employment." *Beckerich*, 2021 WL 4398027 at *16 (rejecting loss of employment as an irreparable harm). *See Chavez v. Judd*, 2018 WL 4684206, at *2 (D.N.M. Sept. 28, 2018) (denying a request under Rule 65 and declining to consider the remaining elements when plaintiff failed to make a threshold showing of "immediate and irreparable harm"). To the extent that Plaintiffs argue that their professional reputations may be damaged, courts routinely decline to find that this sort of speculative damage constitutes irreparable harm. *Barrington*, 2021 WL 4840855, *6 ("Plaintiffs claims that her home will go into foreclosure, that her career will be destroyed, and that no future employer will ever be willing to hire her are speculative."). Plaintiffs' allegation that Triad's accommodation "pressures" them to be vaccinated is similarly speculative and insufficient. Plaintiffs have not provided any evidence showing if or when their security clearances will lapse, and this is pure speculation as well.

Plaintiffs also cannot show irreparable harm because they unreasonably delayed in seeking this relief. *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1544-45 (10th Cir. 1994) ("delay in seeking preliminary relief cuts against finding irreparable injury."). Here, Plaintiffs admit that Triad's vaccine requirement "was first announced on August 23, 2021." *See* Memo at 5. Despite having nearly two months to file suit before the vaccine requirement went into effect, Plaintiffs watched from the sidelines as the *Butters* plaintiffs litigated these same issues before Judge Lidyard. Only after Judge Lidyard denied the *Butters* plaintiffs' motion for a preliminary injunction, and only after the *Butters* plaintiffs dismissed their case

without prejudice, and after Triad placed them on a leave of absence that they knew was coming did Plaintiffs take steps to assert their alleged rights.

## VI.    THE HARM TO TRIAD, THE VAST MAJORITY OF ITS WORKFORCE, AND THE PUBLIC INTEREST WEIGH HEAVILY AGAINST GRANTING PLAINTIFFS' REQUESTED INJUNCTION.

The balancing of the hardships and public interests tip sharply in favor of Triad. Any injunction that blocked or otherwise limited Triad's vaccine requirement would put Triad's mission at LANL at risk. If Triad is blocked from requiring vaccines for workers at LANL and, thereafter, an unvaccinated employee infects others at LANL, causing these individuals serious harm as well as more isolation days for critical scientists, engineers and other technical employees, it could severely risk Triad's ability to complete projects on a timely basis. Based on Triad's studies, the likelihood of such an eventuality is significantly higher if Triad cannot vaccinate all of its workers. It is not just the mission or national security or even the health and safety of Triad employees that is at risk. The Delta variant is highly transmissible. Triad's employees' children who are under 12 years old as well as any immunocompromised family members are also at risk.

In contrast, Plaintiffs argue that if the vaccine requirement were not enjoined, they might suffer job loss, which, in turn, may require them to relocate to a different job market. *See* Memo. at 2, 20, 32-33. Plaintiffs' alleged financial hardship pales in comparison to the health risks to Triad's other employees and their families and the disruption to LANL's mission that Plaintiffs would impose if allowed to work while unvaccinated.  And "if an employee believes his or her individual liberties are more important than legally permissible conditions on his or her employment, that employee can and should choose to exercise another individual liberty, no less significant - the right to seek other employment." *Beckerich*, 2021 WL 4398027 at *9.  So heavily does the public interest tilt in favor of Defendants that the Court cannot grant Plaintiffs ***any*** injunctive relief.

**CONCLUSION**

The Court should deny Plaintiffs' motion for injunctive relief.

Respectfully submitted,

PEIFER, HANSON, MULLINS & BAKER, P.A.
Post Office Box 25245
Albuquerque, NM 87125-5245
Telephone: (505) 247-4800
Facsimile:  (505) 243-6458
Email: ssanchez@peiferlaw.com

By: */s/ Sara N. Sanchez*
    Sara N. Sanchez
    Rebekah A. Gallegos


Michael D. Weil
Andrea Fellion
MORGAN LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA  94105
(415) 422-1107
(415) 422-1001 (fax)
michael.weil@morganlewis.com
andrea.fellion@morganlewis.com

T. Cullen Wallace
MORGAN LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, TX  77002-5006
(713) 890-5722
(713) 890-5001 (fax)
Cullen.wallace@morganlewis.com

***Attorneys for Defendants Thomas Mason and
Triad National Security, LLC***

## **CERTIFICATE OF SERVICE**

     **I HEREBY CERTIFY** that on the 28th day of October, 2021, I filed the foregoing electronically through the CM/ECF system, which caused all counsel or record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

     B. Tyler Brooks
     Thomas More Society
     309 W. Washington ST., Suite 1250
     Chicago, Illinois  60606
     (312) 782-1680
     btb@btylerbrookslawyer.com

     Angelo J. Artuso
     P.O. Box 51763
     Albuquerque, New Mexico  87181-1763
     (505) 306-5063
     angelo@nmliberty.com

     PEIFER, HANSON, MULLINS & BAKER, P.A.

By:    */s/ Sara N. Sanchez*_____
       Sara N. Sanchez