```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3   RAUL ARCHULETA, ISAAC MARTINEZ,
     TRINA SUAZO-MARTINEZ, DANIEL
 4   FRANK, MICHELLE CORIZ, ADRIANNA
     MARTINEZ, VALLERIE LAMBERT,
 5   and SAM SPROW,

 6                    Plaintiffs,

 7        vs.                                  CV-21-1030 KWR

 8   TRIAD NATIONAL SECURITY, LLC, d/b/a
     LOS ALAMOS NATIONAL LABORATORY,
 9   and THOMAS MASON, Director of
     Los Alamos National Laboratory,
10   in his official capacity,

11                    Defendants.

12


13           TRANSCRIPT OF PROCEEDINGS, VIA ZOOM
      PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
14                    PRELIMINARY INJUNCTION
              BEFORE THE HONORABLE KEA W. RIGGS
15               UNITED STATES DISTRICT JUDGE
             FRIDAY, OCTOBER 29, 2021, 9:01 A.M.
16                  ALBUQUERQUE, NEW MEXICO

17


18   FOR THE PLAINTIFFS:

19        LAW OFFICE OF ANGELO J. ARTUSO
          Attorney at Law
20        Post Office Box 51763
          Albuquerque, New Mexico  87181
21        BY:  MR. ANGELO J. ARTUSO

22        --AND--

23        LAW OFFICE OF B. TYLER BROOKS, PLLC
          Attorney at Law
24        Post Office Box 728
          Cary, North Carolina  27512
25        BY:  MR. BRENNAN TYLER BROOKS
```

1     FOR THE DEFENDANTS:

2          PEIFER, HANSON, MULLINS & BAKER, P.A.
           Attorneys at Law
3          Post Office Box 25245
           Albuquerque, New Mexico  87125-5245
4          BY:  MS. SARA NATHANSON SANCHEZ

5          --AND--

6          MORGAN, LEWIS & BOCKIUS, LLP
           Attorneys at Law
7          1000 Louisiana Street, Suite 4000
           Houston, Texas  77002-5006
8          BY:  MR. THOMAS CULLEN WALLACE

9          --AND--

10         MORGAN, LEWIS & BOCKIUS, LLP
           Attorneys at Law
11         One Market, Spear Street Tower
           San Francisco, California  94105
12         BY:  MR. MICHAEL D. WEIL
                MS. ANDREA FELLION

13

14         Proceedings reported by machine shorthand, and

15    transcript produced by computer-aided transcription.

16    Reported by:

17         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
           United States Court Reporter
18         333 Lomas Boulevard, Northwest
           Albuquerque, New Mexico  87102
19         Phone:  (505)348-2209
           Email:  Julie_Goehl@nmd.uscourts.gov

20

21

22

23

24

25


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                     FEDERAL OFFICIAL COURT REPORTER
                     333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102

1                          I N D E X

2                                                    PAGE

3        ARGUMENT BY MR. ARTUSO                        6

4        QUESTIONS BY THE COURT                       49

5        ARGUMENT BY MR. WALLACE                       52

6        QUESTIONS BY THE COURT                       66

7        ARGUMENT BY MR. WEIL                          66

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
         PRELIMINARY INJUNCTION
2                  VIA ZOOM

3            (Court in session at 9:01 a.m.)

4            THE COURT:  Good morning.

5            We are here this morning in the case of

6   Archuleta, Martinez, et al., v. Triad National Security,

7   L.L.C., doing business as Los Alamos National

8   Laboratory, 21-CV-1030.  We are here for a motion for

9   temporary restraining order and preliminary injunction,

10  along with a motion to compel arbitration.

11           That being said, would counsel for the

12  plaintiffs identify yourself for the record, please?

13           MR. ARTUSO:  Good morning, Your Honor.  Angelo

14  Artuso on behalf of the plaintiffs.

15           THE COURT:  Good morning, Mr. Artuso.

16           Counsel for defendants?

17           MS. SANCHEZ:  Good morning, Your Honor.  Sara

18  Sanchez on behalf of defendants Triad National Security,

19  L.L.C., and Dr. Thomas Mason.  And with me this morning

20  are Michael Weil and Cullen Wallace.

21           THE COURT:  Thank you.  We are having a little

22  bit of feedback this morning because there are so many

23  people on Zoom, I believe.  If you are not speaking,

24  please place your screen on mute so that the feedback

25  will be minimized.

1            Now, before we get started, I have set this
2      matter for two and a half hours this morning.  We are
3      not going to go past 11:30.  That gives each of you just
4      a little more than an hour to discuss this case with the
5      Court.  I can tell you that the Court has reviewed all
6      of the pleadings in this matter, and we are ready to
7      proceed.
8            It appears that the motion for a TRO and
9      preliminary injunction and the motion to compel are
10     inextricably intertwined, and so we are going to be
11     discussing both of them this morning, if you would do
12     that, while you are addressing the Court.  The Court
13     would appreciate that.
14            That being said, Mr. Artuso, are you ready to
15     proceed?
16            MR. ARTUSO:  I am, Your Honor.
17            THE COURT:  All right.  Thank you.  We're
18     getting a little feedback still.  Do we know where
19     that's coming from?
20            MR. ARTUSO:  I suspect, Your Honor, that when
21     I speak, it plays over my speaker when it gets to the
22     Court, but I don't know how to reduce that.
23            THE COURT:  I don't think it's just you, Mr.
24     Artuso, so we will do the best that we can.
25            Mr. Artuso, you may proceed, sir.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1          MR. ARTUSO:  Yes, Your Honor.  Thank you.  May

2     it please the Court.

3          I will first address the motion to compel

4     arbitration.  We did file a response brief yesterday

5     afternoon, and essentially our argument with respect to

6     the motion to compel arbitration is that the arbitration

7     provisions in the employment agreements do not apply to

8     plaintiffs' claims.

9          We cited Mathews v. Denver Newspaper Agency

10    LLP, a Tenth Circuit case from 2011, 649 F.3d 1199.  And

11    in that case, the Tenth Circuit held, "As the law now

12    stands, both individual employees and unions may

13    prospectively agree with the employer to arbitrate all

14    employment-related disputes, including statutory rights

15    normally enforced through litigation, but only so long

16    as this intention is clearly expressed."

17          The intention to litigate statutory rights

18    claims such as Title VII claims, or constitutional

19    rights claims such as infringement on the free exercise

20    of religion or equal protection under the law, are not

21    clearly expressed in the arbitration provision that is

22    provided in the employment agreements that are attached

23    as exhibits to Los Alamos' motion to compel arbitration.

24    And we provided cites in our response brief as to where

25    the Court can find those.

1              Under New Mexico law, Your Honor, there have

2       been a few cases holding that arbitration clauses in

3       at-will agreement contracts are not enforceable because

4       they lack consideration.  And we cited the Piano v.

5       Premier Distributing Co. case, which is at 137 New

6       Mexico 57.  In that case, the New Mexico Court of

7       Appeals noted as follows:  "Defendant argues that in

8       exchange for Plaintiff's promise to submit her disputes

9       to binding arbitration it allowed her to retain her job.

10      However, Plaintiff was an at-will employee before she

11      signed the Arbitration Agreement and she remained an

12      at-will employee after she signed the Arbitration

13      Agreement.  The implied promise of continued at-will

14      employment placed no constraints on Defendant's future

15      conduct; its decision to continue Plaintiff's at-will

16      employment was entirely discretionary.  Therefore, this

17      promise was illusory and not consideration for

18      Plaintiff's promise to submit her claims to

19      arbitration."  And I cited a couple of other cases, Your

20      Honor.

21              The same set of facts apply here.  As we

22      pointed out to the Court in our response brief, six of

23      the eight plaintiffs were working at Los Alamos National

24      Labs before Triad was awarded the contract and required

25      plaintiffs to sign new contracts.  They were at-will

1  before, and they remained at-will.  So the contract is

2  not supported by consideration.

3         We also cited to the Court Heye -- I believe

4  I'm pronouncing that correctly, H-E-Y-E -- v. American

5  Golf Corporation, a 2003 case from the New Mexico Court

6  of Appeals, at 134 New Mexico 558.  It reached the same

7  result, saying that an arbitration agreement which has

8  been placed into the employer's employee handbook was

9  not enforceable because the employee was an at-will

10  employee, and the employer remained free to change his

11  handbook any time it wished.

12         The arbitration provision is also not

13  enforceable under New Mexico law.  In our response

14  brief, Your Honor, we cited to the New Mexico Uniform

15  Arbitration Act, which is at 44-7A-1 and following.  And

16  under Section 44-7A-5 of the New Mexico Statutes, it

17  provides in relevant part that, "In the arbitration of a

18  dispute between an employee and another party, a

19  disabling civil dispute clause contained in a document

20  relevant to the dispute is unenforceable against and

21  voidable by the employee.  Section 44-7A-1(b)(4)(f)

22  defines a disabling civil dispute clause as a provision

23  modifying or limiting procedural rights necessary or

24  useful to an employee in the enforcement of substantive

25  rights against a party drafting a standard form contract

1    such as, by way of example, a clause requiring the

2    employee to decline to participate in a class action."

3              Each of the arbitration provisions for each of

4    the plaintiff's employment agreements require that the

5    employees do not bring a class action lawsuit.  As such,

6    it's a disabling civil dispute clause not enforceable

7    under New Mexico law.

8              We also cited to the Court Fiser v. Dell

9    Computer Corp., a 2008 New Mexico Supreme Court case, at

10   144 New Mexico 464.  In that case, the Court held that

11   the arbitration provision was unconscionable and held,

12   "Because our invalidation of the ban on class relief

13   rests on the doctrine of unconscionability, a doctrine

14   that exists for the revocation of any contract, the FAA"

15   -- the Federal Arbitration Act -- "does not preempt our

16   holding.  When a provision of a contract is determined

17   to be unconscionable, we may refuse to enforce the

18   contract or we may enforce the remainder of the contract

19   without the unconscionable clause, or we may limit the

20   application of any unconscionable clause to avoid any

21   unconscionable result.  Here, the class action ban is a

22   part of the arbitration provision and is central to the

23   mechanism for resolving the dispute between the parties;

24   therefore, it cannot be severed.  We decline to enforce

25   the arbitration provision."

1              Respectfully, Your Honor, I would submit that

2       the Court should reach the same conclusion here, that

3       under New Mexico law, the inclusion of a ban on class

4       action lawsuits makes the arbitration provision unlawful

5       under the statute, and the New Mexico Supreme Court has

6       concluded that the inclusion of that class action

7       provision makes the contract unconscionable and

8       unenforceable.

9              Finally, Your Honor, even if the Court were to

10      find that the question of arbitration cannot be finally

11      decided today, the fact that there is an arbitration

12      request pending does not prevent the Court from issuing

13      injunctive relief.

14              And in our response brief, we cited three

15      cases to the Court.  Teradyne, Inc. v. Mostek Corp.,

16      which is out of the First Circuit, 1986, 797 F.2d 43:

17      "A district court can grant injunctive relief in an

18      arbitrable dispute pending arbitration, provided the

19      prerequisites for injunctive relief are satisfied."

20              The same result was essentially reached by the

21      Seventh Circuit in Sauer-Getriebe KG v. White

22      Hydraulics, Inc., 715 F.2d 348.  In that case, the

23      Court of Appeals for the Seventh Circuit reversed the

24      district court's denial of injunctive relief pending

25      arbitration.

1          And the same result was reached by the Fourth

2     Circuit in Merrill Lynch, Pierce, Fenner & Smit, Inc.

3     V. Bradley, a 1985 case, at 756 F.2d 1048.  In that

4     case, the Court of Appeals affirmed the district court's

5     grant of a preliminary injunction pending arbitration.

6     And then finally, Your Honor, I would point out that the

7     arbitration provision calls for the use of the rules of

8     the Triple A, the American Arbitration Association.

9     Those rules, themselves, allow for injunctive or interim

10    relief pending arbitration.

11          Their rules and mediation procedures, Rule 32,

12    provides, "A request for interim measures addressed by a

13    party to a judicial authority shall not be deemed

14    incompatible with the agreement to arbitrate or a waiver

15    of the right to arbitrate."

16          Based on these arguments and facts, Your

17    Honor, and the authorities that we've cited, we

18    respectfully submit that the motion to compel

19    arbitration should be denied.

20          To move on to the motion for TRO and

21    preliminary injunction, as the Court is aware, we need

22    to prove -- as plaintiffs, we need to prove four things

23    in order to be entitled to a TRO or injunction:  That we

24    are likely to succeed on the merits of one or more of

25    our claims; that the plaintiffs will suffer irreparable

1    harm in the event that an injunction does not issue;

2    that the balance of equities or the balance of harm tips

3    in favor of issuing the injunction; and that issuing the

4    injunction is not contrary to public policy.

5         As both parties, I think, agree, one of the

6    primary reasons for a TRO and a preliminary injunction

7    is to preserve the status quo that existed before the

8    litigation.  Actually it's a little bit broader than

9    that.

10        The Tenth Circuit in 2004, en banc, in the

11   case of O Centro Espirita Beneficiente Uniao Do Vegetal

12   v. Ashcroft -- I'll just refer to it as the O Centro

13   case, Your Honor -- at 389 F.3d 973, held that the

14   status quo ante is defined as "the last peaceable

15   uncontested status existing between the parties before

16   the dispute developed."

17        In this instance, the last peaceable

18   uncontested status between the parties was when

19   plaintiffs received their full salary and benefits.

20   Even if as of the date of this lawsuit, which was I

21   believe October 22nd, plaintiffs continued to receive

22   their full salary and benefits because they were all on

23   vacation -- they had not been placed on leave without

24   pay; none of them had.  And therefore, the status quo

25   ante, the last peaceable uncontested status, is that

1   they're working, and that they have their benefits, and

2   that they were being reasonably accommodated by the Labs

3   by either being allowed to work from home or by being

4   masked, social distancing, and taking occasional tests

5   that tested positive for COVID-19.  So even if

6   defendants are perfected, somehow the October 15th

7   deadline passing somehow altered the stance of this

8   case, the fact is that the status quo ante is working

9   and getting paid and having your benefits.

10          The facts in this case are pretty

11   straightforward, I believe, Your Honor.  All of the

12   plaintiffs work for Los Alamos National Labs.  All of

13   the plaintiffs have been granted a religious exemption.

14   In other words, the Labs have conceded, admitted, and do

15   not dispute that each of the plaintiffs has a sincerely-

16   held religious belief that prevents them from taking the

17   COVID-19 vaccine.  Some of the plaintiffs have also

18   applied for a medical exemption on the basis that they

19   had COVID, they survived, and they have natural

20   immunity.  And it is our contention that natural

21   immunity is far more robust and comprehensive than the

22   immunity that would be granted by a vaccine.

23          Despite granting all of the plaintiffs'

24   religious exemptions, the Labs has taken the position

25   that the only accommodation for every employee granted a

1    religious exemption is:  First, you take your vacation

2    time if you have any; once you've used that up, you

3    could be terminated by the Labs, no guarantee that

4    you'll have a job; and then you go on an indefinite

5    leave without pay.

6         This accommodation is in stark contrast,

7    startling sharp contrast, to the accommodations given to

8    medically exempt employees.  The Labs have refused to

9    engage in an interactive dialogue with any of the

10   plaintiffs granted this religious exemption.  Instead,

11   they issued a blanket leave without pay policy.  That's

12   the only accommodation they will offer to the

13   religiously exempt.

14        But the medically exempt have, in fact, been

15   accommodated.  The Labs have engaged in an interactive

16   dialogue with them.  The medically exempt are allowed to

17   continue working, both on-site or off-site, whether by

18   phone, or remotely, or by computer at home, or on-site

19   by following the preexisting protocols of masking,

20   social distancing, and occasional COVID testing.

21        Based on the way in which religiously exempt

22   plaintiffs and others are being treated, we have

23   submitted or asserted claims, the following claims:

24        First:  That the Labs' policies infringe on

25   the plaintiffs' right to the free exercise of their

1    religion under the First Amendment.

2            Second:  That the Labs' policies infringe on

3    the plaintiffs' right to equal protection under the law

4    under the Fourteenth Amendment.

5            Third:  That the defendants' actions violate

6    Title VII of the 1964 Civil Rights Act, in that they

7    have failed to provide reasonable accommodation, have

8    failed to engage in an interactive dialogue about

9    accommodations, and have engaged in a retaliation

10   against the religiously exempt employees by offering a

11   very punitive leave without pay policy.

12           And, finally, we have asserted claims under

13   the Americans with Disabilities Act, where those

14   plaintiffs who have natural immunity, based on the fact

15   that studies indicate that those with natural immunity

16   are at risk of a hyperimmuno-response, a hyperimmune

17   system response, if they receive the vaccines.  And

18   frankly, I do not think that it is the place of the

19   defendants, or anyone for that matter, to insist that

20   the plaintiffs or others should take that chance.  It's

21   not up to them to make that decision.  It's up to the

22   individual to decide whether or not they want to take

23   the risk of a hyperimmune response that could have

24   serious consequences, life-long consequences if they

25   should happen to be one of the few that have that

1    reaction to the vaccine.

2         I think it would be helpful, Your Honor, to

3    just sort of briefly review who these plaintiffs are.

4    There was a declaration attached for each of them to our

5    motion for TRO.

6         I would like to briefly review the first

7    plaintiff, Raul Archuleta.  He has worked at the Labs

8    for over 20 years, Your Honor.  He is an ordained pastor

9    at New Creation in Christ Ministry in Espanola, New

10   Mexico.  He has had COVID and recovered, so he has

11   natural immunity, but his request for a medical

12   exemption was denied.  He has worked from home for over

13   a year.  He has not been required to be on-site at LANL

14   for normal work activities during that year.  His team

15   at the Labs is expected to continue working remotely

16   once the pandemic is over.  In a request for a religious

17   exemption, he asks to be allowed to continue working

18   from home.  That request was ignored.

19        After receiving his religious exemption, he

20   asked for reconsideration of his request to continue

21   working from home.  That request was denied, and he was

22   simply told, "The Lab is" -- quote -- "not

23   differentiating accommodations for those teleworking

24   versus those working on site."  In other words, the

25   Labs' position, we respectfully submit, is that:  It

1    does not matter if you are not here on-site.  It does

2    not matter if you are not meeting with your co-workers.

3    It does not matter if you have proven that you can

4    successfully do your job at home, or remotely, using a

5    computer and a phone.  It does not matter that the Labs

6    are not requiring guest scientists, contractors,

7    subcontractors, and students who work off-site, they

8    don't have to get the vaccine; but because you're an

9    employee working off-site, you do.  It doesn't matter if

10   you have natural immunity to COVID.  And it doesn't

11   matter that we have allowed other medically exempt

12   employees to keep their jobs by providing them with

13   reasonable accommodations, including working from home.

14          The message that Mr. Archuleta and the other

15   employees in this case have received so far from the

16   defendants is:  We recognize that you have a sincere

17   religious belief and have granted you an exemption from

18   the vaccine, but we don't like it.

19          Isaac Martinez, the second plaintiff.  He has

20   worked at the Labs for over 22 years.  He's a life-long

21   resident of the Los Alamos area.  He has had COVID and

22   recovered, so he has natural immunity.  His request for

23   medical exemption was also denied.  After receiving his

24   religious exemption, he sent an e-mail asking to talk

25   about the leave without pay policy.  The Labs did not

1    respond.

2             His wife, Trina Suazo-Martinez, has worked at

3    the Labs for over seven years and, prior to the most

4    recent time, worked there from 2002 to 2007, so 12 years

5    in total.  Isaac and Trina have four children, ages 11

6    to 21, the two oldest being in college.  She is also a

7    life-long resident of Los Alamos.  She also has natural

8    immunity to COVID.  Since the Lab adopted its COVID

9    protocols in April of 2020, Ms. Suazo-Martinez has not

10   had an office on-site.  She is part of the Lab's

11   telework pilot project.  She has been working from home

12   for over 18 months with no problem.  And she also, after

13   receiving her religious exemption, sent an e-mail asking

14   to talk to the Labs about the leave without pay issue

15   and, again, received no response.

16           Adrianna Martinez.  She has been employed at

17   Los Alamos for over a year.  She was hired during the

18   COVID pandemic.  She's married, with two children.  She

19   requested a medical exemption due to preexisting medical

20   conditions that are unrelated to COVID, but were

21   confirmed in writing by her doctor.  The medical

22   exemption request was denied.  She also has natural

23   immunity because she did have COVID.

24           Daniel Frank.  He has been employed at the

25   Labs for over 12 years.  He's married and has two kids.

1    He has successfully worked almost entirely from home

2    since April of 2020, and since April of this year has

3    been part of the Labs' telework pilot project.  He has

4    had no need to be on-site except in rare circumstances

5    like drug or COVID testing required by the Labs.

6         Michelle Coriz.  She has been directly

7    employed by the Labs since 2005, over 16 years.  Before

8    that, she worked there as a contractor for six years.

9    She's married, with two children, and is the main

10   provider for her family.  She's an environmental

11   management professional and works primarily on

12   environmental compliance, and has accumulated a great

13   deal of historic and institutional knowledge regarding

14   environmental, nuclear, and waste issues at the Labs.

15   She has been working from home and has offered to

16   continue to do so.  She has received no response from

17   the Labs regarding her offer to continue working from

18   home.

19         Sam Sprow.  He began working as an intern at

20   the Labs in 2019 and was offered an R&D engineer

21   position in November of last year, which he has been

22   working on.  He was so excited to come to work for the

23   Labs that he moved 1,000 miles away from home, family,

24   and friends in Mississippi and left a master's degree

25   program that he was pursuing.

1        And then finally, Vallerie Lambert.  She has

2    worked for the Labs for over five years.  She's married,

3    with two children in college, and is raising a grandson.

4    She successfully worked from home from March 2020 to

5    September 2021.  She was recommended for a promotion,

6    but after filing her request for a religious exemption

7    was told by her manager that the promotion would

8    probably not be approved because she was unvaccinated.

9    She was told by managers that "it could all go away" if

10   she just took the vaccine.  She was also told that being

11   allowed to continue working from home would be unfair to

12   her co-workers.

13        And recently, last week, she lost the position

14   with a higher salary because she may be placed on leave

15   without pay, and the group that was advertising for the

16   job said that they would have to resubmit or repost the

17   job for employees who would not be on leave without pay.

18   In other words, she lost a chance for a higher-paying

19   job because of her religious exemption.

20        Now, one of the elements I've said, Your

21   Honor, that we have to prove is irreparable harm.  In

22   this instance, I believe irreparable harm consists of

23   the following:

24        First off, without an injunction, there will

25   be a continued infringement of the plaintiffs'

1   constitutional right to the free exercise of their

2   religion.  Without an injunction, there will be a

3   continued infringement of the plaintiffs' free exercise

4   right -- I'm sorry -- of the plaintiffs' constitutional

5   right to equal protection under the law.

6          In the Hobby Lobby Stores, Inc., the Sebelius

7   case that we cited to the Court in our brief at 723 F.3d

8   1114, the Tenth Circuit stated, "In First Amendment

9   cases, the likelihood of success on the merits will

10   often be the determinative factor.  That is because the

11   loss of First Amendment freedoms, for even minimal

12   periods of time, unquestionably constitutes irreparable

13   injury.  When a law is likely unconstitutional, the

14   interests of those the government represents, such as

15   voters, does not outweigh a plaintiff's interest in

16   having its constitutional rights protected.  It is

17   always in the public interest to prevent the violation

18   of a party's constitutional rights."

19          Your Honor, based on the holding in Hobby

20   Lobby, should we prevail, should the Court determine

21   that we are likely to succeed on either the First

22   Amendment or Fourteenth Amendment claims, irreparable

23   harm is established, as well as the other elements.

24          So with respect to our other claims, it has

25   been recognized that irreparable harm can be present

1   when a computation of damages is either impossible or

2   extremely difficult.  In this instance, there are

3   several harms currently being visited upon the

4   plaintiffs, and they will continue to be visited upon

5   the plaintiffs in the absence of an injunction.

6           First, there is the fear and anxiety that

7   accompanies any uncertainty about a person's financial

8   future, and I would point out that this is not a harm

9   just to the plaintiffs, but to their families and minor

10  children, as well.

11          There is psychological harm here, Your Honor,

12  from being ostracized and exiled from communities in

13  which some of these plaintiffs have worked for over 20

14  years.  They are being excluded.  They are being told

15  that they're not welcome because of their religious

16  beliefs.  They run the risk of losing professional

17  relationships.  They run the risk of damage to their

18  reputation.

19          There are harms that are difficult to compute,

20  such as a lost chance.  Plaintiffs, if they don't get

21  injunctive relief, will lose the chance to compete for

22  merit raises, performance bonuses, and promotions.  Now,

23  there's no guarantee that they would ever receive any of

24  those things.  But the harm, the irreparable harm,

25  consists of the fact that they're not even allowed to

1    compete for them.

2            There is irreparable harm in the loss of

3    future pension and lifetime health insurance benefits.

4    For a couple of these plaintiffs, lifetime health

5    insurance benefits were just a couple of years away from

6    vesting.

7            There is irreparable harm in the loss of their

8    current health insurance.  There's no guarantee that any

9    replacement policy will cover a preexisting condition.

10   And in at least one plaintiff's case, they are currently

11   undergoing diagnosis and testing and possible treatment

12   for a serious condition.  That may be interrupted by the

13   loss of their health insurance.

14           There is irreparable harm in the loss of

15   security clearances, Your Honor, in the event -- and

16   eventually it will happen if they remain on leave

17   without pay.  These plaintiffs will lose their security

18   clearances.  There is no guarantee that they'll ever get

19   them back.  And, moreover, when they apply for jobs with

20   a lot of defense contractors or Department of Energy

21   contractors, there is a question, usually on the job

22   application, about whether you have ever held a security

23   clearance, whether you have ever lost a clearance, or

24   had a clearance revoked.  Answering that question alone

25   could be sufficient for the employer not to decide to

1    interview one of the plaintiffs.  That's an irreparable

2    harm.

3           Now, in order for the constitutional claim to

4    be established, Your Honor, the Court will have to find

5    that the defendants are government actors.  We cited

6    several cases in our brief.  I would like to briefly

7    review some of the legal holdings that are before the

8    Court today.

9           In Wittner v. Banner Health, 720 F.3d 770, a

10   Tenth Circuit case out of 2013, the Court held, "A

11   public-private relationship can transcend that of mere

12   client and contractor if the private and public actors

13   have sufficiently commingled their responsibilities."

14          In Gallagher v. Neil Young Freedom Concert,

15   49 F.3d 1442, a Tenth Circuit case from 1995, the Court

16   held that if the government "has so far insinuated

17   itself into a position of interdependence with a private

18   party that it must be recognized as a joint participant

19   in the challenged activity," it can be found that the

20   private party is a government actor.

21          The Supreme Court in 1995, in Lebron v.

22   National Railroad Passenger Corporation, found that

23   Amtrak was a state actor despite a federal statute that

24   declared that it was not part of the federal government.

25   The Court held, "That Government-created and -controlled

1    corporations are (for many purposes at least) part of

2    the Government itself has a strong basis, not merely in

3    past practice and understanding, but in reason itself.

4    It surely cannot be that government, state or federal,

5    is able to evade the most solemn obligations imposed in

6    the Constitution by simply resorting to the corporate

7    form."

8         And that is what we have here, Your Honor.

9    The defendants will argue that they are not government

10   actors because they've created a separate entity, an

11   L.L.C., an entity that is composed of three equal

12   members, two of whom are state institutions, the

13   University of California Regents, the Texas A&M

14   University System, and Battelle Memorial Institute.

15        The Labs are subject to extreme regulation.

16   There are a multitude of statutes and regulations from

17   the federal government that govern every aspect of their

18   activity.  They are under the control of the NNSA, the

19   National Nuclear Security Administration, a division of

20   the Department of Energy.  In fact, Your Honor, if you

21   look at the approval of religious exemption which was

22   attached to the declarations of each of the plaintiffs,

23   and that's Document 5 and the exhibits attached to

24   Document 5, you'll note something interesting.  At the

25   top of each approval is the Los Alamos National

1    Laboratory's logo, and at the bottom of each approval is

2    the logo of NNSA, the National Nuclear Security

3    Administration.  That approval doesn't appear to come

4    from Triad.  It appears to come from the government.

5          The Labs are certainly not shy about using the

6    imprimatur of the government when it suits their

7    purposes, and the same is true of the forms that each of

8    the plaintiffs had to fill out to request a religious

9    exemption and to request a medical exemption.  Those are

10    also included in some of the plaintiffs' declarations as

11    attachments.

12          And, again, it is the Labs' logo that appears

13    at the top, and the Court would be hard pressed to find,

14    without looking carefully, anything on those forms that

15    says "Triad, L.L.C."

16          The Supreme Court has held that a nominally

17    private actor becomes a governmental actor when there

18    exists, "Such a close nexus between the State and the

19    challenged action that seemingly private behavior may be

20    fairly treated as that of the State itself."  And that

21    was in Brentwood Academy v. Tennessee Secondary Schools

22    Athletic Association, 531 U.S. 288 at 295, a 2001 case.

23          I find it incongruous, Your Honor, that a

24    school athletic association and Amtrak could be found to

25    be government actors, and the company managing a

1    national nuclear laboratory would not be found to be a

2    government actor.  There are no private companies that

3    have unfettered access to nuclear weapons.  There are no

4    private companies that are charged with the

5    responsibility of enhancing the security and the safety

6    of nuclear weapons.  That is a function which is

7    uniquely entrusted to the government.  And therefore, I

8    don't see how they can avoid being held as a government

9    actor under such circumstances.

10        Additional indicia that they are government

11   actors includes the fact that the vast majority of their

12   funding comes from the government.  In fact, Triad has

13   been paid over ten billion dollars since it won the

14   contract in 2018.  All of the employees have to pass a

15   national background check.  Most of the employees have

16   to receive a national security clearance.  As I pointed

17   out, they are heavily regulated.  All of their work is

18   reviewed and controlled by the government.

19        Again, in the Brentwood Academy case, the

20   Court outlined some -- I'm sorry.  In a case we cited to

21   the Court, Villegas v. Gilroy Garlic Festival

22   Association, the Court came up with some additional

23   criteria for determining when a private party will be

24   found to be a government actor, stating that a nominally

25   private party is driven by facts which show that any

1    expressly private characterization in statutory law or

2    the failure of the law to acknowledge that they are

3    inseparable from the government or government agencies.

4    Some of the factors to consider are:

5           "(1) the organization is mostly comprised of

6    state institutions."  Well, here, Triad is composed of

7    two state institutions.

8           "(2) state officials dominate decision making

9    of the organization."  Here, decision making at LANL is

10   dominated by NNSA.  The Labs and Triad are not going to

11   do anything that the government tells them they

12   shouldn't be doing.

13          "(3) the organization's funds are largely

14   generated by the state institutions."  Well, in this

15   instance, the organization's funds are generated largely

16   by the federal government.

17          "(4) The organization is acting in lieu of a

18   traditional state actor."  And here, as I pointed out,

19   the Labs are acting with respect to enhancing the safety

20   and security of nuclear weapons, an activity that is

21   uniquely entrusted to a government actor.

22          In the case of Cherry Cotton Mills, Inc. v.

23   United States, which we cited to the Court, in 1946, the

24   Supreme Court, at 327 U.S. 536, 539, held, "That the

25   Congress chose to call it a corporation does not alter

1   its characteristics so as to make it something other

2   than what it actually is, an agency selected by

3   Government to accomplish purely governmental purposes."

4   And that was discussing the Reconstruction Finance

5   Corporation.

6           In light of all the circumstances that I've

7   just discussed, Your Honor, we firmly believe that the

8   defendants in this case are state actors and, as such,

9   their infringement of the plaintiffs' constitutional

10  rights are actionable and constitute irreparable harm.

11          It is undisputed in this matter so far, Your

12  Honor, that the defendants are treating religion

13  differently.  As I pointed out, the only accommodation

14  offered, without discussion with any of the plaintiffs

15  or anyone else granted religious exemption, is:  You get

16  to take leave without pay.  You may lose your job after

17  you've used up your vacation time.  You lose all of your

18  benefits.

19          We highlighted in our brief some of the

20  announcements made by Defendant Mason related to this

21  vaccine.  On August 23rd, the same day, the exact same

22  day that President Biden announced that the FDA had

23  approved Pfizer's Comirnaty vaccine and called on

24  business leaders to impose vaccine mandates, that day

25  Defendant Mason issued a vaccine mandate for Los Alamos

1    employees and said it was necessary because of the

2    "rising COVID-19 case rates in northern New Mexico and

3    beyond," and that was based on three unvaccinated

4    employees of the Los Alamos National Labs workforce

5    having been hospitalized during the recent COVID surge.

6    As we pointed out in our brief, Los Alamos has over

7    10,000 employees, but three employees being hospitalized

8    was sufficient to cause Director Mason to issue a

9    vaccine mandate.

10          Now, what's missing from his announcement is,

11   there's no discussion as to whether those employees were

12   hospitalized because they had COVID, or if they were

13   hospitalized for some other reason and when they got to

14   the hospital they tested positive for COVID.  As I'm

15   sure the Court knows, there has been some discussion

16   over the last 18 months about the accuracy of the

17   reporting.  You may be hospitalized with some other

18   condition, a heart condition, chronic obstructive

19   pulmonary disease -- who knows? -- and you just happen

20   to have COVID.  You may actually die, but there is no

21   distinction in the reports, or at least not that I've

22   been able to see, between dying from COVID and dying

23   with COVID.  And those are two very distinct things, and

24   they are not distinguished in Director Mason's

25   announcement on August the 23rd.

1          On September the 9th, President Biden issued

2     his executive order mandating that all federal employees

3     be vaccinated.  On September the 13th, Director Mason

4     issued a new directive on medical and religious

5     exemption, and that directive stated, "If a medical

6     exemption is granted, the Laboratory will put in place

7     mitigations that will protect the health and safety of

8     the entire workforce consistent with our obligations

9     under the Americans with Disabilities Act."

10          Religious exemptions, however, are to be

11     handled differently.

12          "If a religious exemption is granted, the

13     Laboratory will determine if the exemption can be

14     reasonably accommodated while still protecting the

15     health and safety of the rest of the workforce.

16     However, if the Laboratory has not found an acceptable

17     accommodation by October 15, unvaccinated employees with

18     religious exemptions may be placed on unpaid leave or

19     may use vacation leave until an accommodation that will

20     not unduly burden the Laboratory or other employees has

21     been identified."

22          The question I have is:  If this was such an

23     urgent and compelling issue for the Lab, why did they

24     choose to wait 25 days, from September 20th until

25     October 15th, before implementing this leave without pay

1      policy and telling religiously exempt employees, "We no

2      longer need your services at the moment because you

3      refuse to get vaccinated"?

4              What was it about October 15th that was the

5      magic date, that suddenly, you know, prior to that time:

6      We're going to proceed under this protocol; but once we

7      hit October 15th, we can no longer accept the risk?

8      Especially when the Court considers that the August 23rd

9      announcement was made in large part citing to three

10     employees having been hospitalized during the recent

11     surge, and highlighting a surge in COVID cases in

12     northern New Mexico.

13             Since August 23rd, the rate of COVID cases has

14     declined; and yet, that doesn't ever seem to enter into

15     the Lab's analysis, as it approached the October 15th

16     date, of whether or not it could offer reasonable

17     accommodations to plaintiffs and other religiously

18     exempt employees.

19             On September 20th, Director Mason issued an

20     updated directive saying about 1,000 employees and

21     contractors have gotten the vaccine since he first made

22     the announcement on August 23rd; a small number of

23     medical exemptions have been granted; and the Lab is

24     "working to put in place appropriate accommodations," as

25     required under the Americans with Disabilities Act.

1           And then he says, "a larger number of

2     religious exemption requests" -- have been submitted,

3     and then says, "I have made the decision that the only

4     accommodation the Laboratory can provide at this time

5     for those granted religious exemptions is to take

6     vacation or Leave without Pay effective October 15."

7           In a frequently asked questions publication by

8     the Labs on September 27, 2021, the question was asked,

9     "Can the same appropriate accommodations that will be

10    put in place for an employee with a medical exemption be

11    put in place for an employee with a religious

12    exemption?"

13          The answer, "No.  Medical exemptions fall

14    under different rules and laws than religious

15    exemptions."

16          You will note, Your Honor, that the reason for

17    that decision is not:  "Religious exemptions present

18    different challenges, or religious exemptions present

19    problems that we haven't figured out a way to work

20    around."

21          It is, "We're not required to do anything

22    different under the law; whereas, for medically exempt

23    people, we have to."

24          I would submit respectfully, Your Honor, that

25    there is no doubt, based on the announcements by the

1    Labs and the Labs' actions, that they are treating

2    religion differently than they are treating similar

3    employees who receive a medical exemption.

4         Plaintiffs submit that they are likely to

5    prevail on their free exercise claim, Your Honor, the

6    infringement of their right to free exercise of religion

7    under the First Amendment.

8         As we noted in our brief, in Tandon v. Newsom,

9    a recent case, April of 2021, from the U.S. Supreme

10   Court, at 141 Supreme Court 1294, the Court held that,

11   "Whether two activities are comparable for purposes of

12   the Free Exercise Clause must be judged against the

13   asserted government interest that justifies the

14   regulation at issue," including activities that "could

15   present similar risks of spreading COVID-19."

16        In Church of the Lukumi Babalu Aye, Inc. v.

17   City of Hialeah, the Supreme Court in 1993 held that, "a

18   law which visits gratuitous restrictions on religious

19   conduct...seeks not to effectuate the stated

20   governmental interests, but to suppress the conduct

21   because of its religious motivation."

22        If the defendants are found to be government

23   actors, and if they are found that we have a likelihood

24   of prevailing on the free exercise claim and the equal

25   protection claim, then the defendants' actions are

1   subject to strict scrutiny.  There is no way that under

2   the facts currently before the Court they can pass that

3   test.  They cannot demonstrate that they have a

4   compelling interest in treating religious employees

5   differently than the medically exempt employees.

6        The restrictions are not neutral -- they do

7   treat religious people differently than medical people

8   -- nor are the restrictions generally applicable,

9   because the instructions imposed by the Labs are not

10   narrowly tailored, nor the least restrictive means to

11   accomplish their goal of reducing COVID infections among

12   their workforce.

13        They cannot withstand strict scrutiny,

14   particularly when the Court considers factors such as

15   many of the plaintiffs have been successfully working

16   from home for 18 months.

17        In fact, one of the factoids that we cited to

18   the Court in our brief was that according to an article

19   published in January of 2021, 85 percent of the Lab was

20   working remotely at that point in time; 85 percent of

21   the employees were working remotely.

22        And despite that, the NNSA granted Triad a

23   ten million dollar bonus for its work at the Labs in

24   2020, finding that the Lab management had been "very

25   good."

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1          This clearly demonstrates objectively that the

2     Labs are fully capable of functioning and operating even

3     when the vast majority of their workforce is not

4     on-site.  It also demonstrates that the prior protocols

5     of masking, social distancing, and periodic testing are

6     effective in terms of protecting the Los Alamos National

7     Labs workforce.

8          I believe that we are also likely to prevail,

9     plaintiffs are likely to prevail on their equal

10    protection claim.

11         In our brief, we cited Kitchen v. Herbert, a

12    Tenth Circuit case, 2014, at 755 F.3d 1193, talking

13    about classifications, which is one of the primary

14    considerations when thinking about equal protection.  In

15    that case, the Court said, "If a classification impinges

16    upon the exercise of a fundamental right, the Equal

17    Protection Clause requires 'the State to demonstrate

18    that its classification has been precisely tailored to

19    serve a compelling governmental interest.'"

20         Well, as I've just argued, Your Honor, first,

21    there's no compelling governmental interest in a

22    one-size-fits-all leave without pay policy for the

23    religiously exempt, while providing individual

24    accommodation for the medically exempt.  And, secondly,

25    it impinges on a fundamental right; in this instance,

1     the free exercise of religion.

2            Based on that, those facts, I believe that

3     plaintiffs are likely to prevail on their equal

4     protection claim.

5            Plaintiffs are also likely to prevail on their

6     Title VII claim.  Title VII requires, and the defendants

7     in this instance have recognized, plaintiffs have that

8     sincerely held religious belief that prohibits them from

9     taking the vaccine.  So under Title VII, when that's

10    recognized, defendants have a duty, a legal obligation,

11    to provide a reasonable accommodation, and the only way

12    around that is to show and establish and prove that the

13    accommodations that are available will constitute an

14    undue hardship.

15           Frankly, Your Honor, how can they do that,

16    when so much of their workforce has been working

17    remotely for a long period of time and doing so

18    successfully?

19           They also have an obligation under Title VII,

20    Your Honor, to engage in an interactive and real

21    meaningful dialogue with the employees granted a

22    religious exemption, to try and see what accommodations

23    might be available.  But that never happened here.

24           And finally, Your Honor, they have an

25    obligation not to retaliate against employees who have

1    asserted a right to a religious accommodation.  And

2    although no discovery has been done in this case, one

3    can't help but wonder if that blanket leave without pay

4    policy isn't in some form or manner retaliation.

5            The third element in establishing the right to

6    a TRO or an injunction, Your Honor, as you know, is the

7    balancing of equities or the balancing of harms.  Here,

8    there is no real harm to the defendants.  We're simply

9    asking that the status quo ante be maintained or

10   reinstated.  Our clients were working for the Labs right

11   up until October 15th, following the established

12   protocols at that time, either working remotely from

13   home, or masking and distancing and being tested

14   occasionally.

15           And how does it harm the Labs at this point,

16   right now, today, October 29th, two weeks later, to say,

17   "We're being harmed because they haven't been

18   vaccinated"?  How can they present a danger to any

19   co-worker if they're not even there, if they're working

20   from home, and if the protocols have proven themselves

21   to be successful, as they have, since they were first

22   implemented in April of 2020?

23           Finally, the last element is that it's in the

24   public interest to issue the injunction.  Well, it's

25   always in the public interest, Your Honor, to enforce,

1    protect, and defend constitutional rights for

2    individuals.  It's always in the public interest to

3    enforce the anti-discrimination laws that have been

4    passed by our country.  It is always in the public

5    interest to let someone work and keep their job and to

6    provide for their families.

7              And that's all that we're really asking for at

8    this point, Your Honor, is that this draconian, "You

9    must take leave without pay one-size-fits-all policy,

10   which we refer to as accommodation by termination," is

11   no real accommodation; and that our clients, my clients,

12   the plaintiffs, need this Court's protection in order to

13   keep and defend their rights.

14             Now, in their response, the defendants raised

15   the issue, essentially, of collateral estoppel.  We

16   haven't had time to file a reply, but basically there

17   are four elements under New Mexico law.  The case is

18   Shovelin v. Central New Mexico Electric Co-op, 115

19   New Mexico 293.  That's a New Mexico Supreme Court case

20   from 1993, and they identified four elements that apply

21   to collateral estoppel.

22             First.  The party to be estopped was a party

23   to the prior proceeding.  And in this instance, the

24   defendants are relying primarily on Butters, a case that

25   was heard in the First Judicial District a couple weeks

1    ago.  Well, the plaintiffs in this case were not parties

2    in Butters.  The defendants make some insinuation that

3    they suspect or they think that somehow we have lied to

4    them about whether plaintiffs were parties in this case.

5         Frankly, Your Honor, I'm not sure how they

6    practice law in California.  I suspect that's where that

7    came from.  But it is offensive.  It's a borderline

8    ethical violation, if you were to ask me.  They

9    specifically wrote to us and asked if any of the

10   plaintiffs were parties in Butters, and we told them

11   unequivocally, "No."

12        For them to make their suspicion

13   representations to the Court, it lacks a good faith

14   basis, and it just -- they make some other insinuations,

15   that we never threatened to file a TRO until after the

16   Butters case was decided.  That's just wrong.  In our

17   October 11th letter that we sent them -- and Butters

18   wasn't heard until the 15th and wasn't decided until the

19   18th -- we basically told them that if we were unable to

20   reach an agreement, that we would have no choice but to

21   file a federal lawsuit and to seek immediate injunctive

22   relief.  So their assertion that we waited, somehow, is

23   also completely wrong.

24        They make a claim in their response, Your

25   Honor, that they have to limit the religiously exempt to

1    leave without pay because there are so many of them.

2    Well, there is nothing in Title VII that recognizes a

3    numerical inconvenience defense that says, "You have to

4    make reasonable accommodations for the employees, you

5    have to discuss reasonable accommodations with the

6    employees, unless there's too many of them."  The law

7    doesn't say that, and no court has ever held that.

8           They cite to the EEOC Guidance in their brief,

9    in Footnote 11 on Page 29, and that guidance is somewhat

10   instructive.  For example, Article L.3:  "How does an

11   employer show that it would be an 'undue hardship' to

12   accommodate an employee's request for religious

13   accommodation?"

14          Answer:  "Under Title VII, an employer should

15   thoroughly consider all possible reasonable

16   accommodations, including telework and reassignment.  In

17   many circumstances, it may be possible to accommodate

18   those seeking reasonable accommodations for their

19   religious beliefs, practices, or observances without

20   imposing an undue hardship."

21          Later on, that guidance says:  "An employer

22   will need to assess undue hardship by considering the

23   particular facts of each situation and will need to

24   demonstrate how much cost or disruption the employee's

25   proposed accommodation would involve.  An employer

1    cannot rely on speculative hardships when faced with an

2    employee's religious objection."

3            They also cite the Barrington v. United

4    Airlines case, Your Honor, which was a case decided in

5    Colorado, October 14, 2021, or at least a partial

6    decision was rendered.  That case is significantly

7    different than the case here before the Court.  In that

8    case, it was found that:  For the avoidance of any

9    doubt, even if plaintiff's job is advertised, plaintiff

10   will be allowed to return to her job, or to a comparable

11   position in the event her job has been filled, at such

12   time as United is able to implement a testing protocol

13   in her location and work area.

14           In our case, no such guarantee or assurance

15   has been offered to the plaintiffs.  In fact, they've

16   been told the exact opposite:  Once you've used up your

17   vacation, you may be terminated.  We can't guarantee

18   that you'll have a job.

19           The Court there in Barrington also noted that

20   neither party had provided it with any authority

21   concerning whether temporary but indefinite unpaid

22   leave constitutes a reasonable accommodation under Title

23   VII.

24           Moreover, in the Barrington case, United

25   Airlines actually did undertake a genuine case-specific

1    investigation regarding accommodations, unlike the Labs

2    in this instance, which has issued a blanket:  All

3    religiously exempt employees will be placed on leave

4    without pay.

5              So that case, I submit, Your Honor, is really

6    not much support for the defendants' position.

7              There are some cases, though, that I think

8    offer some support for the plaintiffs' claim in this

9    instance.  Yesterday, in U.S. District Court for the

10   District of Columbia, in the case of Church v. Biden,

11   which is at 1:2021-CV-02815, issued a minute order in

12   which they said, in part, "The Court orders Defendant to

13   file a supplemental notice."  In that case, the

14   defendants said:  We're not going to place people on

15   leave without pay; we're not going to penalize them

16   until this gets decided.

17             The Court said, "It is not clear to the Court

18   that this Notice sufficiently addresses the Court's

19   concern that the Plaintiffs will not be disciplined or

20   terminated while briefing is completed pursuant to the

21   extended schedule requested by Defendants.  It therefore

22   appears that Plaintiffs may be prejudiced by the

23   proposed extended briefing schedule.  Accordingly, the

24   Court orders Defendants to file a supplemental notice by

25   no later than October 29, 2021, at 12:00 p.m. indicating

1    whether or not they shall agree voluntarily that no

2    plaintiff will be disciplined or terminated pending the

3    Court's ruling on the TRO Motion.  Absent such

4    agreement, the Court shall order bifurcated briefing,

5    requiring Defendants to file an expedited opposition to

6    the TRO Motion (by no later than November 2, with a

7    reply due by November 3) and to file their proposed

8    motion to dismiss in accordance with the schedule

9    discussed during the October 27, 2021, teleconference."

10            In other words, the Court there is requiring

11   that they either agree that they're not going to punish

12   the plaintiffs, or there will be an immediate TRO

13   hearing.

14            In Sambrano v. United Airlines, a case in the

15   United States District Court for the Northern District

16   of Texas, on October 25, 2021, the Court there extended

17   the temporary restraining order that had been issued on

18   September 24, 2021, in order to give the parties time to

19   complete their briefing on preliminary injunction and to

20   attend a court-ordered mediation.

21            And then finally, in Jeffrey Bilyeu v.

22   UT-Battelle, L.L.C., which is a case that's very close

23   to the case here, Your Honor, it involved Oak Ridge

24   National Laboratories, the Court issued a temporary

25   restraining order --

1        THE COURT:  Mr. Artuso, just one moment,

2   please.  All right, counsel.  As you can probably hear,

3   we are currently having a fire alarm.

4        MR. ARTUSO:  Yes, ma'am.

5        THE COURT:  It's very unexpected.  If you

6   could remain on the line until we can find out where we

7   can go from here.  The Court will note it started at

8   10:00.  We're going to be in a brief recess while we

9   determine what is going on.  Thank you.

10        MR. ARTUSO:  Yes, ma'am.

11        (Recess from 10:00 a.m. until 10:21 a.m.)

12        AA VINCENT ESPINOZA:  Counsel, we're back in

13   session.  Sorry.  We apologize for the fire alarm.  But

14   if everyone would like to come back, we're ready to

15   resume.

16        THE COURT:  All right, counsel.  Thank you for

17   your patience with us.  We had a fire alarm and had to

18   evacuate.  We are back.

19        Mr. Artuso, you were right at an hour when we

20   were unexpectedly interrupted.  I would like for you to

21   wrap up, if you could.  I'll give you five minutes to

22   wrap up, sir.  I think you were about at the end of your

23   argument.  And then I may have a couple of questions for

24   you before I let the defense proceed.

25        So please proceed, Mr. Artuso.

1          MR. ARTUSO:  Yes, Your Honor.  Thank you.

2          When we took the break, I was just going to

3     discuss the decision that was issued on October 15,

4     2021, by the U.S. District Court for the Eastern

5     District of Tennessee, Jeffrey Bilyeu v. UT-Battelle,

6     L.L.C.  Respectfully, I'll submit that case is on all

7     fours with this case.  It involves the Oak Ridge

8     National Laboratories.  Battelle Memorial Institute is a

9     member of the UT-Battelle, L.L.C., just as it is a

10    member of Triad in this case.

11         The Court notes in its order of October 15th

12    that defendant granted plaintiffs an exemption and

13    provided unpaid leave beginning October 16, 2021, as an

14    accommodation.

15         That is the same set of facts which is present

16    here.  In its order, the Court says:  The Court finds

17    that issuing a TRO is necessary to avoid immediate and

18    irreparable injury, loss, or damage to plaintiffs,

19    citing as those irreparable harms:  Plaintiffs presented

20    evidence that indicates their claims have a substantial

21    likelihood of success on the merits.  They have

22    adequately expressed they will suffer irreparable harm.

23    In addition to a functional loss of employment,

24    plaintiffs assert that they will suffer irreparable harm

25    due to the possible loss of employment benefits, loss of

1    security clearances associated with their employment,

2    and inability to pay for housing and education costs.

3        So that is directly in line with the

4    irreparable harm that plaintiffs here contend they are

5    suffering.

6        The partial grant of plaintiff's request,

7    according to the Court in the Eastern District of

8    Tennessee, inflicts minimal harm on the defendant

9    UT-Battelle.  The company was operating with plaintiffs

10   and others receiving accommodations before this

11   afternoon.  Preventing their placement on unpaid leave

12   for a matter of two weeks simply will not harm the

13   defendants.  That is also the case here.

14       And then, finally:  The Court hereby enjoins

15   from terminating or placing on indefinite unpaid leave

16   any employee who has received a religious or medical

17   exemption until such time as the preliminary injunction

18   hearing can be held.

19       Finally, in closing, Your Honor, I would like

20   to leave the Court with these thoughts.  This case, like

21   so many cases, is really more about people, I think,

22   than wrangling over the law.  Trina Suazo-Martinez, one

23   of the plaintiffs, in Document 5-3, her declaration to

24   the motion, at the very end provided this information.

25   She says, "The emotional stress to my family arising

1    from this matter is impossible to quantify.  It is hard

2    for my 13-year-old son and 11-year-old daughter to

3    understand suddenly mom and dad are losing their jobs

4    because they are obeying God.  Because of the economic

5    uncertainty being created by LANL's policies we are

6    having to prepare to sell our home with no assurance as

7    to where we will move.  This is very difficult for my

8    children to understand and handle."

9         Adrianna Martinez, no relation, in her

10   declaration, which is Exhibit 5-4, says, "My 13-year-old

11   son's depression and anxiety have digressed since the

12   uncertainty being created by LANL's policies.  My

13   12-year-old daughter is also struggling with wanting to

14   go to school.  This is very difficult for my children to

15   understand and handle."

16        These are good people, Your Honor.  They are

17   hard-working people, people who are doing their best to

18   take care of their families and raise their families,

19   and people who believe that they are following God's

20   word and God's commands.  And the Labs recognizes that

21   they have a sincere religious belief that prevents them

22   from taking this vaccine.

23        At the end of the day, this Court, as all

24   courts, has the power and authority to help these people

25   honor their convictions and to protect their consciences

1    and to set a strong and powerful example for their

2    children and their neighbors.  At the end of the day,

3    this Court will, hopefully, restore some common sense to

4    a situation the COVID pandemic that has, in my humble

5    opinion, for too long been ruled by fear and chaos and

6    confusion and mandates and dictates and an increasing

7    loss of freedom and liberty, and I would respectfully

8    ask that the Court help to turn that tide.

9            It's time to return to the promise of this

10   country as a place where everyone is free -- free to

11   worship God as they wish; free to speak what is on their

12   mind, even or especially when others disagree; free to

13   decide how best to take care of themselves and their own

14   families; and free to make their own choices when it

15   comes to their own health and safety.

16           We respectfully ask that the Court grant our

17   motion, issuing a temporary restraining order, and, if

18   appropriate, a preliminary injunction to help these

19   people preserve their lives and the lives of their

20   families until this matter can come to a completion.

21           And that concludes my presentation, Your

22   Honor.  I'd be happy to answer any questions the Court

23   may have.

24           THE COURT:  Thank you, Mr. Artuso.  The Court

25   certainly understands the anxiety that all of these

1    families and employers and employees are facing as these

2    decisions are being made, and the Court takes its

3    responsibility to uphold the rule of law extremely

4    seriously.

5            That being said, I do have just a few brief

6    questions for you before I turn it over to the defense.

7            Regarding injunctive relief, the pay status of

8    the plaintiffs, it appears that six might be on paid

9    leave, and two are on leave without pay.  Is that

10   correct, Mr. Artuso?

11           MR. ARTUSO:  I am not certain of that, Your

12   Honor.  I do know that when we filed our petition, or

13   our complaint and our motion, that all of them had

14   vacation time.  I do know that a couple of them may have

15   had very short vacation time.

16           THE COURT:  Okay.  That being said, the Court

17   does recognize that the arbitration issue is a threshold

18   issue the Court is going to have to deal with before

19   moving any further.  Should the Court decide that it was

20   appropriate to issue the injunctive relief in this

21   matter, the purpose of the injunctive relief is to

22   maintain the status quo.

23           Based on your arguments earlier, what are you

24   envisioning the status quo to be?  Would that be for

25   them to maintain payroll status, even if they're out of

 1    vacation days and benefits?  Or go back to work?  What
 2    are you envisioning the status quo to be?
 3            MR. ARTUSO:  I believe that the status quo,
 4    Your Honor, should be to go back to work.  But certainly
 5    maintaining pay while on vacation status, if that's
 6    what the defendants would prefer, would also be
 7    acceptable.
 8            As I pointed out during my argument, in the
 9    O Centro case, the Tenth Circuit case decided en banc
10    back in 2004, they define the status quo as "the last
11    peaceable uncontested status existing between the
12    parties before the dispute developed."
13            Now, the dispute obviously developed when the
14    Labs announced back in September that the only
15    accommodation would be leave without pay.  At that point
16    in time, the last peaceable uncontested status was that
17    all of the plaintiffs were working.
18            THE COURT:  All right.  Thank you.  That
19    answers my question, Mr. Artuso.
20            With that being said, I believe it's time to
21    move on.  Ms. Sanchez, would you like to present on
22    behalf of the defense?
23            MS. SANCHEZ:  Thank you, Your Honor.  I think
24    my colleague, Mr. Weil, will be presenting.
25            THE COURT:  Thank you.  Mr. Weil?

1          MR. WEIL:  Thank you, Your Honor.  There are

2     two motions before the Court, and absent objection from

3     the Court, I would like my colleague, Mr. Wallace, to

4     handle the motion to compel arbitration, while I focus

5     my arguments on the motion for temporary restraining

6     order and preliminary injunction.

7          THE COURT:  All right.  So would you like for

8     Mr. Wallace to start regarding arbitration?

9          MR. WEIL:  Yes, Your Honor.

10          THE COURT:  All right.  Mr. Wallace?

11          MR. WALLACE:  Thank you, Your Honor.  May it

12     please the Court.

13          In their motion for temporary restraining

14     order and preliminary injunction, plaintiffs are asking

15     the Court to require Triad to effectively reinstate

16     them, and hundreds of other employees who have been

17     placed on leave, to active employment pending a trial on

18     the merits.

19          While defendants Triad and Dr. Thomas Mason

20     maintain that plaintiffs are not entitled to the

21     injunctive relief they seek, the Court need not even

22     reach that issue today.  This is so for three reasons.

23          First.  Plaintiffs each signed and agreed to

24     be bound by an arbitration agreement, binding them to

25     submit all claims, both arising out of or related to

1    their employment, to arbitration, and "waived the right

2    to take any such dispute to court."

3         The arbitration provision is broad, and it

4    contains no carve-out for either party to seek

5    injunctive relief in this Court.  In fact, the

6    arbitration provision expressly provides that the

7    arbitrator has the express right to issue all remedies

8    that a court of law can issue.

9         Third.  While some courts have allowed

10   litigants to pursue injunctive relief prior to

11   arbitration, they have only done so to preserve the

12   meaningfulness of the arbitration process and to ensure

13   it is not a hollow formality, which is not the case

14   here, where plaintiffs are seeking a mandatory

15   injunction, seeking to be returned to work.  This is not

16   a request for injunctive relief in aid of arbitration.

17   It's a request for injunctive relief in lieu of

18   arbitration.  And for that reason, it must be rejected.

19        As has been alluded to several times this

20   morning, Triad manages and operates Los Alamos National

21   Laboratory under a contract with Department of Energy's

22   National Nuclear Security Administration.

23        Triad's contract became effective on

24   November 1, 2018.  Prior to that time, the Lab was

25   operated by Los Alamos National Security, L.L.C.  As

1    part of the transition from Los Alamos National Security

2    to Triad, Triad offered new jobs to certain of the LANS

3    employees, including five of the eight plaintiffs here.

4    The offer of employment came with an offer letter, an

5    offer acceptance letter, and a document called an

6    At-Will Employment, Invention Assignment, and

7    Confidentiality Agreement that contained the arbitration

8    provision at issue.

9             Each of these employees, these five employees,

10   were required to sign those documents to accept

11   employment with Triad and become Triad employees.  All

12   five did.  The three other plaintiffs in this case were

13   subsequently hired after Triad had the contract to

14   operate the Lab, and all three of those employees, it's

15   uncontested, signed the same documentation, or

16   substantively the same documentation, containing a

17   substantively identical arbitration provision.

18             So as a starting point, Triad has established,

19   through its papers and otherwise, all of the familiar

20   elements of contract formation of New Mexico law.  First

21   there was an offer.  Each received an offer letter, an

22   offer acceptance letter, and the arbitration agreement

23   and the employment contract; and each one of them signed

24   it, and there's no dispute to that.  So we have offer,

25   acceptance.

1          As for consideration, plaintiffs spent

2     considerable time in their briefing and this morning

3     talking about the fact that essentially an at-will

4     employee can't enter into an enforceable arbitration

5     agreement because, I suppose, it's not supported by

6     consideration.  I'll talk about that in a minute.

7          But to shortcut the argument, the fact of the

8     matter is, the arbitration agreement is mutual.  It

9     requires both parties to submit all claims arising out

10    of or related to their employment, plaintiffs'

11    employment, to arbitration.  That constitutes adequate

12    consideration ten times out of ten.

13         To this end, I direct the Court to an opinion

14    in the case of Clark v. Unitedhealth Group, 2018,

15    Westlaw, 2932735.  In that case, the magistrate judge

16    was grappling with this concept of whether the offer of

17    employment would constitute adequate consideration.

18    There's some question as to whether, if it's an offer on

19    the front end as opposed to an offer in midstream

20    employment, it's adequate consideration.

21         The Court in that case, after grappling with

22    that issue, said, "This is not to say that an at-will

23    employment contract could never include an enforceable

24    arbitration agreement.  Rather, at-will relationships

25    are subject to arbitration agreements whenever another

1    form of consideration supports the employment agreement.

2    Clearly such consideration exists when the parties

3    mutually agree to arbitrate their disputes in valid and

4    enforceable arbitration agreements – in other words,

5    arbitration agreements not dependent on the at-will

6    employment relationship alone for consideration," are

7    valid."

8              So even when courts grapple with those at-will

9    issues, the conclusion, again, ten times out of ten, is

10   that a mutual agreement to arbitrate constitutes

11   adequate consideration.

12             That being said, Judge Browning has repeatedly

13   held, as have others on this Court, including in the

14   case of Parish v. Bolero Retail Holdings, 727 F.Supp. 2d

15   1266:  The Court believes that plaintiff takes New

16   Mexico contract law too far.  According to -- and I'm

17   using "plaintiff" in terms of the name, the plaintiff's

18   name -- at-will employment contracts in New Mexico could

19   never include arbitration agreements because the offer

20   of at-will employment is not a sufficient promise to

21   constitute consideration.  The Court has found no New

22   Mexico case law, nor has Parish -- the plaintiff --

23   provided the Court with any case law that has found any

24   at-will employment is insufficient consideration for a

25   contract.  The Supreme Court of New Mexico, rather,

1      seems to accept that a contract for at-will employment,

2      even an implied contract, for the consideration is the

3      offer of employment, is valid.

4              So whether the Court finds that there is

5      adequate consideration by virtue of the fact that the

6      arbitration provision is unquestionably mutual, or it

7      finds it by virtue of the fact that they were offered

8      at-will employment in exchange for signing the contract,

9      adequate consideration exists.

10             Which takes us to the last element of contract

11     formation, mutual assent.  There doesn't appear to be

12     any dispute that by virtue of signing the contracts and

13     coming to work for the company, and also certifying, by

14     virtue of signing the arbitration agreement, that they

15     acknowledge that they've carefully read all the

16     provisions of the agreement, understand them, and will

17     willfully and faithfully comply with the agreement.  The

18     mutual assent issue seems to be resolved, as well, and

19     all elements are therefore established.

20             Now, with all elements of contract formation

21     established, oftentimes courts will next look to the

22     issue of arbitrability, with the claims at issue are

23     covered by the arbitration agreement.

24             One thing that plaintiffs' counsel did not

25     address in his presentation this morning was the fact

1    that this arbitration agreement at issue incorporates

2    the American Arbitration rules, the rules of the

3    American Arbitration Association, the employment rules,

4    which, through those rules, delegate the issue of

5    arbitrability to the arbitrator.  And as a result of

6    that, almost every court to have decided the issue has

7    found that the issue of arbitrability is therefore an

8    issue for the arbitrator to decide because it has been

9    expressly delegated.  That is our position here.  But

10   despite that fact, there can be no question the claims

11   at issue are covered.  They all relate to the status of

12   the plaintiffs' employment.  Therefore, they all arise

13   out of or relate to the plaintiffs' employment.

14        The cases that plaintiffs cite for the

15   proposition that perhaps this broad contract doesn't

16   cover the claims at issue are cases that arise in the

17   labor context involving collective bargaining

18   agreements, where it's unclear as to whether the

19   collective bargaining agreement only covers claims or

20   requires claims to be submitted that arise under the

21   collective bargaining agreement, or do they also cover

22   claims that may arise under statutes that are extra

23   contractual, CBA.  That's not an issue here, where all

24   claims related to employment or the terms of the

25   contract must be submitted to arbitration.

1          Plaintiffs' argument also ignores the fact

2     that, "When the applicability of arbitration is in

3     dispute, as a matter of federal law, any doubts

4     concerning the scope of arbitrable issues should be

5     resolved in favor of arbitration."  And that was a quote

6     La Frontera Center, Inc. v. United Behavioral Health,

7     Inc., 268 F.Supp. 3d 1167, District of New Mexico.

8          So when the Court decides to delegate the

9     issue of arbitrability to the arbitrator or decides to

10    address the issue head-on as to whether the plaintiffs

11    are covered here, Triad has established the claims are

12    covered.

13         As to the arbitration agreement, itself, and

14    the request for injunctive relief today, the agreement

15    is broad.  Again, under the agreement, the arbitrator is

16    authorized to provide all remedies that a Court could

17    provide which would necessarily include injunctive

18    relief.

19         These facts distinguish this case from the one

20    Tenth Circuit case to have addressed an issue similar,

21    that case being Merrill Lynch, Pierce, Fenner & Smith,

22    Inc. v. Dutton, 844 F.2d 726.  It's a Tenth Circuit case

23    from 1988.  Plaintiffs cited us this case in a letter

24    they sent to Triad's counsel on October 10th of this

25    year for the proposition that the Court had the ability

1    to hear their potential temporary injunction because an

2    arbitration would be premature.

3         But in that case, the Court decided that it

4    could issue injunctive relief based entirely on the fact

5    that the arbitration agreement at issue allowed for the

6    Court to do so.  It expressly said:  According to the

7    Court, the parties consented to the issuance of a

8    temporary restraining order or permanent injunction to

9    prohibit the breach of any provision of a restrictive

10   covenant agreement; and therefore, "plaintiff was

11   entitled," under the employment contract, to the entry

12   of orders protecting the status quo, the merits of the

13   dispute with its former employer.

14        That's not the case here.  Furthermore, that

15   case is distinguishable on the facts because in that

16   case, the Dutton case, the employer was moving to enjoin

17   the employee because the employee was acting in

18   potential violation of restrictive covenants agreement,

19   had absconded with trade secrets, was soliciting

20   potential clients.  The Court found there's no way for

21   the Court to put the toothpaste back in the tube.  Once

22   that individual goes out there and violates the contract

23   and steals those clients for its new employer, there's

24   no remedy that can be given to the employer at a trial

25   on the merits at that point in time.  That's not the

1    case here.

2              And, again, in cases where courts have held,

3    all outside the Tenth Circuit, on these facts, that

4    injunctive relief may be granted pending arbitration,

5    they've only done so to preserve the meaningfulness of

6    the arbitration process and ensure it is not a hollow

7    formality.  Further, when courts are exercising their

8    authority outside of the Federal Arbitration Act to

9    issue injunctive relief prior to compelling arbitration,

10   they're exercising their equitable powers.

11             Here, the equities, as an initial matter,

12   don't dictate that the Court should rule prior to

13   compelling arbitration on plaintiffs' request for

14   injunctive relief.  That's primarily so because

15   plaintiffs have known of their obligation to arbitrate

16   for weeks, if not far longer.  They didn't pursue their

17   rights in arbitration.  They had every right to do so.

18   The contract provides for it.  The contract absolutely

19   100 percent says the arbitrator has the ability to grant

20   all remedies that a court would grant.

21             Instead, they lay in wait.  They lay in wait

22   because there was another filed lawsuit in the First

23   District Court, a New Mexico State Court, to see what

24   that court was going to do.  And so they sent a letter

25   to Triad two weeks prior to the hearing in that case,

1   and did nothing for two weeks.  They didn't exercise

2   their rights to go to arbitration, which they could have

3   done.

4          The Court then issued a ruling, properly so,

5   denying the plaintiffs' in that case request for

6   injunctive relief and thereby allowing Triad's mandate

7   to go into full effect, and resulting in a number of the

8   plaintiffs, and the other individuals they seek to

9   represent, to be placed on leave without pay.

10          They now come to this Court and say, "Well,

11   Your Honor, enter our injunctive relief pending

12   arbitration potentially."  They're not even really

13   saying that.  They're just saying, "I don't have to go

14   to arbitration because of enforceable arbitration laws,

15   but grant me this injunctive relief."

16          There's no precedent that supports that

17   proposition, especially under these facts, and given the

18   fact that plaintiffs have waited on their rights to

19   assert them, which they could have done weeks ago in

20   arbitration.

21          Furthermore, granting the injunctive relief

22   request does not preserve arbitration.  Instead, it

23   makes arbitration a hollow formality for Triad because

24   forcing Triad to return individuals to active status or

25   take any other number of actions, including reallocating

1    the work that has been subsequently reallocated, the

2    costs and everything else associated with those things,

3    there's no way to unwind that if Triad were to prevail

4    at arbitration.

5            Again, that toothpaste can't go back in the

6    tube.  Triad can't get a judgment from an arbitrator

7    that the money it expended and the resources it expended

8    in the interim, litigating the case due to this

9    injunction, are recoverable.

10           So it doesn't preserve the meaningfulness of

11   the arbitration.  It makes it a mere hollow formality.

12   And for that reason, this case is distinguishable from

13   all the other cases that have found that a court could

14   stay, could issue injunctive relief, pending

15   arbitration.

16           In closing, I want to address a few arguments

17   that plaintiff raised this morning; namely, the class

18   waiver issue.  Plaintiffs seem to take the position that

19   the inclusion of a class waiver, which does exist in the

20   subject arbitration provision, somehow makes the

21   provision unenforceable.  That's not the law.

22           In Fiser v. Dell, the case that plaintiffs'

23   counsel referenced, in 2008, the Court found that the

24   class waiver in that case, which was a case involving

25   consumer contracts, was unconscionable.  It was

1    unconscionable because the only damages available to the

2    plaintiffs in that case were a maximum of $10 to $20.

3    And so the Court found that if it were to enforce the

4    class waiver, there would be no right to redress for

5    all of the individuals who were wronged by this

6    potential policy, and a policy that violated the law

7    protection.

8         The Court did not find class action waivers

9    per se unenforceable.  If it did, such a finding would

10   be preempted by the Federal Arbitration Act as found by

11   the United States Supreme Court in AT&T Mobility v.

12   Concepcion, in 2001, which was two years subsequent to

13   the Fiser case, where the Court said:  When state law

14   prohibits outright the arbitration of a particular type

15   of claim, the analysis is straightforward.  Conflicting

16   rule is displaced by the Federal Arbitration Act.

17        And subsequent to Fiser and AT&T, at least --

18   the New Mexico Supreme Court at least one time called

19   into question Fiser and Felts v. CLK Management, 2012

20   Westlaw 12371462, but in doing so pointed out that there

21   is no, again, per se rule that prohibits class action

22   waivers.  That analysis is whether the overall contract

23   is unconscionable.

24        Here, there has been no allegation that the

25   arbitration provision at issue is unconscionable in any

1    respect.   Therefore, the class action waiver issue is

2    not even properly preserved, and it's not properly

3    presented.

4              Plaintiffs also raise in their briefing,

5    though not discussed this morning, that the contract

6    constitutes an adhesion contract.   However, while Triad

7    refutes the notion that its contract is an adhesion

8    contract, New Mexico courts, including this Court, in

9    Davis v. USA Nutra Labs, 303 F.Supp. 3d 1183, finds

10   that:   "Adhesion contracts, however, or take-it-

11   or-leave-it contracts, have become the norm, and the

12   disparity in bargaining power that results from these

13   contracts is not considered sufficient to render them

14   unconscionable."   Instead, there must be some additional

15   allegations of unconscionability, procedural

16   unconscionability of some form, some high-pressure

17   tactics or anything of the sort.

18             Again, no allegations have been raised related

19   to any kind of unconscionability; and therefore, this

20   adhesion contract argument also fails.

21             With all of that said, Your Honor, we

22   respectfully request the Court compel arbitration and

23   stay the proceedings in accordance with the arbitration

24   agreement at issue and the applicable law and the

25   Federal Arbitration Act.

1          THE COURT:  Thank you, Mr. Wallace.  Before I

2     move on, I just have one question.  You have filed your

3     motion to compel arbitration.  There was a response

4     filed yesterday.  Have you had an opportunity to review

5     that?

6          MR. WALLACE:  Yes, Your Honor.

7          THE COURT:  Do you feel it necessary to file a

8     reply, or do you feel that this matter has been

9     sufficiently briefed for the Court to make a decision?

10          MR. WALLACE:  I'm happy to file a reply.  I

11     think it has been sufficiently argued and briefed, but

12     I'm happy to file a reply in short order if that would

13     help the Court.

14          THE COURT:  Do you feel that's necessary?  I'm

15     just asking you if you want that additional time?

16          MR. WALLACE:  I'm happy to file a reply, Your

17     Honor, yes.

18          THE COURT:  All right.  Thank you.

19          Now, Mr. Weil, would you like to proceed on

20     behalf of argument on the TRO?

21          MR. WEIL:  Yes, Your Honor.  Thank you.

22          Before I address the merits of the TRO,

23     there's a couple of threshold issues, one which was

24     already addressed by my colleague, Mr. Wallace, that the

25     plaintiffs' claims are subject to arbitration.

1          The second one is that two weeks ago, there

2     was an order issued; two weeks and a day ago, there was

3     a hearing in the State Court brought by plaintiffs on

4     behalf of the same plaintiffs here.  In that case, the

5     plaintiffs were Triad employees who were bringing their

6     action and their motion for preliminary injunction on

7     behalf of all those similarly situated, which included

8     the plaintiffs in this case.

9          At least one of the -- the plaintiffs in the

10    case were both named as "Doe" plaintiffs.  At least one

11    of those plaintiffs in the Butters case was a plaintiff

12    here, Adrianna Martinez.

13         Counsel referenced an e-mail that he sent me

14    on this point; and so therefore, I think it's fair to

15    read from that e-mail.  He says, "Adrianna Martinez was

16    initially a part of the group of plaintiffs and did

17    provide an affidavit, but she did not sign a

18    representation agreement with plaintiffs' counsel and

19    subsequently told plaintiffs' counsel that she was

20    withdrawing as a party in the case."

21         I don't know how somebody can withdraw as a

22    party if they were never a party in the first place, and

23    certainly signing a representation agreement with

24    counsel is not the measure of whether someone was a

25    party in that case.

1          There is at least one party in this case, if

2     not more, that were parties to a State Court action,

3     Your Honor.  It is rare that plaintiffs -- to find

4     authority where plaintiffs in a State Court action

5     failed to obtain preliminary injunction and then run to

6     a Federal Court to try again.  But that is what has

7     happened here, Your Honor.

8          In Taylor v. Sturgell, the Supreme Court

9     identified a number of circumstances -- and that cite is

10    553 U.S. 880.  The Court identified a number of

11    circumstances in which plaintiffs who were not formally

12    parties in the action can nonetheless be precluded by a

13    prior action, and one of those is where the party

14    litigating the second action is a proxy for the original

15    plaintiffs.

16          Here, we know at least one of those plaintiffs

17    was one of the plaintiffs.  And certainly given the

18    timing of what has occurred here, we know that she has

19    to be, and these plaintiffs are a proxy.  The timing is

20    such that the Lab received a letter from these groups of

21    plaintiffs' counsel on October 11th.

22          On October 13th the Lab responded, asking the

23    plaintiffs' counsel to identify the plaintiffs in this

24    case, and noted that the Butters case was in existence.

25    There was no response immediately.  On October 14th,

1    Judge Lidyard heard argument, after receiving evidence

2    on the paper, and on October 15th he issued a lengthy

3    order from the bench denying all relief.

4          In that case, the plaintiffs sought the same

5    relief as in this case, or certainly could have sought

6    the same relief that is being sought here, which means

7    that they are precluded from trying again.

8          We know that there must have been a proxy

9    because on October 18th, the plaintiffs in the Butters

10   case suddenly dismissed their action with hopes of

11   nullifying Judge Lidyard's order.  And literally within

12   hours, plaintiffs' counsel in this case sent another

13   letter, making demands, but again not identifying his

14   clients.

15         The Lab responded again a couple of days later

16   and noted the fact that the Butters -- or Judge Lidyard

17   had issued his order, and also noted the preclusive

18   effect.  Again asked for the identity of the plaintiffs,

19   but none was to be had.

20         Plaintiffs insist that Triad needs to conduct

21   an individualized inquiry of their requests for

22   accommodation, but by staying anonymous before filing

23   the suit, it made it impossible to do so.

24         Because of the similarities and that these

25   plaintiffs are essentially acting as a proxy for the

1    Butters plaintiffs, this case has been decided, and the

2    Court can deny and refuse preliminary injunction because

3    of the obvious forum shopping that's happening here.

4            That's before the Court even gets to the

5    merits of this case.  I would like to turn to that now.

6            Your Honor, Triad did not issue its vaccine

7    mandate arbitrarily or lightly or on a whim.  It did not

8    issue the requirement in response to any request or

9    requirement by any federal or state government entity.

10   It did so without the influence or direction from any

11   outsider.

12           It did so to address a serious threat to its

13   workers in its operations.  It did so after it suffered

14   massive losses of productivity, and even the lives of

15   some of its employees.  It did so after trying other

16   things.  Triad used masks, social distancing, and

17   testing, but still suffered massive disruptions to its

18   operations.  Triad issued its vaccine requirement after

19   trying to incentivize employees to become vaccinated,

20   including through educational meetings and even raffling

21   a truck.  It issued its vaccine requirement after asking

22   its own experts involved in medicine and data modeling

23   to analyze whether a vaccine requirement would decrease

24   risks to both the mission of the Lab and the health of

25   its employees.  The analysis revealed overwhelmingly

1        that it would.

2                Counsel suggested in his argument that Triad

3        and the operations at the Labs seemed to work just

4        fine -- I'm paraphrasing his argument -- using the other

5        measures.  Your Honor, I don't think the families of the

6        five employees who died would agree.  I don't think the

7        families of the ten employees who can no longer work

8        because of long-term consequences of COVID would agree

9        that things were working just fine.

10               After careful thought about all of these

11       issues and trying other measures, Triad decided to issue

12       its vaccine requirement.  It did so consistent with both

13       state and federal law by providing medical and religious

14       accommodations.

15               There were 293 religious accommodation

16       requests versus 95 medical.  And 267 religious requests

17       were approved; three medical requests were approved for

18       permanent exemption; and 24 extensions were given, but

19       those employees too must be vaccinated within weeks.

20               There was an individualized analysis.  Triad

21       hired outside contractors to review each and every one

22       of the religious accommodation requests.  But the

23       culmination of -- the accumulation, I should say, of

24       requests, 293 with 267 approvals, cause burdens

25       associated with the volume and create an undue hardship

1     to Triad, based on the volume, which the EEOC guidance

2     confirms that Triad may consider in coming up with a

3     reasonable accommodation.  And that effective decision

4     and judgment about what was reasonable for the religious

5     accommodations and what would not constitute an undue

6     hardship, given the nature of Triad's work, it requires

7     in-person attendance.  The plaintiffs will need to be

8     on-site to conduct their duties.

9          For example, Adrianna Martinez is a research

10    tech in the high explosive and science technology group.

11    Among her responsibilities, she must be present on-site

12    at Triad to set up experiments in explosive work.  Your

13    Honor, I don't know how she can do that from home.  And

14    certainly she doesn't say that in her declaration.

15    Counsel says they all have been off-site and working

16    from home.  She doesn't say that.  Neither does Isaac

17    Martinez, who says -- whose duties include also running

18    -- assembling explosive tests and running hazardous

19    diagnostics.  He can't do that from home, and he doesn't

20    say he can.

21          In fact, Your Honor, counsel said that they've

22    all been working from home, but we were able to pull the

23    badge swipes from March 2020 through October 2021.  Mr.

24    Martinez, for example, was on-site 240 times, based on

25    those badge swipes.  Sam Sprow was on-site 263 times.

1          Based on the badge swipes, they've all been

2     present on-site, so the idea that they can simply do

3     their work from home or have just been doing their work

4     from home is not supported by the evidence.  It's not

5     supported by their affidavits.  It's not supported by

6     Ms. Lambert, who admits in her affidavit -- and she is

7     the one who is the receptionist -- that she currently

8     works from home one day a week -- I assume she wrote

9     that affidavit before she was put on leave -- confirming

10    that she was working four days a week.

11         And even to the extent employees could perform

12    some of their duties from home, Triad has mandatory and

13    random drug tests that require employees to come

14    on-site.  There are other reasons each one of these

15    employees needs to come on-site.

16         So the idea that they can simply work from

17    home is not accurate.

18         The accommodation given to them was a leave of

19    absence.  Triad believes it's reasonable because it's

20    not a termination per se.  They're on a leave of

21    absence.  And all of the plaintiffs in this case are not

22    just on vacation; they're on a leave of absence.

23    They've turned in all of their equipment.  Their duties

24    have been reassigned by other employees who have covered

25    for them.

1          The leave of absence doesn't create an undue

2     burden, and employees are likely to get their jobs back

3     when the pandemic subsides because there's a demand for

4     employment.  Triad is hiring.  You know, there are

5     openings.  There's a big demand for work.  And they can

6     use their vacation pay.

7          Turning to the merits of the case, or the

8     legal arguments, I should say, this is a mandatory

9     injunction, Your Honor.

10         Counsel was very focused on the status quo,

11    but that's not the only issue that affects the standard

12    that the Court must consider.  The Court must also

13    consider whether this is a disfavored mandatory

14    injunction, and there's no doubt it is, based on the

15    relief that's being requested, which is they would have

16    to -- the briefing from plaintiffs suggests they want

17    reinstatement, restoration.

18         But the restoration would require them to be

19    reinstated.  It would require them to unravel -- it

20    would require Triad to unravel all of its efforts to

21    have their jobs covered.

22         That is a mandatory injunction, based on the

23    cases -- based on and including the Tenth Circuit case

24    Triad v. University of Colorado, 727 F.3d 1253, where

25    the Court found that the relief requesting that the

1    plaintiff be reinstalled as chair of the Department of

2    Medicine was a mandatory injunction.  Based on that, the

3    Court must apply a heightened scrutiny to the merits of

4    the case, or to the claims being presented by the

5    plaintiffs.

6           I also want to address one other procedural

7    issue before I address the merits.

8           Based on the plaintiffs' briefing, the relief

9    that they are seeking is on behalf of all employees who

10   received a religious exemption, not just the named

11   plaintiffs here.  Your Honor, this was not a Rule 23

12   action, nor could it be because the plaintiffs all

13   waived their rights to a Rule 23 action.

14          So a request on behalf of all employees is not

15   proper or before the Court properly.  It can only be

16   done on behalf of these particular plaintiffs, again,

17   who all have individualized issues.  As I noted, they

18   are not all working from home.  They all have very

19   individualized issues, so it's very -- the idea that the

20   Court can issue a sweeping order on behalf of so many

21   employees is not appropriate in this instance.

22          Next, I want to turn to the likelihood of

23   success on the merits element.  I first want to address

24   plaintiffs' claims under Section 1983 of the

25   constitutional law claims.

1            Your Honor, the Court need not grapple with

2    whether Triad is a federal actor.  The Court need not

3    grapple with the merits of the constitutional claims.

4    And the reason why is that plaintiff has not stated a

5    valid 1983 action, cause of action against Triad.  1983

6    relates to state actors, not federal actors.

7            Counsel, in his argument, used the terminology

8    very loosely.  He sometimes referred to government

9    actors, federal actors, state actors.  But there are

10   very important legal distinctions.  The "government

11   actor" term is the umbrella, but then you have federal

12   actors and state actors.  There is no 1983 -- this is

13   hornbook law.  You cannot state a 1983, Section 1983

14   action against a federal actor.

15           All of the arguments presented by counsel

16   related to plaintiffs' contention that Triad is a

17   federal actor, that it receives direction from the

18   federal government, that it receives money from the

19   federal government, and then counsel loosely says,

20   "Well, it's a state actor," that's not how it works,

21   Your Honor.

22           Counsel has argued that Triad is a federal

23   actor, and because of that argument the Court could

24   dismiss those claims on summary judgment now, because

25   it's hornbook law that there is -- you cannot have a

 1    Section 1983 action against a federal actor.  The

 2    statutes -- the only statutes at issue or that would be

 3    relevant are the Title VII and ADA claims.  But none of

 4    the constitutional claims have merit because of that

 5    threshold issue.

 6           Triad is not a federal actor, even if the

 7    Court would go there.  What counsel describes are facts

 8    that suggest that Triad is a federal contractor.  But

 9    being a federal contractor does not make one a federal

10    actor.

11           In the Brentwood, the U.S. Supreme Court case

12    Brentwood that counsel refers to, which involved the

13    sports association, in that case these public schools

14    provided -- the organization was run by employees of the

15    public schools, themselves.  The record in that case

16    suggested that board meetings were held during official

17    school hours.  In other words, the employees that were

18    running the organization were employees of the public

19    schools and conducting operations of the association

20    during school hours.  That's not the case here.  Triad

21    is a private employer and doesn't have a similar

22    situation as the Brentwood case, with the membership and

23    the identity of the employees.  Simply having a federal

24    contract and receiving money from the federal government

25    does not make one a federal actor.

1            But again, Your Honor, this is not a federal

2     actor.  It is of no moment because plaintiffs cannot

3     just state a Section 1983 action.

4            Plaintiff does not suggest or argue that Triad

5     is actually a state actor.  There is no evidence in the

6     record about its association with any states, certainly,

7     or that Triad was acting on behalf of the State of

8     California, the State of Texas, or the State of New

9     Mexico.  There's no evidence in the record related to

10    that.  It is not a state actor; nor is Dr. Mason a

11    government actor, either.

12           But if the Court were to turn to the

13    constitutional law claims and still address those, which

14    there is no reason to do so, given there is no valid

15    1983 claim, Triad's vaccine policy passes muster under

16    the free exercise clause as well as the Fourteenth

17    Amendment.  It is a policy, a neutral policy of general

18    applicability; and therefore, only a rational basis

19    review applies.  It is neutral because this policy

20    applies to all Triad employees.  It does not target

21    religion.

22           Unlike the cases cited by plaintiffs,

23    including the Lukumi case, 508 U.S. 520, and O Centro, a

24    U.S. case, in both of those cases the policy targeted

25    particular religions.

1          In this case, Triad's policy doesn't target
2     any religion.  It applies across the board.  It's also
3     generally applicable because it does not selectively
4     burden religion, and the reason, because to be generally
5     applicable, a law may not selectively burden religiously
6     motivated conduct while exempting comparable secular
7     motivated conduct.  And it's the comparability is what's
8     important here.
9          And as stated by Tandon v. Newsom, 141 Supreme
10    Court 1294, comparability is construed with the risks
11    various activities pose.
12         Those employees with medical exemptions have
13    one due to medical necessity because they would
14    literally be harmed by the vaccine if they take one.
15    Those with medical necessities are not comparable to
16    those seeking religious accommodations because
17    particularly when one focuses on purpose of the policy,
18    the purpose of the policy is to protect the health of
19    the Triad's workers and to protect the operations of the
20    Lab.  Providing better accommodations for medical
21    exemptions does not undermine these goals because
22    requiring medically exempt employees to take the vaccine
23    would harm them, which is not true of religious
24    objectors.  And there are substantially fewer medical
25    exemptions than religious exemptions.  There are three

1    permanent medical exemptions versus 267 religious

2    exemptions.

3              Those are not comparable because one would --

4    in this instance, because allowing the religious

5    exemptions to be on-site would undermine the purpose of

6    the policy.  But the medical exemptions, they would be

7    harmed, themselves, by receiving the vaccine, which

8    would be counter to the policy of protecting workers.

9              And this result is aligned with the result

10   from Does 1-6 v. Mills, the First Circuit Court opinion

11   cited in our papers.  It does not yet have an "F," a

12   Federal Reporter citation.  But the Court -- in that

13   instance, the State of Maine did not provide any

14   religious exemptions, but did exempt on medical basis.

15   In that opinion, the Court upheld or found that the

16   vaccine requirement was subject to irrational basis

17   review.

18             The proper comparatives here would be

19   non-medical and non-religious objections to the vaccine,

20   as compared to religious objections.  But in this case,

21   the plaintiffs here have been treated better because

22   they're on a leave of absence and have not been

23   terminated.

24             But even if the Court were to provide or were

25   to apply strict scrutiny to the vaccine mandate, it

1    would survive that.  And, again, this is not dissimilar

2    to the decision in Does 1-6 v. Mills in the Mills case.

3    Because Triad -- and the reason why it would survive

4    strict scrutiny is because the policy is narrowly

5    tailored.

6          Triad tried -- similar to what happened, the

7    facts in the Mills case, where they tried other measures

8    before going to vaccine mandate, Triad did that here.

9    Same in the Mills case.  They tried to incentivize

10   employees to become vaccinated.  Triad did that here.

11   Those things didn't work; and therefore, only then did

12   Mills, in the Mills case, did they go to a narrow -- a

13   vaccine mandate, which the Court held was therefore

14   narrowly tailored.  In this case, too, Triad tried all

15   these measures but came to the result of a vaccine

16   mandate only after suffering loss or suffering

17   disruptions to its operations and the health of its

18   employees.

19          Turning to the Title VII claims, Your Honor,

20   which are really the only valid claims that plaintiffs

21   can bring in this case, given the federal actor issue,

22   the 1983 issue, Title VII is clear that the plaintiffs

23   are not entitled to the accommodation of their choosing.

24   It just needs to be a reasonable accommodation.  As I

25   already alluded to, this is a reasonable accommodation.

1    They are not being -- they do not have to become

2    vaccinated.  They can take a leave of absence, and Triad

3    will try to prioritize those employees.  Later, when the

4    pandemic reaches an appropriate level to have employees

5    to return, Triad will prioritize those on leave over

6    other candidates.

7            All Title VII requires is that -- or excuse

8    me.  I should say that Title VII does not require Triad

9    to provide an accommodation that would impose an undue

10   burden.  And that standard is low.  As long as it

11   doesn't -- Triad is not required to provide an

12   accommodation that would be more than a de minimis

13   burden on them.

14           Certainly in this case, and in multiple cases

15   that we've cited to the Court, allowing employees to

16   come on-site and remain actively employed would create

17   an undue burden and be more than a de minimis risk to

18   the other employees in the operations.  Triad is not

19   obligated to provide the accommodation of plaintiffs'

20   choosing or have to consider an indefinite number of

21   accommodations.

22           It is also lawful to distinguish between

23   medical and religious exemptions under a Title VII and

24   the ADA.  The Seventh Circuit case 94 F.3d 1041 at 1049

25   recognized that the difference between the -- the

1    standard between accommodations for Title VII versus ADA

2    are different.  We've cited to the Court other cases.

3    We could have cited more cases to the Court, but we were

4    limited by pages.

5            That issue is really not controversial.  They

6    are different standards.  For providing a reasonable

7    accommodation standard between the ADA and Title VII are

8    different.  ADA requires a much higher standard for

9    accommodation.  So the fact that there are differences

10   is of no moment to the proper analysis.

11           With respect to the plaintiffs' ADA claims,

12   plaintiffs seem to think or suggest or they argue that

13   the fact that they once had COVID and now are recovered

14   makes them covered by the disability statute.  No court

15   has held that, that someone who has recovered from an

16   illness is now disabled and subject to the statute and

17   covered by that statute.

18           And in any event, Dr. Pasqualoni evaluated all

19   of the medical requests and applied CDC guidance to her

20   determination as to whether someone should be exempted.

21   She also consulted experts, and based on her review, her

22   expertise of the CDC guidance, her consultation with

23   experts, and her experience, she granted accommodations

24   to those employees who had medical conditions that were

25   contraindication to the vaccine, but did not grant as to

1   others because granting an accommodation as to others

2   wouldn't be reasonable in those circumstances, to grant

3   an accommodation where there is no -- where the

4   condition at issue is not a contraindication to

5   receiving a vaccine.

6          Your Honor, I would like to turn to the

7   irreparable harm element, which is an extremely

8   important one in this instance.  Counsel has

9   identified -- or plaintiffs have identified essentially

10  two irreparable harms.  One is a violation of their

11  constitutional rights; and two, harm that would

12  essentially arise from them being put on an unpaid

13  leave.

14         With respect to the infringement of

15  constitutional rights, as I mentioned, that's not even

16  an issue here because the plaintiffs have not stated a

17  1983 action, a proper 1983 action, because they cannot

18  have a 1983 action against a federal actor, which is all

19  that the plaintiffs have argued here.  Secondly, there

20  haven't been any constitutional rights, federal.  Triad

21  is not a federal actor.  Third, there have not been

22  constitutional rights violations here.

23         So, really, what we're only looking at here

24  are the irreparable harms or the alleged irreparable

25  harms that might arise from plaintiffs being on unpaid

1    leave.  But to have it be irreparable harm, first of

2    all, the case law is clear from this circuit and all the

3    others that loss of employment and the consequential

4    damages that may result from loss of employment or loss

5    of pay is not irreparable harm.

6         That is what all that has been described in

7    the papers and in argument are the types of

8    consequential damages, the compensable damages, that

9    plaintiffs assert in just about every wrongful

10   termination case in which damages experts come to

11   testify about all the harms that have occurred such as

12   -- you know, all the consequences of what happens

13   because they lost insurance, they perhaps lost

14   clearances, and the monetary damages that resulted from

15   that.  These are the types -- this is why we have

16   wrongful termination claims.  They exist so that a

17   terminated -- they exist so a plaintiff who has been

18   terminated improperly or unlawfully can receive monetary

19   damages to compensate for all their employment loss.

20        In addition, irreparable harm cannot be

21   speculative.  Counsel described in his argument all of

22   the things that might happen, may happen to the

23   plaintiffs, such as what might happen to them if they

24   lose their security clearances.  That is speculative,

25   and that is not a proper basis for irreparable harm.

86

1        Counsel also raised the TRO decision out of

2   the Eastern District of Tennessee, and they cited the

3   Sambrano case.  Putting aside the merits of those cases,

4   Your Honor, those are out-of-circuit cases that,

5   respectfully, they were not applying irreparable harm

6   standard appropriately.

7        But the procedural posture in those cases was

8   very different from this case.  In those cases, the

9   vaccine mandate had not yet been effected.  The

10   employees had not already been put on a leave.  In this

11   case, the employees, the plaintiffs, have already been

12   put on a leave.

13        And it's very -- the way that happened here is

14   also very important to that issue, Your Honor.  The

15   letter -- certainly plaintiffs knew about the vaccine

16   requirements since August of this year, and there were

17   continually pronouncements and policies that have been

18   put in the record, Q and A from the Lab through

19   September.

20        Certainly during the September time frame, the

21   plaintiffs could have filed this suit.  They did file a

22   different suit in late September, including one of the

23   plaintiffs here.  So certainly as of late September,

24   they could have come to this Court and asked for the

25   relief that they're seeking today, but they did not.

1          A letter was sent on October 11th.  They could

2     have come to this Court or could have filed an

3     arbitration, and by now could have had a hearing before

4     an arbitrator on this issue, but did not file, and

5     waited to see what was going to happen in the Butters

6     case before bringing this action more than a week after

7     Judge Lidyard issued his decision denying the relief,

8     and now come to this Court, where things have changed,

9     the status of their employment has changed.  They are no

10    longer active.  And they could have come here and sought

11    a TRO from the Court when they were still active status,

12    but did not, and waited until they're now on leave of

13    absence, and it has been almost two weeks since they've

14    been on leave of absence, but could have come here to

15    this Court before.

16          That makes this case very different from the

17    ones where courts have issued a TRO.  Putting aside the

18    merits of those TROs, the procedural posture are very

19    different, and there is no basis to issue a TRO here,

20    where the conduct that -- where the request is to

21    preserve the status quo or to freeze the parties in

22    place, the events have changed, where they're now on

23    leave of absence, where now their duties have been

24    reassigned and are covered by someone else, their badges

25    and computers are no longer with them.

1    There's no irreparable harm that would accrue

2    if the Court granted a TRO in this instance.  Given

3    that, and given the fact that, as a matter of law,

4    plaintiffs have not stated a viable irreparable harm

5    recognized.  So even if the Court was inclined to sort

6    of freeze the parties in place pending an arbitration,

7    plaintiffs still have to satisfy that irreparable harm

8    element, which has not been satisfied in this instance.

9    THE COURT:  Thank you, counsel.  We only have

10   a few minutes left.  If you have a few brief comments

11   before the Court makes comments?

12   MR. WEIL:  I would just -- thank you, Your

13   Honor.  I was almost done.

14   And based on the balance of the hardships in

15   this case, Your Honor, it certainly would be more of a

16   hardship not only just to the Lab if employees were

17   allowed to continue to work unvaccinated, but also the

18   other employees at the Lab who could be exposed to them.

19   And based on all of the elements that are

20   required for preliminary injunction, plaintiff hasn't

21   satisfied any of them to get either a TRO or a

22   preliminary injunction.

23   With that, Your Honor, I'll wrap up.

24   THE COURT:  Thank you, counsel.  And thank

25   you, counsel, for being observant of the time restraints

1    that we had today.

2            I'm not going to issue a ruling today.  I'm

3    going to allow counsel for the defendant to file a reply

4    to the response and the motion to compel arbitration.

5    I'm going to give you an abbreviated deadline.

6            Mr. Wallace, can you make November 5th?  That

7    is next Friday.  Are you able to make that deadline for

8    your reply?

9            MR. WALLACE:  Yes, Your Honor.  Thank you.

10            THE COURT:  All right.  Counsel, I appreciate

11    everything that you all, Mr. Artuso on behalf of the

12    plaintiffs and counsel for the defendants, have put

13    before the Court.  You have made this very well briefed

14    and given the Court a lot of information.

15            I look forward, Mr. Wallace, to your reply

16    brief by next Friday, November 5th, and then the Court

17    will issue a ruling after that time.

18            Anything further, Mr. Artuso, on behalf of the

19    plaintiffs?

20            MR. ARTUSO:  Nothing further.  Well, actually,

21    Your Honor, just a quick question.  Would the Court care

22    to be informed of any decisions from other districts?

23    These cases are sort of pending all over, and our finger

24    may be on the pulse of those.  So I just don't know what

25    the Court's preference would be with respect to that.

1          THE COURT:  If you feel it's applicable, I'll

2     be happy to consider it or to be informed of it.  You

3     should notify defense counsel of it, obviously, before

4     you provide that to the Court.

5          MR. ARTUSO:  Yes, ma'am.

6          MR. WEIL:  And, Your Honor, I assume that goes

7     both ways, for both parties?  Because I'll submit that I

8     think if you put those decisions on a scale, the ones

9     that favor us are a lot heavier.

10          THE COURT:  Absolutely, counsel.  And, again,

11     if you would provide it to Mr. Artuso on behalf of the

12     plaintiffs before you provide it to the Court.  I

13     appreciate it, counsel.  We will look forward to further

14     briefing.

15          We'll be in recess regarding this matter.

16     Have a good weekend.

17          MR. WEIL:  Thank you, Your Honor.

18          MR. ARTUSO:  Thank you, Your Honor.

19          (Proceedings concluded at 11:30 a.m.)

20

21

22

23

24

25

```
 1    UNITED STATES OF AMERICA

 2    DISTRICT OF NEW MEXICO

 3

 4              CERTIFICATE OF OFFICIAL REPORTER

 5              I, Julie Goehl, RDR, CRR, RPR, RMR,

 6    New Mexico CCR #95, Federal Official Realtime Court

 7    Reporter, in and for the United States District Court

 8    for the District of New Mexico, do hereby certify that

 9    pursuant to Section 753, Title 28, United States Code,

10    that the foregoing is a true and correct transcript of

11    the stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page

13    format is in conformance with the regulations of the

14    Judicial Conference of the United States.

15              Dated this 2nd day of November, 2021.

16

17              _____

18              JULIE GOEHL
                FEDERAL OFFICIAL COURT REPORTER
                Registered Diplomate Reporter
19              Registered Professional Reporter
                Registered Merit Reporter
20              Certified Realtime Reporter
                NM Certified Court Reporter #95
21              333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102
22              Phone:  (505)348-2209
                Email:  Julie_Goehl@nmd.uscourts.gov
23

24

25
```